# EXHIBIT "A"

FILED: NEW YORK COUNTY CLERK 06/22/2021 02:50 PM
NYSCEF DOC. NO. 4

INDEX NO. 650693/2021

RECEIVED NYSCEF: 06/22/2021

24-12328-dsj    Doc 11-1    Filed 01/10/25    Entered 01/10/25 13:19:08    Exhibit
Exhibit A    Pg 2 of 29

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY

---

ALAN A. PARDEE,

Plaintiff,

— against —

MERCURY CAPITAL ADVISORS GROUP GP, LLC, MERCURY CAPITAL ADVISORS, LLC, and MERCURY CAPITAL ADVISORS GROUP, LP,

Defendants.

Index No. 650693/2021

**AMENDED COMPLAINT**

---

Plaintiff Alan A. Pardee ("Plaintiff" or "Pardee"), by and through his attorneys Mandel Bhandari LLP, for his Complaint against Defendants Mercury Capital Advisors Group GP, LLC ("Mercury GP"), Mercury Capital Advisors, LLC ("Mercury LLC") and Mercury Capital Advisors Group, LP ("Mercury LP" and collectively "Mercury") states as follows:

## PRELIMINARY STATEMENT

1.      This is a case about a Wall Street Firm that has, over the past ten years, remade itself into a safe space for white men only.  Women and persons of color employed by Mercury, to the extent they still exist in the United States, are subject to regular harassment, denigration, and unequal treatment.  Even as companies and their boards throughout this nation have been called to account for systemic racism and sex discrimination, Michael Ricciardi ("Ricciardi"), Mercury's Chief Executive Officer, has dug in his heels and refused even to consider the impact of his racist and misogynistic conduct on the company, its clients and its faithful employees who simply seek an equal right to a career.

FILED: NEW YORK COUNTY CLERK 06/22/2021 02:50 PM
INDEX NO. 650693/2021
NYSCEF DOC. NO. 4
RECEIVED NYSCEF: 06/22/2021

24-12328-dsj    Doc 11-1    Filed 01/10/25    Entered 01/10/25 13:19:08    Exhibit
Exhibit A    Pg 3 of 29

2.  And despite its stated commitment to Environmental, Social and Governance ("ESG") and Diversity & Inclusion ("D&I") standards, Mercury's ultimate owner, Investcorp, has aided, enabled, and excused Ricciardi's persistent misconduct ever since its acquisition of the company in 2019. Mercury's Board of Directors, appointed by Investcorp, have turned a blind eye to racism and misogyny, and have even instructed employees to support Ricciardi when complaints arose.

3.  The Plaintiff, Alan A. Pardee ("Pardee"), is one of the original founders of Mercury. A man of Dominican and American descent, Pardee was proud of having built a world-class placement agency where talented women of all backgrounds and African Americans, Latins, Asian Americans and other persons of color were well represented and their skills put to daily use on behalf of Mercury's clients.

4.  But others within Mercury viewed its diversity as a failing to be corrected. Ricciardi, acting as Mercury's Chief Executive Officer, has embarked on a multi-year effort to eliminate women and persons of color from all positions of authority within the business. Through a combination of terminations and targeted harassment, Ricciardi eliminated many of the women and racial minorities who had joined the firm at its founding or shortly thereafter. In their place, Ricciardi hired and promoted dozens of white men in his own image. In fact, Ricciardi often referred to "making Mercury in his own image", a biblical reference to God's creation of man.

5.  The realization of Ricciardi's biased vision is illustrated in Mercury's whitewashed demographics. As a result of his hiring and termination policy, Mercury's professional roster (excluding assistants) has gone from approximately 40% female in the United

2

States to only two newly hired women.[1]  And while 36% of Mercury's United States

professionals were African American or African-Latino-American at its founding, today

Mercury's offices **globally** have zero African Americans.  Indeed, the United States team is now

approximately 86% white.

6.        When Pardee challenged Ricciardi's behavior, in particular his incessant

harassment of the few professional women that remained, Pardee was sidelined, effectively

demoted, and threatened with further reprisals.  Pardee was repeatedly told, not just by Ricciardi,

but also by Mercury's Board of Directors, that he needed to "have [Ricciardi's] back", as stated

by Investcorp's Co-CEO, Rishi Kapoor, when it came to the repeated complaints of sex

discrimination levied by female employees.  And Pardee was criticized for "coddling the

women" and "letting them run the place" when he sought to intercede on their behalf.

7.        Ricciardi's bias was obvious not merely from his hiring and termination policy

but also his hostile and threatening behavior toward women, the racially insensitive stories to

which he subjected employees, and his overtly bigoted treatment of minority employees.  Indeed,

while still at Merrill Lynch, he once made a white employee and Pardee, a person of color, sing

"Ebony and Ivory" together at a work function.

8.        When Mercury was sold to Investcorp in November 2019, Pardee hoped that the

new Board of Directors would rein in Ricciardi's behavior and take affirmative steps toward

correcting the problems within the company.  Both before and after the sale was consummated,

Pardee spoke at length to key officers at Investcorp, including its Co-CEO, Rishi Kapoor, Dave

Tayeh, Head of North American Private Equity, Anand Radhakrishnan, then Head of Post-

Acquisition activities for North American Private Equity, and Rajiv Sheth.  He told each man

---

[1]        After taking into account two announced departures in the U.S.

about the employment discrimination problems within the business and Ricciardi's hostile and unstable behavior and decision-making.

9.      Messrs. Kapoor, Tayeh, and Sheth each became Mercury Board Members after the acquisition and had the power to correct the problems within the business. But despite acknowledging Ricciardi's racist and misogynist behavior – indeed, comparing him unfavorably to former Representative and defender of white supremacy Steve King of Iowa – Investcorp and the new Mercury Board chose to double down on enabling Ricciardi's worst impulses. When he complained, Pardee was branded a troublemaker, and Ricciardi was given leave to finally remove him from the business entirely.

10.     In fact, Investcorp has its own history of constructive discharge against African Americans. For example, Dave Tayeh, the Head of North American Private Equity at Investcorp, expressed a strong desire to push out the one African American Managing Director at Investcorp, who was long-tenured and had risen through the ranks from Associate. Tayeh raised this topic with Pardee several times in the Spring and early Summer of 2019. Tayeh and Investcorp decided to sideline their African American long-time colleague and remove him from the new fund and have him be responsible for exiting his investments to work his way out of a job or perhaps resign. Little did Pardee know then that a similar fate awaited him. Shortly after, Investcorp's only female Managing Director in the North American Private Equity team also left.

11.     Indeed, one presentation about Investcorp's North American private equity activities, dated September 2018, showed that its North American Private Equity Advisory Director Board consisted of nine men and one woman, none of whom were African Americans. The same presentation identified Investcorp's United States Private Equity Independent Board Directors, a group of eight people with, again, no African Americans, six men and two women.

4

FILED: NEW YORK COUNTY CLERK 06/22/2021 02:50 PM
NYSCEF DOC. NO. 4
INDEX NO. 650693/2021
RECEIVED NYSCEF: 06/22/2021
24-12328-dsj    Doc 11-1    Filed 01/10/25    Entered 01/10/25 13:19:08    Exhibit
Exhibit A    Pg 6 of 29

The presentation also profiled a number of portfolio companies.  Out of 81 people leading those companies today, only two are African Americans and only 15 are women.  Virtually all senior management at the identified companies consists of white males.

12.     With Investcorp's apparent blessing, in an effort to convince Pardee to quit, Ricciardi stepped up his harassment.  Over the course of months, Pardee was further marginalized within the company, several of his responsibilities taken from him and appropriated by Ricciardi or handed off to Ricciardi's favored white men.  Indeed, many of Pardee's duties were assigned to Tom Donovan, a white man whom Ricciardi wanted to make Head of Origination despite his utter lack of experience and qualifications.

13.     In addition, Pardee was forced to accept a substantial cut in his future compensation and was subject to near daily verbal assaults, occasionally punctuated with physical threats.  For example, Ricciardi threatened to "[expletive] throw [Pardee] through that wall," where the wall in question was Ricciardi's in-office display of beer cans, lighters, and other frat-house memorabilia in a purpose-built set of well-lit shelves.

14.     Ricciardi was also permitted to take charge of a "360 Review" of Pardee in which Ricciardi hand-picked the individuals permitted to comment on Pardee's performance so that he could engineer a dishonest and humiliating process.  The results were wildly inconsistent with the results of the prior 360 review done firmwide in which Pardee received glowing reviews.

15.     When these threats, demotions and humiliations failed to dislodge him, Mercury escalated matters.  In July of 2020, Pardee was informed by the Mercury Board that he was being formally demoted, exiled from the Mercury offices, and his remaining responsibilities stripped from him.  These actions were unambiguous violations of his employment agreement with Mercury and constituted an effective termination of his employment.

5

FILED: NEW YORK COUNTY CLERK 06/22/2021 02:50 PM
INDEX NO. 650693/2021
NYSCEF DOC. NO. 4
24-12328-dsj    Doc 11-1    Filed 01/10/25    Entered 01/10/25 13:19:08    Exhibit
Exhibit A    Pg 7 of 29
RECEIVED NYSCEF: 06/22/2021

16.     As a consequence, Pardee has no choice but to bring this action to hold Mercury accountable for its discriminatory practices and its failure to honor its contractual promises.

## THE PARTIES

17.     Plaintiff Pardee resides in New York, New York.

18.     Defendant Mercury LLC is a limited liability company whose principal place of business is located at 225 Liberty Street, New York, New York 10281.

19.     Defendant Mercury GP is a limited liability company whose principal place of business is located at 225 Liberty Street, New York, New York 10281.

20.     Defendant Mercury LP is a limited liability company whose principal place of business is located at 225 Liberty Street, New York, New York 10281.

21.     Mercury LLC, Mercury LP, and Mercury GP operate under common ownership and control as a single economic entity.  Mercury LP owns Mercury LLC, and Mercury GP is the general partner of Mercury LP.  On information and belief, FINRA registered representatives with Mercury LLC have employment contracts with Mercury GP.

## JURISDICTION AND VENUE

22.     The Court has jurisdiction over this action pursuant to CPLR § 301.  Defendants reside within the state of New York and are properly subject to general *in personam* jurisdiction for suits commenced within the state of New York.  Jurisdiction is also proper pursuant to CPLR § 302, as this dispute concerns discriminatory acts and contractual breaches that occurred within the state of New York.

23.     Venue is proper in this Court pursuant to CPLR § 503 because all parties resided in New York County when the suit was commenced.

6

24.     In addition, Mercury GP consented to the exclusive jurisdiction of the state and federal courts located in the City of New York in connection with disputes arising under the October 23, 2019 Amended and Restated Employment Agreement ("Employment Agreement") between Mercury GP and Pardee.

## FACTUAL ALLEGATIONS

**Alan Pardee Background**

25.     Plaintiff Alan A. Pardee is a highly successful financial professional who has worked on Wall Street for more than thirty-two years.  He is of Dominican and American descent.  Pardee holds a B.A. from Princeton and an M.B.A. from the Stanford Graduate School of Business.

26.     For the last two decades, Pardee has focused on raising capital through private placements.  Over the course of his career, he has won fund raising assignments from clients and led these fund raisings and capital raises for private equity, real estate, credit, venture capital, infrastructure and secondaries funds, private companies and other investment opportunities.  He led the raising of over $110 billion raised from sovereign wealth funds, public and corporate pension funds, insurance companies, endowments, family offices, foundations, funds of funds, and consultants all over the world.

27.     Pardee has successfully led fundraisings for some of the industry's biggest names, including KKR, Bain Capital, Coller Capital, Silver Lake Partners, Thomas H Lee Partners, Walton Street Capital, Welsh Carson Anderson & Stowe, Madison International Realty, Calera Capital and Forest City Enterprises.

7

28.     Pardee formerly served as a Managing Director in and Chief Operating Officer of Merrill Lynch's Private Equity Funds Group.  He was also the Global Head of Merrill Lynch's Real Estate Private Capital Group within its Global Commercial Real Estate Division.

29.     While at Merrill Lynch, Pardee assembled a team to raise private capital for the bank's many private equity and real estate clients.  This team was enormously talented and drew upon individuals from a variety of demographic backgrounds.  While some firms within the finance industry suffer from a lack of diversity on multiple dimensions, Pardee's team included highly qualified women and persons of color among its investment professionals.

30.     In September of 2008, during the height of the financial crisis, Merrill Lynch was purchased by Bank of America.  Pardee's group was one of the many business units acquired.  It continued to operate within Bank of America Merrill Lynch for several months after the acquisition.

**Mercury Capital Advisors**

31.     In 2009, Pardee, along with Michael Ricciardi and Enrique Cuan, founded Mercury LP, taking with them substantially all of the team from the Private Equity Funds Group at Bank of America Merrill Lynch.  The firm was structured as a limited partnership.  Defendant Mercury GP was created at or around that time to serve as the General Partner of that limited partnership.  Defendant Mercury LLC was created to serve as a FINRA member SEC-registered broker-dealer.

32.     Mercury was envisioned as a global, full-service placement agent, enabling private equity and real estate funds to raise substantial capital from institutional investors through private placements.  Mercury also specialized in raising capital for what the industry refers to as "direct deals," capital raises for private companies and investment vehicles focused

8

on specific assets.  This business plan drew upon Pardee's deep connections with potential clients throughout the world and his decades of experience in private placements.

33.     As founders, Pardee, Ricciardi, and Cuan all made substantial investments in Mercury and held ownership interests in the company.  In addition, they raised outside capital from a number of private investors.  Before its 2019 acquisition by Investcorp, Mercury was operated by a Board of Directors, composed of Ricciardi, Pardee, Cuan and representatives of these outside investors.

34.     At its founding, Mercury's employees reflected the diverse group that Pardee had assembled at Merrill Lynch.  Globally, approximately 45% of the professional staff were women and 25% were African American or African-Latino-American.  In the United States these percentages were approximately 40% and 36%.  And women and racial minorities also made up a significant percentage of high-level employees.  At its founding, five of Mercury's partners were women, of which three were in the United States, including its head of North American distribution.  And African Americans were represented at the Managing Partner (Pardee, an African-Latino-American), Partner, Principal, Vice President, and Associate level.

35.     In the years that followed, Mercury grew significantly, expanding its team and opening offices throughout the world.  From its initial locations in New York, London, Los Angeles and Tokyo, Mercury expanded to include offices in Boston, Chicago, San Francisco, New Delhi, and Singapore.  Pardee also structured an alliance with HMC Itajuba in Latin America that expanded Mercury's reach through HMC's offices in Bogota, Lima, Santiago, Rio de Janeiro, Sao Paulo and Mexico City.

**Mercury Discriminates Against Women and Racial Minorities**

36.     While Pardee was proud of the diverse company that he had helped to create, others had a different vision.  Ricciardi viewed the presence of women and ethnic minorities as, at best, an annoyance, and at worst a weakness to be corrected.  Even as Mercury continued to grow from approximately 25 employees to approximately 50 he set about altering its demographics, replacing women and ethnic minorities with white men like himself.  In fact, Ricciardi often referred to "making Mercury in his own image," a biblical reference to God's creation of man.

37.     If anyone, like Pardee, was not the sort of white man that Ricciardi wanted to surround himself with and look at each day, they did not fit in Ricciardi's Mercury men's club. Employees who did not fit Ricciardi's "image" were subject to Ricciardi's bullying, microaggressions, sidelining, hostile behavior, taking of others' opportunities to perform and a constant stream of belittling and verbally violent comments.

38.     In 2012, Ricciardi fired Mercury's only African-American partner.  Within a year the other African-American employees other than Pardee, who is African-Latino-American, had all left the firm.  While no legal action was filed, at least one of the employees complained informally of having suffered race discrimination at the hands of Ricciardi.

39.     On information and belief, the following former employees suffered race discrimination at the hands of Ricciardi:  Natasha Farquharson, Monica Davis and Erick Bronner.

40.     Ricciardi was also active in eliminating women from Mercury.  Some were fired and others subjected to cruel taunts, merciless bullying and assurances that they had no future at the company.  Many had their economic opportunities to perform taken away from them and

10

reallocated to white males.   Ricciardi also frequently held back in paying already earned

compensation to women on pretextual reasons never applied to white men.

41.     None of this was secret, and Ricciardi made his attitudes well known.   For

example, in one weekly meeting with the whole firm held in New York and via conference call,

Ricciardi was asked if he would consider extending Mercury's maternity leave policy from three

months to four.   He grew angry and irate, claiming that such a thing was impossible because it

would "bankrupt the firm."   When Pardee tried to reason with Ricciardi, pointing out how little

the policy was likely to cost, Ricciardi refused to consider it, replying with invective and scorn.

42.     Ricciardi's disdain for women was also manifest in his grossly unprofessional and

misogynistic speech.   Ricciardi made use of the "C-word" in Pardee's presence, both as a noun

and an adjective (adding a y).   Ricciardi frequently directed it at two men, one a board member

and one who held an observer seat on Mercury's board, both prior to the sale of Mercury to

Investcorp.   When Pardee pushed back on the use of this language,  Ricciardi responded that

"there is no other way to say it."   Ricciardi was also fond of the word "pussy," using it as an all-

purpose insult for any man who disagreed with him, to reflect his belief that they were

effeminate or unmanly.

43.     Because of this ongoing behavior, the company has been repeatedly accused of

sex discrimination, both by departing employees or by women who remained on staff.   On

information and belief, the following current and former employees were subject to sex

discrimination at the hands of Ricciardi: Kristen Belfi, Julie Bauch, Martie d'Apice, Lisa

Chaves, and Lisa Lee among others.

44.     Pardee regularly objected to this behavior, criticizing Ricciardi to his face.   In

management committee meetings, Pardee regularly pushed for the company to aggressively

11

recruit women and racial minorities and to pay earned compensation to them, as the fair and equitable thing to do, and to ensure that Ricciardi's terminations and mistreatment of women and minorities did not result in a white men only club. Ricciardi rejected these efforts as wrong-headed and a waste of time. He refused to consider any plan that would increase the racial or gender diversity at Mercury. He criticized Pardee for letting women "run the Firm".

45.     In 2016 Ricciardi became CEO of Mercury. After his promotion, he put an end to all management committee meetings, in part so that he could stop hearing complaints from Pardee about his discriminatory and unethical behavior.

46.     After becoming CEO, Ricciardi began staffing up a new business line exclusively with white men. This business never made any revenue of consequence and had to be funded in part by the underpaying of or delaying earned payments to the remaining women and Pardee.

47.     Under Ricciardi's leadership, diversity plummeted. As of today, the firm has zero African Americans and only two newly hired women in professional roles, after taking into account two pending announced departures of women, in the U.S, where the firm is otherwise populated almost entirely with white men.

48.     Ricciardi also did away with the on-campus recruiting program that Pardee led. Under that program Mercury had sought the best candidates from a selection of colleges across the country, aiming to produce a diverse workforce from a variety of ethnicities, religions, races, and backgrounds. Instead, Ricciardi replaced these efforts with, in effect, an affirmative action program for white males. For several years he filled junior positions with the male children of his friends from New Jersey or from other parts of his life.

49.     Ricciardi's overt bigotry was not limited to hiring and firing decisions. He also subjected his employees to racially insensitive stories about his "humorous" interactions with

African Americans.  For example, on numerous occasions he told Pardee a story in which

Ricciardi followed an African American colleague on his way to the office and whispered a

violent death threat into the colleague's ear that specifically mentioned the man's race.

50.     And to the extent Ricciardi interacted with racial minorities at work, he treated

them with disrespect and hostility.  On occasion, this behavior rose to absurd levels, such as

when he made a white employee and Pardee sing "Ebony and Ivory" at a work function while

still at Merrill Lynch.

51.     While Ricciardi was the driving force behind much of the discrimination at

Mercury, his actions were aided and enabled by others in management positions.  In particular,

Enrique Cuan, despite being regularly informed of Ricciardi's behavior, turned a blind eye to the

impact on employees or the business.  This may have been driven by personal prejudice, or

Cuan's substantial personal financial debts to Ricciardi.

52.     Lending money to the white men of Mercury was a management tool that

Ricciardi used with great frequency.  These men were also paid, at times, in advance of

performance that might trigger a payment.  In contrast, female employees at Mercury were

frequently the ones who had earned compensation that Ricciardi mysteriously delayed and, as a

result, were due payments in arrears.

53.     Ricciardi also provided non-monetary benefits to white men while keeping a very

different set of policies for the other professionals in the United States.  Ricciardi allowed

Richard Johnson, who commuted from Connecticut and was a competitive bodybuilder before

his years as an alternative investment salesman, to work from the Core Club in Midtown

Manhattan.  This permitted Johnson to exercise at the gym during business hours rather than

travel downtown to Lower Manhattan to the Mercury offices.  Another white man, Nick Savasta,

13

was also allowed to essentially never work from the office. In contrast, women would be yelled at for taking days off to be with family or for working from home. They would also have to read condescending "Rules for the Road" or other edicts written by Ricciardi, Johnson, or Tom Donovan another white male favored by Ricciardi. Indeed, while white male Mercury employees could spend their days working out at the gym, other employees would be admonished for things such as going for walks during lunch.

54.     The culture Ricciardi created with this team, added poison to the increasingly toxic atmosphere. Employees working on iFunds, a team staffed exclusively with Ricciardi's white male hires, routinely put down women, making comments that women did not belong in the workplace. One Ricciardi protégé likened the expected growth of the iFunds business to a male erection in a long story told to the whole firm. Ricciardi would spend virtually all his time with this all-white fraternity, often holding exclusionary events in his office, at local bars, or his home.

**Sale to Investcorp**

55.     In August of 2018, Mercury executed a letter of intent to sell itself to Investcorp, a global alternatives investment management company.

56.     Pardee took charge of the due diligence process on behalf of Mercury. The level of scrutiny that Investcorp required was extremely thorough and took the better part of two years.

57.     In connection with that diligence process, Pardee worked closely with representatives from Investcorp at the highest levels, including its Co-CEO Rishi Kapoor, Dave Tayeh, Head of North American Private Equity, Anand Radhakrishnan, Head of Post-Acquisition activities for North American Private Equity, Rajiv Sheth, a Vice President, and Tim Mattar, Head of Distribution efforts globally at Investcorp.

14

58.     During those discussions, Pardee was frank about the challenges that Mercury

faced, not merely with its business lines, but also with Ricciardi's behavior.  He made no secret

of the issues Mercury had with female employees concerning account responsibility,

compensation opportunities and changes of the statements about the guidelines for commissions.

Indeed, a change in this environment was one of the reasons that Pardee had pushed for a sale of

the company in the first place.

59.     Pardee was personally assured multiple times by Tayeh and Kapoor that when

Investcorp took control of the Mercury Board of Directors that Ricciardi would be reined in and

that the corporate culture would shift.  Indeed, Investcorp employees often expressed

bewilderment at Ricciardi's behavior, with Anand Radhakrishnan comparing him unfavorably to

former Representative and defender of white supremacy Steve King of Iowa.  Radhakrishnan

specifically said that he could see Ricciardi saying similar things to what caused King to be

removed from his House committees at that time.

60.     Tayeh also compared Ricciardi unfavorably to Donald Trump, claiming that both

exhibited unpredictable behavior.  He also said that Ricciardi and Hazem Ben-Gacem,

Investcorp's Co-CEO both had a "Trumpian disregard for the truth."

61.     Ricciardi could not keep his misogynistic views and behavior to himself even

during due diligence meetings with Investcorp.  For example, Ricciardi attended a meeting on or

about October 12, 2018 with Tayeh, Radhakrishnan, Sheth and Mattar over lunch at the Four

Seasons restaurant.  While there, Ricciardi told a story of how an administrative colleague left

her phone in Ricciardi's office. While he had it on his desk, Ricciardi accessed the Tinder online

dating application on the device and made virtual overtures on her behalf to, as he described it,

many of the most "tattooed and biker-looking" of the men on screen. When she came back to

15

FILED: NEW YORK COUNTY CLERK 06/22/2021 02:50 PM
NYSCEF DOC. NO. 4

INDEX NO. 650693/2021

RECEIVED NYSCEF: 06/22/2021

24-12328-dsj    Doc 11-1    Filed 01/10/25    Entered 01/10/25 13:19:08    Exhibit
Exhibit A    Pg 17 of 29

retrieve her phone and saw what he had done, she yelled "Motherf—ker!" at him. He laughed at

her. Ricciardi told the story to the Investcorp people very proud of himself and with much

laughter and Sheth then sat up straight and asked concerned due diligence questions. Ricciardi

was unfazed.

62.    Toward the end of the due diligence process Ricciardi's conduct toward women

became a more substantial issue. In or about May of 2019, Kristen Belfi accused Ricciardi of

discriminating against her because of her sex, treating her with regular abuse and scorn, taking

her economic opportunities and giving them to Ricciardi's favored white men, Richard Johnson

and Tom Donovan, and refusing to pay her promised compensation. Shortly thereafter, another

woman, Julie Bauch, came forward with similar complaints against Ricciardi.

63.    Mercury was forced to quietly settle both matters in order to ensure that the deal

with Investcorp would close. This was done with Investcorp's encouragement and close

monitoring. During those negotiations Pardee pushed for the company to fairly compensate the

women for their work and take their allegations seriously. In return, Pardee was viciously

criticized by Ricciardi and his allies for "coddling the women' and "letting them run the place."

64.    Attuned to this issue, Investcorp asked for and received information about the

compensation and account coverage of women and men at Mercury over time. In a due

diligence meeting on May 15, 2019, an Investcorp employee specifically remarked about the

compensation of six women over time and noted the "small pay" of one of the women. In

another conversation that same day, without attorneys present, Anand Radhakrishnan asked

Pardee numerous questions about gender discrimination accusations and the history of the team.

16

FILED: NEW YORK COUNTY CLERK 06/22/2021 02:50 PM
NYSCEF DOC. NO. 4

INDEX NO. 650693/2021

RECEIVED NYSCEF: 06/22/2021

24-12328-dsj    Doc 11-1    Filed 01/10/25    Entered 01/10/25 13:19:08    Exhibit
Exhibit A    Pg 18 of 29

**The Sale Closes and Ricciardi Retaliates Against Pardee**

65.     In November of 2019, the sale to Investcorp closed.  Investcorp took control of the Mercury Board of Directors and appointed Rishi Kapoor, Investcorp's Co-CEO, Dave Tayeh, Investcorp's Head of North American Private Equity, Tim Mattar, Head of Distribution globally, Jan Erik Back, Investcorp's CFO and Raj Sheth, a Vice President, who had done a fair amount of the work on the acquisition, to serve on its behalf.  Pardee, Ricciardi, and Cuan received new employment contracts, the terms of which are described below.

66.     Pardee hoped that with this change in ownership that the problems at Mercury could be addressed, or at least mitigated.  But instead, the problems got worse.  With the backing of the new directors, Ricciardi was given leave to continue his discriminatory actions.

67.     In fact, Investcorp had its own history of constructive discharge against African Americans.  For example, Dave Tayeh, the Head of North American Private Equity at Investcorp, expressed a strong desire to push out the one African American Managing Director at Investcorp, who was long-tenured and had risen through the ranks from Associate.  Tayeh raised this topic with Pardee several times in the Spring and early Summer of 2019.  Tayeh and Investcorp decided to sideline their African American long-time colleague and remove him from the new fund and have him be responsible for exiting his investments to work his way out of a job or perhaps resign.  Little did Pardee know then that a similar fate awaited him.

68.     Indeed, one presentation about Investcorp's North American private equity activities, dated September 2018, showed that its North American Private Equity Advisory Director Board consisted of nine men and one woman, none of whom were African Americans. The same presentation identified Investcorp's United States Private Equity Independent Board Directors, a group of eight people with, again, no African Americans, six men and two women.

17

FILED: NEW YORK COUNTY CLERK 06/22/2021 02:50 PM
INDEX NO. 650693/2021
NYSCEF DOC. NO. 4
RECEIVED NYSCEF: 06/22/2021

24-12328-dsj    Doc 11-1    Filed 01/10/25    Entered 01/10/25 13:19:08    Exhibit
Exhibit A    Pg 19 of 29

The presentation also profiled a number of portfolio companies. Out of 81 people leading those companies today, only two are African Americans and only 15 are women. Virtually all senior management at the identified companies consists of white males.

69.     And now that Pardee was no longer needed for the due diligence process and negotiations of the transaction, Ricciardi was soon given permission by Investcorp to remove Mercury's highest-ranking person with African roots, eliminating one more person of color from the rolls and punishing the man who had tried to protect women and racial minorities from his mistreatment.

70.     In early 2020 Julie Bauch came forward with another series of complaints about sex discrimination by Ricciardi. When Pardee attempted to intercede on her behalf in multiple conversations with Tayeh, he was shot down. In a meeting held in February of 2020 Pardee was told by Kapoor that "we all have to have [Ricciardi's] back on this."

71.     With his new freedom from Investcorp's support, multiple times after the sale, Ricciardi said to Pardee that Mercury was not "going to hire any more [expletive] women," as they were too much trouble.

72.     As a result, more women continued to leave Mercury, tired of Ricciardi's mistreatment, including Melissa Oberman Pietroforte in December of 2019 and Elizabeth DiCioccio in April of 2020.

73.     DiCioccio's payments of commissions due were always significantly mysteriously held up by Ricciardi relative to her male peer Richard Johnson, both Co-Heads of Global Distribution.

74.     The same was true of another female employee's contractual compensation. At the insistence of Ricciardi, she was paid only half the amount due, with the other half withheld

18

FILED: NEW YORK COUNTY CLERK 06/22/2021 02:50 PM
NYSCEF DOC. NO. 4

INDEX NO. 650693/2021

RECEIVED NYSCEF: 06/22/2021

24-12328-dsj   Doc 11-1   Filed 01/10/25   Entered 01/10/25 13:19:08   Exhibit
Exhibit A   Pg 20 of 29

for many months.  Pardee was forced to push back against this treatment along with Mercury's Chief Financial Officer.  The timing of these payments became a topic with Investcorp as they struggled to understand the logic and timing of payments.

75.     Investcorp also met with Ricciardi, Pardee and Cuan to discuss potential retention allocations.  Investcorp learned that Pardee would have paid a sizable retention to Elizabeth DiCioccio, but Dave Tayeh and Investcorp agreed with Ricciardi to pay her much less so that the remaining money could be given to Nick Savasta.  Savasta arrived shortly before the deal was signed, fully aware of the Investcorp deal, and, unlike DiCioccio, had no track record of stellar performance at Mercury.  Dave Tayeh expressed surprise that a new hire would receive any retention bonus at all, much less one as generous as this, particularly given the importance Investcorp placed on DiCioccio, but Tayeh quickly agreed to Ricciardi's plan.

76.     Indeed, it quickly became clear that Tayeh was uninterested in hearing complaints about Ricciardi's misconduct.  After Pardee attempt to intercede on behalf of Julie Bauch and other employees targeted by Ricciardi, Tayeh stopped communicating regularly with Pardee, cutting him off from key management and decision-making at Mercury.  Instead, Ricciardi was given further license to force Pardee from the company.

77.     For example, in December of 2019, Ricciardi ordered Pardee to agree to a reduction in the retention bonus that had been promised him in connection with the Investcorp sale.  Indeed, Ricciardi demanded that Pardee sign over hundreds of thousands of dollars in compensation to Ricciardi personally.  This was memorialized in a document Investcorp issued in March of 2020.

78.     Ricciardi also started rumors that Pardee was going to be forced out of the company imminently.  These rumors circulated widely among staff at every level, undermining

FILED: NEW YORK COUNTY CLERK 06/22/2021 02:50 PM
NYSCEF DOC. NO. 4

INDEX NO. 650693/2021

RECEIVED NYSCEF: 06/22/2021

24-12328-dsj    Doc 11-1    Filed 01/10/25    Entered 01/10/25 13:19:08    Exhibit
Exhibit A    Pg 21 of 29

Pardee's ability to lead and making employees reluctant to be too closely associated with him for fear of reprisal.

79.     Pardee was also informed that a "360 Review" of his performance had been commissioned from Alix Partners, another company owned by Investcorp.  While Pardee was happy to receive an honest assessment of his performance, he was dismayed to learn that the process would be run by Ricciardi and substantially all of the assessments of Pardee would be made by individuals hand-picked by Ricciardi.  This process was unambiguously designed to humiliate Pardee and/or create a record to use as a justification for his termination.  Notably, Alix Partners's current leadership team of 20 people is virtually all white, with only three women or 15% of the total and no African Americans.

80.     When these actions failed to convince Pardee to quit, Mercury and its Investcorp board members stepped up their retaliatory campaign.  In July of 2020, Pardee was told by Rishi Kapoor and Dave Tayeh that he was being demoted, stripped of all management responsibilities, and literally moved out of the Mercury offices.  This was a termination in all but name and unambiguously violated Pardee's contract of employment, which guaranteed, among other things, his title, responsibilities, and office location.  As such, Pardee declined to accept this new, punitive job assignment and left Mercury.

**Contract with Mercury**

81.     At the time of his termination, Pardee's employment was governed by the October 23, 2019 Amended and Restated Employment Agreement (the "Employment Agreement") between him and Mercury GP.

82.     This Employment Agreement guaranteed, among other things, that Pardee would serve as a Managing Partner of Mercury GP and that he "shall have such authority and

responsibility as is customarily attendant to such position." The Employment Agreement further guaranteed that Pardee would be "entitled to act as a Managing Partner of the Company for so long as [he was] employed by the Company."

83.    With respect to office location, the Employment Agreement guaranteed that, unless Pardee "agreed in writing" otherwise, the "principal office location" from which he "performed [his] services" would be the Mercury offices at 225 Liberty Street in Manhattan.

84.    In addition to his annual compensation, including salary and bonus, the Employment Agreement also promised Pardee substantial "Retention Bonuses" payable in three tranches of $1,488,888.89 in January of 2021, January of 2022, and January of 2023.

85.    To ensure that Mercury could not arbitrarily avoid payment of this compensation, the Employment Agreement drastically curtailed Mercury GP's ability to terminate Pardee, prohibiting any termination except for cause until December 31, 2021.

**COUNT ONE**
**(BREACH OF CONTRACT)**
**(against Mercury GP)**

86.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every preceding paragraph as if fully set forth herein.

87.    Plaintiff entered into a valid and enforceable contract for employment with Mercury GP, the October 23, 2019 Amended and Restated Employment Agreement (the "Employment Agreement")

88.    Plaintiff performed all of his obligations under the Employment Agreement.

89.    Defendant Mercury GP breached the Employment Agreement by, *inter alia*:

- Stripping Plaintiff of his position as "Managing Partner" in violation of § 2(a) of the Employment Agreement;

21

- Stripping Plaintiff of his Management Authority in violation of § 2(c) of the Employment Agreement;

- Changing Plaintiff's office location in violation of § 2(e) of the Employment Agreement;

- Constructively terminating Plaintiff Without Cause in violation of § 5(a) of the Employment Agreement;

90.    In consequence of these breaches, Plaintiff has suffered damages in an amount to be determined at trial but believed to be not less than $6,600,000.

91.    Plaintiff is entitled to prejudgment interest at the statutory rate of 9% per year.

## COUNT TWO
### VIOLATION OF NEW YORK EXECUTIVE LAW § 296, subd. 1(a)
### RACE DISCRIMINATION
### (against all Defendants)

92.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every preceding paragraph as if fully set forth herein.

93.    Defendants have discriminated against Plaintiff in violation of Section 296, subdivision 1(a), of the New York Executive law by harassing, demoting and ultimately constructively terminating Plaintiff because of his race, and permitting, enabling, and encouraging its agents to engage in such behavior.

94.    Defendants have engaged in, *inter alia*, the following unlawful and/or discriminatory conduct:

- Forcing Plaintiff to surrender hundreds of thousands of dollars in compensation;

- Starting rumors that Plaintiff was to be forced out imminently and otherwise undermining his authority with his subordinates;

- Subjecting Plaintiff to relentless verbal harassment and physical threats in a manner never done to similarly situated white employees;

22

- Stripping Plaintiff of his position as "Managing Partner";

- Stripping Plaintiff of his Management Authority;

- Changing Plaintiff's office location in violation of Plaintiff's Employment Agreement;

- Constructively terminating Plaintiff without Cause;

95.     Plaintiff is not the only victim of Defendants' conduct and other employees of color were also discriminated against, including, on information and belief: Natasha Farquharson, Monica Davis and Erick Bronner.

96.     Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff.

97.     As a result of Defendants' conduct alleged in this complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, lost employment opportunities, other financial loss, and non-economic damages.

98.     By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of the New York Executive Law.

## COUNT THREE
## VIOLATION OF NEW YORK CITY ADMINISTRATIVE CODE § 8-107, subd. 1(a)
## RACE DISCRIMINATION
### (against all Defendants)

99.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every preceding paragraph as if fully set forth herein.

100.     Defendants have discriminated against Plaintiff in violation of Section 8-107, subdivision 1(a), of the New York City Administrative Law by harassing, demoting and ultimately constructively terminating Plaintiff because of his race, and permitting, enabling, and encouraging its agents to engage in such behavior.

23

101. Defendants have engaged in, *inter alia*, the following unlawful and/or discriminatory conduct:

- Forcing Plaintiff to surrender hundreds of thousands of dollars in compensation;

- Starting rumors that Plaintiff was to be forced out imminently and otherwise undermining his authority with his subordinates;

- Subjecting Plaintiff to relentless verbal harassment and physical threats in a manner never done to similarly situated white employees;

- Stripping Plaintiff of his position as "Managing Partner";

- Stripping Plaintiff of his Management Authority;

- Changing Plaintiff's office location in violation;

- Constructively terminating Plaintiff without Cause;

102. Plaintiff is not the only victim of Defendants' conduct and other employees of color were also discriminated against including, on information and belief: Natasha Farquharson, Monica Davis and Erick Bronner.

103. Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

104. As a result of Defendants' conduct alleged in this complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, lost employment opportunities, other financial loss, and non-economic damages.

105. By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of the New York City Administrative Code, including an award of punitive damages.

24

24-12328-dsj    Doc 11-1    Filed 01/10/25    Entered 01/10/25 13:19:08    Exhibit
Exhibit A    Pg 26 of 29

**COUNT FOUR**
**VIOLATION OF NEW YORK EXECUTIVE LAW § 296**
**RETALIATION**
**(against all Defendants)**

106.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every preceding paragraph as if fully set forth herein.

107.    Defendants have a policy of discriminating against women by, *inter alia*, hiring them at lower rates than men, terminating them at higher rates than men, paying them lower compensation than similarly situated men, limiting their opportunities to earn bonuses and commission compensation relative to similarly situated men, taking investing accounts or fund raising clients from women to give to men, paying them more slowly in cash than their similarly situated male co-workers, and subjecting them to unwarranted hostility and criticism not directed toward their similarly situated male counterparts.

108.    The victims of this harassment include on information and belief: Kristen Belfi, Julie Bauch, Martie d'Apice, Lisa Chaves and Lisa Lee, among others.

109.    Plaintiff complained about these behaviors, in particular those carried out by Defendants' CEO Michael Ricciardi.  Ricciardi was accused of sex discrimination by multiple women, including Kristen Belfi and Julie Bauch.  Plaintiff directed these complaints to Ricciardi himself as well as to members of Defendants' Board of Directors.

110.    In retaliation for Plaintiff's complaints, Defendants took the following actions:

- Forcing Plaintiff to surrender hundreds of thousands of dollars in compensation;

- Starting rumors that Plaintiff was to be forced out imminently and otherwise undermining his authority with his subordinates;

- Subjecting Plaintiff to relentless verbal harassment and physical threats in a manner never done to employees who did not complain about sex discrimination;

25

FILED: NEW YORK COUNTY CLERK 06/22/2021 02:50 PM
INDEX NO. 650693/2021
NYSCEF DOC. NO. 4
RECEIVED NYSCEF: 06/22/2021

24-12328-dsj    Doc 11-1    Filed 01/10/25    Entered 01/10/25 13:19:08    Exhibit
Exhibit A    Pg 27 of 29

- Stripping Plaintiff of his position as "Managing Partner";

- Stripping Plaintiff of his Management Authority;

- Changing Plaintiff's office location in violation;

- Constructively terminating Plaintiff without Cause;

111.    Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff.

112.    As a result of Defendants' conduct alleged in this complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, lost employment opportunities, other financial loss, and non-economic damages.

113.    By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available under the New York Executive law.

### COUNT FIVE
### VIOLATION OF NEW YORK CITY ADMINISTRATIVE CODE § 8-107, subd. 7
### RETALIATION
### (against all Defendants)

114.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every preceding paragraph as if fully set forth herein.

115.    Defendants have a policy of discriminating against women by, *inter alia*, hiring them at lower rates than men, terminating them at higher rates than men, paying them lower compensation than similarly situated men, limiting their opportunities to earn bonuses and commission compensation relative to similarly situated men, taking investing accounts or fund raising clients from women to give to men, paying them more slowly in cash than their similarly situated male co-workers, and subjecting them to unwarranted hostility and criticism not directed toward their similarly situated male counterparts.

26

116.    The victims of this harassment include on information and belief: Kristen Belfi,

Julie Bauch, Martie d'Apice, Lisa Chaves and Lisa Lee, among others.

117.    Plaintiff complained about these behaviors, in particular those carried out by

Defendants' CEO Michael Ricciardi.  Ricciardi was accused of sex discrimination by multiple

women, including Kristen Belfi and Julie Bauch.  Plaintiff directed these complaints to Ricciardi

himself as well as to members of Defendants' Board of Directors.

118.    In retaliation for Plaintiff's complaints, Defendants took the following actions:

- Forcing Plaintiff to surrender hundreds of thousands of dollars in compensation;

- Starting rumors that Plaintiff was to be forced out imminently and otherwise undermining his authority with his subordinates;

- Subjecting Plaintiff to relentless verbal harassment and physical threats in a manner never done to employees who did not complain about sex discrimination;

- Stripping Plaintiff of his position as "Managing Partner";

- Stripping Plaintiff of his Management Authority;

- Changing Plaintiff's office location in violation;

- Constructively terminating Plaintiff without Cause;

119.    Defendants' conduct has been intentional, deliberate, willful, malicious, reckless,

and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive

damages.

120.    As a result of Defendants' conduct alleged in this complaint, Plaintiff has suffered

and continues to suffer harm, including but not limited to lost earnings, lost benefits, lost

employment opportunities, other financial loss, and non-economic damages.

121.     By reason of Defendants' discrimination, Plaintiff is entitled to all remedies

available under the New York City Administrative Code, including an award of punitive

damages.

### PRAYER FOR RELIEF

WHEREFORE the Plaintiff prays that this Court:

A.     Award nominal, compensatory, and punitive damages to Plaintiff in an amount to

be determined at trial but believed to be not less than $6,600,000.00;

B.     Award litigation costs and expenses to Plaintiff, including, but not limited to,

reasonable attorneys' fees;

C.     Award back pay, front pay, lost benefits, preferential right to jobs, and other

damages for lost compensation and job benefits with pre-judgment and post-judgment interest

suffered by Plaintiff.

D.     Order Defendants to make whole Plaintiff by providing him with appropriate lost

earnings and benefits and other affirmative relief; and

E.     Award any additional and further relief as this Court may deem just and proper.

**DATED:**     New York, New York
               June 22, 2021

MANDEL BHANDARI LLP
80 Pine Street, 33rd Floor
New York, New York 10005
(212) 269-5600

By: _____
     Robert Glunt

*Attorneys for Plaintiff Alan A. Pardee*

28