# EXHIBIT "B"

## SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

| | | | |
|---|---|---|---|
| PRESENT: | **HON. NANCY M. BANNON** | PART | 61M |
| | *Justice* | | |

-------------------------------------------------------------------------------X

ALAN A PARDEE,

                          Plaintiff,

               - v -

MERCURY CAPITAL ADVISORS GROUP GP, LLC,
MERCURY CAPITAL ADVISORS, LLC, MERCURY
CAPITAL ADVISORS GROUP, LP,

                      Defendants.

-------------------------------------------------------------------------------X

| | |
|---|---|
| INDEX NO. | 650693/2021 |
| MOTION DATE | |
| MOTION SEQ. NO. | 008 009 |

**DECISION + ORDER ON
MOTION**

The following e-filed documents, listed by NYSCEF document number (Motion 008) 108 -127, 178-191, 236 - 241

were read on this motion to/for                 JUDGMENT - SUMMARY         .

The following e-filed documents, listed by NYSCEF document number (Motion 009) 131-173, 192 - 229, 233, 234, 235, 242

were read on this motion to/for                 JUDGMENT - SUMMARY         .

## I.    <u>INTRODUCTION</u>

      The plaintiff, Alan A. Pardee, alleges that the defendants breached his employment agreement, constructively terminated his employment, and subjected him to racially discriminatory and retaliatory conduct. Pardee's amended complaint, filed on June 22, 2021, alleges causes of action for breach of contract, as well as racial discrimination and retaliation in violation of the New York State and New York City Human Rights Laws. The defendants' answer to the amended complaint, filed on August 2, 2021, asserts four counterclaims sounding in breach of contract, breach of the duty of loyalty, and tortious interference with contract. Pardee now moves, pursuant to CPLR 3212, for summary judgment dismissing all of the counterclaims (MOT SEQ 008). Defendants oppose the motion and separately move for

650693/2021    PARDEE, ALAN A vs. MERCURY CAPITAL ADVISORS
Motion No.    008 009

Page 1 of 29

summary judgment dismissing the amended complaint (MOT SEQ 009), which motion is in turn

opposed by Pardee.  Pardee's motion is granted in part and defendants' motion is denied.

## II.    BACKGROUND

The defendants, Mercury Capital Advisors Group GP, LLC, Mercury Capital Advisors,

LLC, and Mercury Capital Advisors Group, LP, operate as a single enterprise (collectively,

"Mercury") based in New York City.  Mercury is a global private capital advisor focused on

private fund placements, asset management, and secondary advisory that assists private equity

and real estate funds by raising substantial capital from institutional investors through private

placements.  Pardee, who identifies as "a man of Dominican and American descent", is a former

managing partner and head of origination at Mercury, which he co-founded in 2009 along with

managing partner and CEO Michael Ricciardi and managing partner Enrique Cuan. Pardee

alleges that over the past ten years, Mercury "remade itself into a safe space for white men only."

1. **The Mercury Contracts**

In August 2018, Mercury executed a letter of intent to sell itself to Investcorp.  The sale

of the company closed on November 1, 2019.  In connection with the sale of Mercury to

Investcorp, the managing partners each executed a new employment agreement with Mercury,

dated May 22, 2019, which was followed by an Amended and Restated Employment Agreement

with Mercury dated October 23, 2019.  As relevant here, Section 2 of Pardee's Employment

Agreement, titled "Responsibilities and Reporting," provided that:

(a) General. In serving in the Designated Position [of Managing Partner], you shall
have such authority and responsibility as is customarily attendant to such
position, subject to such directions and limitations as may reasonably be
specified from time to time by [Mercury] and as are consistent with your
position.

(c) Management Authority. You are entitled to act as a Managing Partner of the
Company for so long as you are employed by the Company.

(e) <u>Location</u>. Unless otherwise agreed in writing by you and Purchaser, the principal office location from which you perform your services hereunder will be (i) at 225 Liberty Street in Manhattan, New York City, as long as the current lease for such office remains in effect and (ii) thereafter at the same office location or such other location in downtown Manhattan, New York City, as you and Purchaser agree.

The Employment Agreement also provided that Pardee could not be terminated "other than for Cause . . . prior to December 31, 2021."

In connection with his new Employment Agreement, Pardee also executed a pair of restrictive covenants, the Merger Agreement Covenant and the Employment Agreement Covenant. Section 1 of the Merger Agreement Covenant, titled "Non-Solicitation of Clients," provides that:

For a period of five (5) years following the Closing (the "Restricted Period"), [Pardee] shall not, and shall cause his, her or its Affiliates not to, directly or indirectly in any capacity through any Person or contractual arrangement, engage in the following acts or assist others to do so:

(a) (i) solicit, accept, conduct or perform any Private Placement and Advisory Services from or for any Client (as hereinafter defined) or third-party sub-placement agent engaged by any Group Company (as hereinafter defined), [or]
(iii) take any action that is designed or intended to have the effect of discouraging any Client, or third-party sub-placement agent engaged by any Group Company, from maintaining the same Private Placement and Advisory Services business relationships with the Group Companies[.]

The Merger Agreement Covenant defines a "Client" as any entity or person "who engages or has engaged any Group Company to provide Private Placement and Advisory Services during the two-year period prior to the time at which any determination shall be made that any such [entity or person] is a Client, and while [Pardee] was an employee of a Group Company." The "Group Companies" are the various related entities comprising Mercury. As

relevant here, "Private Placement and Advisory Services" is defined as "(i) private placements (including to institutional investors) of newly issued or secondary interests in, or co-investment opportunities with, private equity, mezzanine, infrastructure, real estate, venture capital, distressed debt and hedge funds and/or (ii) private placements of equity into private companies and investments, and public companies[.]"

Section 4 of the Merger Agreement Covenant, titled "Permitted Activities," provides that:

Nothing set forth in the foregoing Sections 1-3 of this Agreement shall prohibit [Pardee] from (a) being employed by any single Client or potential Client (any such single Client or potential Client, a "Client Employer"); provided that [Pardee] shall, in [his] capacity as an employee of such Client Employer (and otherwise), comply with the provisions of Sections 1-3 of this Agreement; provided, further, that, solely in [Pardee's] capacity as an employee of such Client Employer and for the benefit of (x) any fund managed and sponsored by such Client Employer or (y) any portfolio company beneficially owned by such fund (and not, for the avoidance of doubt, in respect of the foregoing clauses (x) and (y), for the benefit of any other Person), [Pardee] may solicit third-party investors to provide capital commitments for any such fund and investments in such portfolio companies[.]

Section 1 of the Employment Agreement Covenant, titled "Non-Solicitation of Clients," provides that:

(b) [Pardee] covenants and agrees that after [his] employment with [Mercury] ends, [he] will not, for [the 24 months following the termination of his employment with Mercury], directly or indirectly, engage in the following acts or assist others to do so:

(i) solicit, accept, conduct or serve any business from any . . . [Mercury Client] for whom [Pardee] worked on behalf of [Mercury] or about whom [Pardee] learned any confidential information (including the fact that such Person is a Client) in the 12-month period prior to [Pardee's] termination of employment[.]

Section 7 of the Employment Agreement Covenant provides that "[t]he obligations of [Pardee] under this Agreement shall be independent of, and unaffected by, and shall not affect, other agreements, if any, binding [Pardee] which apply to [his] business activities during and/or subsequent to [his] employment by [Mercury]."

## 2. Pardee's Exit

According to Pardee, in January or February 2020, he heard from multiple Mercury employees that he was likely to be terminated or otherwise forced out of the company. Other company employees, including Michael Manfredonia, the COO, and Luke Sanders, another former partner, heard similar rumors. This coincided with instructions that Pardee claims to have received from Rishi Kapoor (Kapoor), the co-CEO of Investcorp and a member of the Mercury Board, that he was to "have Ricciardi's back" in connection with various sex discrimination claims that had been alleged against Ricciardi by Mercury employees.

In late February 2020, Pardee reached out to Juan Sabater, a partner and co-president of Valor Equity Partners ("Valor"), a Mercury client, to solicit him about potential employment at Valor. Employment discussions between Pardee and Valor continued over the next several months in a slow and sporadic fashion.

In March 2020, Mercury retained AlixPartners to conduct an organizational health review and a comprehensive leadership assessment of Mercury and its Managing Partners. On April 24, 2020, AlixPartners released its comprehensive "360 Review" report ("360 Review"), which gave Pardee low marks for effective leadership and trustworthiness, noting that he was "widely viewed as a problematic leader and an impediment to Mercury's ability to adapt and change," and that the Origination function, of which he was the head, "is perceived as reactive, lacking in process or strategy, and highly dysfunctional to the point of being 'broken.'"

650693/2021   PARDEE, ALAN A vs. MERCURY CAPITAL ADVISORS          Page 5 of 29
Motion No.  008 009

5 of 29

On June 20, 2020, Pardee e-mailed Valor his "thanks and eager anticipation as it relates to my joining Valor in the near term," though there were still "details to sort out in the coming days." On July 7, 2020, fearing that he was going to be terminated imminently, Pardee "urgently" pushed Valor to send him an offer of employment letter.

On July 13, 2020, AlixPartners presented Pardee with his individualized assessment which channeled the same negative feedback in the 360 Review. On July 14, 2020, after receiving Pardee's individualized assessment, Kapoor and David Tayeh, Investcorp's Head of Private Equity – North America and a Mercury Board member, met with Pardee remotely. According to Mercury, the purpose of the meeting was to discuss the results of the 360 Review and the Mercury Board's potential responses to it, including suggestions to give Pardee a non-executive vice-chairman position, to move Pardee out of the Mercury office and have him work at Investcorp's office, and to re-assign some of Pardee's managerial duties in the Origination department. According to Pardee, the purpose of the meeting was to discuss changes to his position at Mercury that had already been decided upon and that amounted to his constructive termination, including the removal of executive and managerial responsibilities and his banishment from the Mercury office, with the ultimate aim of terminating his employment entirely at the first opportunity.The same day, July 14, 2020, Valor emailed Pardee a draft offer of employment letter. On July 16, 2020, Pardee received a signed employment offer letter from Valor, which he immediately countersigned and returned to Valor. Pardee informed Mercury the next day that he was resigning from the company effective August 16, 2020, and that he would be taking a job at Valor. Pardee joined Valor on September 8, 2020.

### 3.  The Valor Engagement Agreement

Prior to Pardee's departure from Mercury, Valor had engaged Mercury to provide Private Placement and Advisory Services in connection with "Fund V," an investment fund created by Valor. This engagement was formalized in an agreement dated December 29, 2019 (the "Valor

650693/2021    PARDEE, ALAN A vs. MERCURY CAPITAL ADVISORS                           Page 6 of 29
Motion No.  008 009

6 of 29

Engagement Agreement"). Section 5 of the Valor Engagement Agreement provided, *inter alia*, for Mercury to be paid a minimum fee of $1 million, and an aggregate fee of $6.5 million if the Valor Fund V reached $1.5 billion or more. Section 8 of the Engagement Agreement contained a "key man" provision, pursuant to which Valor was entitled to immediately terminate the Engagement Agreement if Pardee ceased being employed by Mercury or otherwise ceased servicing the Valor account on Mercury's behalf, without continued payment of fees that would otherwise be payable were the agreement terminated for another reason.

On August 7, 2020, while still employed at Mercury, Pardee, using his personal email address, sent an email to Sabater, the co-president of Valor, proposing a "carve out" amendment to the Valor Engagement Agreement that would allow Valor to appoint, at its discretion, additional placement agents outside the U.S. "while preserving for Mercury names contacted and progresses by Mercury, if any, in such jurisdictions."

Pardee now maintains, and Mercury disputes, that he repeatedly advised Mercury prior to his departure that Valor was dissatisfied with Mercury's services and was likely to renegotiate or terminate its Engagement Agreement if performance did not improve. Valor did, in fact, ultimately seek to renegotiate the fee structure of the Engagement Agreement. By letter agreement dated "as of September 10, 2020"—two days after Pardee joined Valor—Valor and Mercury agreed to modify the Valor Engagement Agreement to include the "carve out" amendment proposed earlier by Pardee, as well as a change in the fee structure under Section 5, replacing the $6.5 million aggregate fee due if the Valor Fund V reached $1.5 billion or more with a bonus fee of $1.5 million (on top of the $1 million minimum fee). The Valor Fund V closed at $1.7 billion. Mercury was paid $2.5 million, $4 million less than what it would have received under the Valor Engagement Agreement's original terms.

### 4. **The Instant Litigation**

650693/2021   PARDEE, ALAN A vs. MERCURY CAPITAL ADVISORS                    Page 7 of 29
Motion No.  008 009

7 of 29

Pardee's amended complaint alleges five causes of action: (1) breach of the Amended and Restated Employment Agreement based on allegations that Mercury stripped him of his management authority and position as managing partner, changed his office location, and constructively terminated his employment; (2)-(3) racial discrimination and (4)-(5) retaliation, in violation of the New York State and New York City Human Rights Law, based on the allegations regarding the changes to his position and his constructive termination, as well as his alleged replacement with a white male employee, following his complaints regarding the company's treatment of female employees, and allegations that he was subjected to verbal harassment by Ricciardi, who has a purported history of racially discriminatory conduct.

In its answer, Mercury asserts counterclaims for (1) breach of the Merger Agreement Covenant, (2) breach of the Employment Agreement Covenant, (3) breach of the duty of loyalty, and (4) tortious interference with contract with respect to the Valor Engagement Agreement.

By an order dated February 25, 2022, the court denied a pre-answer motion by the plaintiff to dismiss the defendants' counterclaims pursuant to CPLR 3211(a)(1) and (a)(7) (MOT SEQ 002). The instant summary judgment motions were filed upon completion of discovery.

## III.    **DISCUSSION**

The proponent of a motion for summary judgment pursuant to CPLR 3212 must establish prima facie entitlement to judgment as a matter of law by submitting proof in admissible form demonstrating the absence of triable issues of fact.  See Winegrad v New York Univ. Med. Ctr., 64 NY2d 851 (1985); Zuckerman v City of New York, 49 NY2d 557 (1980). Should the movant meet that burden, it then becomes incumbent upon the party opposing the motion to come forward with proof in admissible form sufficient to raise a triable issue of fact. See Alvarez v Prospect Hosp., 68 NY2d 320 (1986); Zuckerman v City of New York, supra; O'Halloran v City of New York, 78 AD3d 536 (1st Dept. 2010). However, if the initial burden is not met by the

650693/2021   PARDEE, ALAN A vs. MERCURY CAPITAL ADVISORS                    Page 8 of 29
Motion No.  008 009

8 of 29

movant, summary judgment must be denied regardless of the sufficiency of the opposing papers.
See Winegrad v New York University Medical Center, supra; O'Halloran v City of New York,
78 AD3d 536 (1st Dept. 2010). Similarly, "[s]ummary judgment should not be granted where
there is any doubt as to the existence of a factual issue or where the existence of a factual issue is
even arguable." Asabor v Archdiocese of New York, 102 AD3d 524, 527 (1st Dept. 2013). This
is because "summary judgment is a drastic remedy, the procedural equivalent of a trial. It should
not be granted if there is any doubt about the issue.'" Bronx-Lebanon Hosp. Ctr. v Mount Eden
Ctr., 161 AD2d at 480 (1st Dept. 1990) quoting Nesbitt v Nimmich, 34 AD2d 958, 959 (2nd Dept.
1970); see Andre v Pomeroy, 35 NY2d 361 (1974); Aguilar v City of New York, 162 AD3d 601
(1st Dept. 2018).

## 1. Pardee's Summary Judgment Motion

### a. Breach of the Merger Agreement Covenant

Pardee seeks summary judgment dismissing Mercury's *first* counterclaim, which alleges
that Pardee violated Sections 1(a)(i) and 1(a)(iii) of the Merger Agreement Covenant. Mercury
alleges that Pardee violated Section 1(a)(i) by soliciting and accepting a job at Valor and
conducting and performing services for Valor, as this constitutes the "solicit[ation], accept[ance],
conduct or perform[ance] [of] Private Placement and Advisory Services" for a client. Mercury
further alleges that Pardee violated Section 1(a)(iii) by (1) both leaving Mercury and going to
work for Valor, as this increased the likelihood that Valor would invoke the Valor Engagement
Agreement's "key man" provision, thereby providing it leverage to renegotiate the Engagement
Agreement to Mercury's detriment, and (2) suggesting to Valor, while still employed by
Mercury, the "carve out" amendment to the Valor Engagement Agreement, which Mercury
contends was self-evidently detrimental to Mercury.

Pardee argues that Section 4, the "Permitted Activities" provision, of the Merger
Agreement Covenant, a copy of which he submits in support of his motion, expressly permits

him to take a job with Valor, as it provides that "[n]othing set forth in the foregoing Sections 1-3 of this Agreement shall prohibit" him from "being employed" by "any single Client" of Mercury, and, in the course of such employment, from "solicit[ing] third-party investors to provide capital commitments" for "any fund managed and sponsored by such Client." He further submits his own affidavit in support of the motion, as well as Sabater's deposition testimony, which demonstrate that Pardee has complied with the requirements of Section 4, as he works for only a single Mercury client, Valor, and his sole job at Valor is to solicit third-party investors to provide capital commitments for funds managed and sponsored by Valor. Based on these submissions, Pardee demonstrates, *prima facie*, that his employment at Valor does not violate Sections 1(a)(i) and 1(a)(iii) of the Merger Agreement Covenant.

Mercury, in opposition, fails to raise a triable issue of fact with respect to Section 1(a)(i). Mercury does not dispute that Pardee works only for Valor and that his sole function at Valor is to solicit third-party investors to provide capital commitments for funds managed and sponsored by Valor. As such, it does not raise an issue of fact as to whether Pardee's employment at Valor falls within the "Permitted Activities" carveout of Section 4. Instead, it argues that while Section 4 permits Pardee to be employed by Valor, it also provides that, in the course of such employment, Pardee must still "comply with the provisions of Sections 1-3 of this Agreement," which Pardee has not done because his job function at Valor falls within the Merger Agreement Covenant's definition of "Private Placement and Advisory Services." This contention is unavailing.

It is well settled that "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." Greenfield v Philles Records, Inc., 98 NY2d 562, 569 (2002); see Marin v Constitution Realty, LLC, 28 NY3d 666 (2017); MHR Capital Partners LP v Presstek, Inc., 12 NY3d 640, 645 (2009); Chetrit v HPS Invest. Partners, LLC, 226 AD3d 423 (1st Dept. 2024). Further, "[a]ll parts of a contract must be read in

harmony to determine its meaning." Bombay Realty Corp v. Magna Carta, Inc., 100 NY2d 124, 127 (2003). This is because it is a cardinal rule of contract construction that no provision should be ignored nor any agreement interpreted so as to render any provision meaningless. See Cortlandt St. Recovery Corp. v Bonderman, 31 NY3d 30 (2018); Beal Savings Bank v Sommer, 8 NY3d 318 (2007); Tini v Alliancebernstein L.P., 108 AD3d 409 (1st Dept. 2013); Kolmar Americas, Inc. v Bioversal, Inc., 89 AD3d 493 (1st Dept. 2011).

As relevant here, Section 4 of the Merger Agreement Covenant has three parts: (1) it permits Pardee's employment by any single Mercury client, notwithstanding the general prohibition set forth in Section 1(a)(i) that might otherwise prevent this, provided that (2) Pardee otherwise comply Section 1(a)(i) in the course of such employment, except that (3) "[Pardee] may solicit third-party investors to provide capital commitments" for "any fund managed and sponsored by such Client[.]"  Assuming, *arguendo*, that "solicit[ing] third-party investors to provide capital commitments" falls within the definition of "Private Placement and Advisory Services," as Mercury contends, then Section 4 must be read to allow Pardee to engage in this species of "Private Placement and Advisory Services" so long as he does so only for the benefit of Valor and the funds it manages and sponsors, and so long as he does not otherwise violate Section 1(a)(i) by "solicit[ing], accept[ing], conduct[ing] or perform[ing] any Private Placement and Advisory Services from or for any [Mercury] Client" other than Valor.

Similarly unavailing is Mercury's assertion that, while Section 4 may allow Pardee to be employed at Valor, he nonetheless violated Section 1(a)(i) because he "solicited" such employment.   Section 1(a)(i), by its express terms, does not prohibit the solicitation of employment, only of Private Placement and Advisory Services.  Moreover, such a reading is inconsistent with the plain and ordinary meaning of Section 4, which specifically and unambiguously permits employment with a single Mercury client.  Section 4 does not state that such employment is permitted only if it falls into Pardee's lap without any effort on his part to

650693/2021   PARDEE, ALAN A vs. MERCURY CAPITAL ADVISORS                          Page 11 of 29
Motion No.  008 009

11 of 29

seek it out, nor would this be a reasonable interpretation of the provision.  See Gilbane Bldg.
Co./TDX Const. Corp. v St. Paul Fire & Marine Ins. Co., 143 AD3d 146, 151 (1st Dept. 2016) (a
contract is unambiguous if "the language has a definite and precise meaning, unattended by
danger of misconception in the purport of the agreement itself and concerning which there is no
reasonable basis for a difference of opinion").

Mercury also does not raise a triable issue of fact with respect to whether Pardee violated
Section 1(a)(iii) by leaving his employment at Mercury and taking up employment at Valor.
Section 1(a)(iii) provides that, for five years after the Investcorp acquisition of Mercury, Pardee
"shall not ... take any action that is designed or intended to have the effect of discouraging any
Client ... from maintaining the same Private Placement and Advisory Services business
relationships with [Mercury]."  Mercury submits the Valor Engagement Agreement, the
September 10, 2020 letter agreement amending the Engagement Agreement, the deposition
testimony of Pardee and Sabater, and an affidavit from Ricciardi to demonstrate that by leaving
his employment at Mercury and going to Valor, Pardee empowered Valor to invoke the Valor
Engagement Agreement's "key man" provision, thereby giving it leverage to force Mercury into
an amendment of the Engagement Agreement that ultimately cost Mercury $4 million in fees.
However, as already discussed, Section 4 of the Merger Agreement Covenant unambiguously
permits Pardee to leave his employment with Mercury and to go work for Valor, notwithstanding
any general prohibitions set forth in Sections 1-3 of the Agreement.

Moreover, Mercury's submissions do not demonstrate that Pardee's actions in seeking
and accepting employment at Valor were "designed or intended" to have a detrimental effect on
Mercury, as required to establish a violation of Section 1(a)(iii).  Sabater testified that it was his
idea to renegotiate the Valor Engagement Agreement, that this was unrelated to Pardee, and that
he had concerns regarding Mercury's performance that predated Pardee's hire.  Similarly,
Ricciardi testified that, although the Valor Fund V ultimately closed at $1.7 billion, Mercury was

slow in initially raising capital for the fund, and that, before his departure, Pardee often complained that Mercury was not working to raise money for the fund. The fact that Sabater also testified that he expressly raised the idea of renegotiating Mercury's fees only after Pardee joined Valor does not demonstrate that Pardee was involved in that decision or that his actions were designed or intended to facilitate that outcome.

However, Mercury does raise an issue of fact with respect to Section 1(a)(iii) by its submission of the August 7, 2020 email that Pardee sent to Sabater while still a Mercury employee concerning the proposed "carve out" amendment to the Valor Engagement Agreement. Ricciardi testified that the amendment would have the effect of allowing Valor to eliminate some of the business it was giving Mercury and was thus self-evidently to Mercury's detriment. And while Pardee testified, in effect, that he was responding to a proposal by Sabater, and that the specific language he proposed to add was limited to "preserving for Mercury names contacted and progresses by Mercury," which was intended to protect Mercury's interests, it is not evident from the email itself that Pardee's contribution to the proposed amendment was limited in the manner he describes. Nor does his testimony explain why he sent the email from his personal email address or why he was corresponding at all with Sabater about amendments to the Valor Engagement Agreement while still employed by Mercury, both of which are facts that might allow an inference of the necessary bad intent.

Therefore, Pardee's motion is denied to the extent it seeks dismissal of the counterclaim for breach of the Merger Agreement Covenant.

### b. Breach of the Employment Agreement Covenant

Pardee's motion is likewise denied to the extent it seeks summary judgment dismissing Mercury's *second* counterclaim for breach of the Employment Agreement Covenant. By its terms, the Employment Agreement Covenant prohibits Pardee, following the end of his

650693/2021    PARDEE, ALAN A vs. MERCURY CAPITAL ADVISORS
Motion No.  008 009

Page 13 of 29

13 of 29

employment at Mercury, from, *inter alia*, conducting or serving any business from any Mercury client for whom Pardee worked on behalf of Mercury in the 12-month period prior to his termination of employment.  It is undisputed that Pardee did some work for Valor on behalf of Mercury in the year preceding his termination of employment.

Pardee argues that because the Merger Agreement Covenant and Employment Agreement Covenant were negotiated by the same people and signed on the same date as part of the same transaction, they must be read together, and that Section 4 of the Merger Agreement Covenant, which permits his employment by Valor, should therefore control.  See 1471 Second Corp. v NAT of NY Corp., 162 AD3d 449, 450 (1st Dept. 2018) (it is a "settled principle that agreements executed at substantially the same time and related to the same subject matter are regarded as contemporaneous writings and must be read together as one") (internal quotation marks omitted). However, even read together, it is possible to harmonize the two covenants by reading the Employment Agreement Covenant as modifying Section 4 of the Merger Agreement Covenant to specifically exclude employment by clients for whom Pardee worked in the year preceding the end of his employment at Mercury, while leaving intact his permitted employment by any single client that does not violate this condition.  See Bank of Tokyo-Mitsubishi, Ltd., New York Branch v Kvaerner a.s., 243 AD2d 1, 8 (1st Dept. 1998) (it is a rule of contract construction that, "if there is an inconsistency between a general provision and a specific provision of a contract, the specific provision controls").

Nonetheless, it is unclear why the parties would have chosen to modify the "Permitted Activities" provision of the Merger Agreement Covenant in this way, via a separate agreement, rather than by including all the relevant terms and conditions in the same contract.  Moreover, Section 7 of the Employment Agreement Covenant provides that "[t]he obligations of [Pardee] under this Agreement shall be independent of, and unaffected by, and shall not affect, other agreements, if any, binding [Pardee] which apply to [his] business activities during and/or

650693/2021   PARDEE, ALAN A vs. MERCURY CAPITAL ADVISORS
Motion No.  008 009

Page 14 of 29

14 of 29

subsequent to [his] employment by [Mercury]."  Mercury contends that, in light of this

provision, the Employment Agreement Covenant and the Merger Agreement Covenant may not

be read together so as to abridge or alter Pardee's obligations under the former by virtue of the

latter.  By the same token, however, this language would not allow the Employment Agreement

Covenant to "affect" and modify the Permitted Activities provision in Section 4 of the Merger

Agreement Covenant in the manner suggested above, in which case the two agreements, though

negotiated together and signed simultaneously as part of the same transaction, would appear to

be in conflict.

Thus, at the very least, there is an ambiguity as to the intent of the parties with respect to

the interaction, if any, between the Merger Agreement Covenant and Employment Agreement

Covenant.  See Chimart Assoc. v Paul, 66 NY2d 570, 573 (1986) (a contract is ambiguous if "[it]

is reasonably susceptible of more than one interpretation").  "Where . . . contract language is

reasonably susceptible of more than one interpretation, . . . extrinsic or parol evidence may be . .

. permitted to determine the parties' intent as to the meaning of that language."  Nationstar

Mortg., LLC v Hoar, 209 AD3d 864, 866 (2nd Dept. 2022).  Here, the parties have not offered

evidence regarding their intent that would allow the court to resolve this ambiguity.  As such,

there is a triable issue of fact regarding the parties' intent with respect to the interaction between

these provisions.  See Hartford Acc. & Indem. Co. v Wesolowski, 33 NY2d 169, 172 (1973) ("If

there is ambiguity in the terminology used . . . and determination of the intent of the parties

depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be

drawn from extrinsic evidence, then such determination is to be made by the jury."); Prime Prop.

& Cas. Ins. Inc. v Imperio Transp. Corp, 211 AD3d 650, 651 (1st Dept. 2022) (same); Yizheng

Zhao v Evans, 154 AD3d 624, 626 (1st Dept. 2017) (when contractual intent cannot be

determined from the four corners of the contract, the issue of contractual intent is normally an

issue of fact for the jury).

Pardee also argues that the two restrictive covenants that Mercury seeks to recover upon are generally void as against public policy and unenforceable as a matter of law because they lack reasonable geographic limitations and include Mercury's entire client base without regard to whether Pardee ever serviced those clients or whether those clients came to Mercury because of a prior relationship with Pardee.  These arguments are unavailing.

To be sure, unlike similar covenants incident to a sale of a business, "a covenant given by an employee that he will not compete with his employer has been regarded much more strictly because of the 'powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood'." Shearson Lehman Bros. Holdings, Inc. v Schmertzler, 116 AD2d 216, 223 (1st Dept. 1986) quoting Purchasing Assocs., Inc. v Weitz, 13 NY2d 267, 246 (1963). Conversely, "an employer has a legitimate interest in preventing former employees from exploiting or appropriating the goodwill of a client or customer, which had been created and maintained at the employer's expense, to the employer's competitive detriment."  BDO Seidman v Hirschberg, supra at 392.  However, to be enforceable, "an anticompetitive covenant ancillary to an employment agreement must be reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the public, and not unreasonably burdensome to the employee." Crown IT Servs., Inc. v Koval-Olsen, 11 AD3d 263, 264 (1st Dept. 2004) citing BDO Seidman v Hirshberg, 93 NY2d 382 (1999).  A restraint is not reasonable if, inter alia, it is greater than required for the protection of the legitimate interest of the employer.  BDO Seidman v Hirschberg, supra at 388 (citations omitted).

Here, Pardee fails to submit evidence to establish that the challenged client-based restrictions are greater than required to protect Mercury's legitimate interests in protecting client relationships.  See BDO Seidman v Hirshberg, supra; Reed, Roberts Assoc. v Strauman, 40 NY2d 303 (1976); Crown IT Servs., Inc. v Koval–Olsen, supra. In other words, Pardee has not met his prima facie burden of demonstrating that the challenged covenants are overbroad or

unduly burdensome.  See TBA Glob., LLC v Proscenium Events, LLC, 114 AD3d 571 (1st Dept. 2014).  And, given the issue of fact previously discussed regarding the interaction, if any, between these covenants, the scope of the restriction imposed remains unclear.

### c.  **Breach of the Duty of Loyalty**

Mercury alleges that Pardee breached his duty of loyalty by virtue of his August 7, 2020, email to Sabater while still a Mercury employee concerning the proposed "carve out" amendment to the Valor Engagement Agreement.  As already discussed, based on the deposition testimony submitted by the parties, there are questions of fact regarding the extent and nature of Pardee's involvement in the formulation of the subject amendment, whether and to what extent the amendment adversely impacted the amount of business Mercury received from Valor, and whether Pardee's involvement in formulating the amendment was actually protective of Mercury's interests.  As such, Pardee's motion is denied to the extent it seeks dismissal of the *third* counterclaim for breach of the duty of loyalty.

### d.  **Tortious Interference with Contract**

Pardee's motion is granted to the extent it seeks the dismissal of the *fourth* counterclaim for tortious interference with contract.  It is well settled that "[a] claim of tortious interference requires proof of (1) the existence of a valid contract between plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procuring of the breach, and (4) damages."  Foster v Churchill, 87 NY2d 744, 749–50 (1996) (citation omitted); Macy's Inc. v Martha Stewart Living Omnimedia, Inc., 127 AD3d 48 (1st Dept. 2015); see also 330 Acquisition Co., LLC v Regency Sav. Bank, F.S.B., 293 AD2d 314 (1st Dept. 2002).

Mercury alleges that Pardee tortiously interfered with its relationship with Valor by soliciting and accepting employment with Valor, thereby triggering the "key man" provision in the Valor Engagement Agreement, which gave Valor leverage to "force" Mercury into an

650693/2021   PARDEE, ALAN A vs. MERCURY CAPITAL ADVISORS                    Page 17 of 29
Motion No.  008 009

17 of 29

adverse amendment of the Engagement Agreement.  However, it is undisputed that there was no breach of the Valor Engagement Agreement and thus there was no "intentional procuring of a breach" by Pardee.  See Jack L. Inselman & Co. v FNB Fin. Co., 41 NY2d 1078 (1977); DashDevs LLC v Capital Markets Placement, Inc., 201 AD3d 525 (1st Dept. 2022); Luxor Aviation LLC v Kerwin Media LLC, 91 AD3d 569 (1st Dept. 2012). Moreover, while Mercury contends that it lacked leverage to effectively resist the amendment of the Engagement Agreement, it presents no evidence demonstrating that the subject amendment was not negotiated and signed voluntarily nor, as already discussed, does it submit any evidence to demonstrate that Pardee was involved in Valor's decision to renegotiate its fee arrangement with Mercury.  Thus, to the extent Mercury is alleging a theory of tortious interference with prospective economic advantage, the court notes that it fails to submit evidence of any "conduct by the defendant [Pardee] that allegedly interfered with the plaintiff's prospects [that] either was undertaken for the sole purpose of harming the plaintiff or that such conduct was wrongful or improper independent of the interference allegedly caused thereby." Jacobs v Continuum Health Partners, Inc.,7 AD3d 312, 313 (1st Dept. 2004); see Carvel Corp. v Noonan, 3 NY3d 182 (2004).

## 2. **Mercury's Summary Judgment Motion**

### a. **Breach of the Amended and Restated Employment Agreement**

Pardee's *first* cause of action alleges that Mercury breached Sections 2(a), 2(c), and 2(e) of his Employment Agreement, and constructively terminated his employment, by stripping him of his position as a managing partner, taking away his management authority, and changing his office location. In seeking summary judgment on this cause if action, Mercury presents the deposition testimony of its principals and board members, including Kapoor, Tayeh, and Ricciardi, as well as documentation regarding the 360 Review, to demonstrate that, while certain suggested changes to Pardee's role were discussed with Pardee in response to the 360 Review process, these changes were never finally decided upon or implemented, and were not as

significant as Pardee suggests.  For example, Kapoor testified that it was his understanding that so long as Pardee remained at Mercury, he was entitled to act as a managing partner and that a demotion was not considered, that he did not discuss changing Pardee's office location, and that no conclusive decision was reached as to whether Pardee should retain management responsibilities at Mercury.  Similarly, Tayeh testified that the discussions with Pardee concerned suggested changes to his role in response to the 360 Review, but that these were only suggestions, that nothing had been finally determined, and that the suggestions were not implemented prior to Pardee's resignation.

In opposition, Pardee submits his affidavit and deposition testimony, in which he states that, early in 2020, he began to hear from other Mercury employees that he was likely to be terminated or otherwise forced out of the business, that this coincided with instructions from Kapoor to "have [Ricciardi's] back" in connection with sex discrimination claims brought against him by Mercury employees, and that, due to Ricciardi's position as CEO, and Ricciardi's pattern of hostile and unprofessional behavior towards him, he feared and believed that he would be forced out of the business.  This is partially corroborated by an affidavit from Sanders, in which Sanders similarly states that he had heard rumors from multiple other employees that Pardee was going to be forced to leave the firm or otherwise have his role "involuntarily diminished."  Pardee further testified that Ricciardi was attempting to engineer his demotion and to lessen his role in the company for quite some time, and that he complained to Kapoor, Tayeh and other firm leaders about these efforts but was met with silence.  Pardee testified that the changes to his role discussed at his July 2020 meeting with Kapoor and Tayeh were not merely suggestions, but rather, that he was told he would no longer be a managing partner, that his management and executive responsibilities would be removed, and that he would no longer be welcome at Mercury's offices.  Pardee also submitted an internal Investcorp document, dated June 2020, discussing the changes to Pardee's role, and that appears to indicate that he should be terminated

650693/2021   PARDEE, ALAN A vs. MERCURY CAPITAL ADVISORS
Motion No.  008 009                                                    Page 19 of 29

19 of 29

as of December 31, 2021, the earliest date that he could be fired without cause pursuant to his Employment Agreement.

Given this conflicting evidence, there is an issue of fact as to whether Mercury breached Sections 2(a), 2(c), and 2(e) of Pardee's Employment Agreement by stripping him of his position as a managing partner, taking away his management authority, and changing his office location. There is likewise an issue of fact as to whether Pardee's employment at Mercury was subject to constructive termination.

"Constructive discharge occurs when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." Morris v Schroder Cap. Mgmt. Int'l, 7 NY3d 616, 621–22 (2006) (internal quotation marks omitted). "In order to meet this threshold, the trier of fact must be satisfied that the ... working conditions were so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." Id. (internal quotation marks omitted); see Teran v JetBlue Airways Corp., 132 AD3d 493 (1st Dept. 2015). "[S]ince what a just, reasonable person would or would not do under certain circumstances is a question of fact, the issue of constructive discharge should [generally] be left to the trier of fact." Fischer v KPMG Peat Marwick, 195 AD2d 222, 226 (1st Dept. 1994). An employee resignation in the face of an inevitable termination may also give rise to a constructive discharge claim. See Credit Suisse Sec. (USA) LLC v Finn, 182 AD3d 493 (1st Dept. 2020). Here, an issue of fact arises from, *inter alia*, the conflicting testimony regarding Ricciardi's alleged hostile behavior toward Pardee and his purported efforts to engineer Pardee's demotion, the lack of responsiveness from firm leadership when Pardee voiced his concerns, and the true nature of the discussions regarding the changes to Pardee's role at Mercury, including whether they were a precursor to Pardee's inevitable termination.

650693/2021   PARDEE, ALAN A vs. MERCURY CAPITAL ADVISORS                    Page 20 of 29
Motion No.  008 009

20 of 29

b. **Discrimination**

Mercury seeks dismissal of Pardee's *second* and *third* causes of action, alleging racial discrimination in violation of the New York State Human Rights Law (NYSHRL) and the New York City Human Rights Law (NYCHRL).

Pursuant to the NYSHRL and the NYCHRL, it is an unlawful discriminatory practice for an employer to refuse to hire or employ, or to fire or to discriminate against an individual in the terms, conditions or privileges of employment because of the individual's race or national origin. See Executive Law § 296 (1) (a); Administrative Code of the City of NY (Administrative Code) § 8-107 (1) (a). Under the NYSHRL, the court applies the burden shifting analysis developed in McDonnell Douglas Corp. v Green (411 US 792 [1973]), where the plaintiff has the initial burden to establish a prima facie case of discrimination. Forrest v Jewish Guild for the Blind, 3 NY3d 295, 305 (2004). The plaintiff must set forth that "[he or she] is a member of a protected class, was qualified for the position, and was terminated or suffered some other adverse employment action, and that the discharge or other adverse action occurred under circumstances giving rise to an inference of discrimination." Baldwin v Cablevision Sys. Corp., 65 AD3d 961, 965 (1st Dept. 2009). If the plaintiff successfully sets forth a prima facie case of discrimination, the burden shifts to the defendant employer to rebut the presumption by demonstrating that the plaintiff was discharged for a nondiscriminatory reason. Id. at 965. If the employer meets this burden, the plaintiff is still entitled to "prove that the legitimate reasons proffered by defendant were merely a pretext for discrimination." Id. (internal quotation marks and citation omitted).

The provisions of the NYCHRL are to be construed more liberally than its state counterpart. See Bennett v Time Warner Cable, Inc., 138 AD3d 598 (1st Dept. 2016). On a motion for summary judgment to dismiss a claim for discrimination under the NYCHRL, courts have reaffirmed the applicability of the burden-shifting analysis as developed in McDonnell Douglas Corp. v Green, in addition to the mixed-motive analysis. See Hudson v Merrill Lynch

650693/2021   PARDEE, ALAN A vs. MERCURY CAPITAL ADVISORS                          Page 21 of 29
Motion No.  008 009

21 of 29

& Co., Inc., 138 AD3d 511 (1st Dept. 2016) (internal quotation marks and citation omitted) ("A motion for summary judgment dismissing a City Human Rights Law claim can be granted only if the defendant demonstrates that it is entitled to summary judgment under both the *McDonnell Douglas* burden-shifting framework and the mixed-motive framework"). Under the mixed-motive analysis, "the employer's production of evidence of a legitimate reason for the challenged action shifts to the plaintiff the lesser burden of raising an issue as to whether the action was motivated at least in part by . . . discrimination." Melman v Montefiore Med. Ctr., 98 AD3d 107, 127 (1st Dept. 2012) (internal quotation marks and citations omitted). That is, a plaintiff may prevail on a NYCHRL claim if "he or she proves that unlawful discrimination was one of the motivating factors, even if it was not the sole motivating factor, for an adverse employment decision." Id.

Here, it is undisputed that Pardee was a member of a protected class and was qualified to serve as a managing partner at Mercury. Further, as already discussed, Pardee has at least raised an issue of fact as to whether he suffered an adverse employment action, specifically the possible removal of his management authority and effective demotion. Pardee also submits evidence that these potentially adverse employment actions occurred under circumstances giving rise to an inference of discrimination.

Pardee relies upon his deposition testimony and affidavit, as well as an affidavit from Sanders and the deposition testimony of Ricciardi, Cuan, and other Mercury employees. Pardee testifies that Mercury has a history of discrimination. He asserts that, at its founding, the firm's employees were approximately 45% women and 25% African-American or African-Latino American globally, and that these figures were approximately 40% and 36%, respectively, within the United States. He further testifies that Ricciardi has steadily shifted the firm's demographics by replacing women and ethnic minorities with white men, asserting that, for the better part of a decade, the company did not hire any new African-American employees, and that the company

650693/2021    PARDEE, ALAN A vs. MERCURY CAPITAL ADVISORS                    Page 22 of 29
Motion No.  008 009

22 of 29

currently does not employ any African-Americans.  Indeed, Ricciardi himself testified that he could recall hiring only one new African-American employee in the entire history of the firm since its founding.  Pardee further testifies, and Sanders corroborates, that Ricciardi regularly treated him with hostility and disrespect in front of other employees, including in company-wide meetings, which he never did to Cuan, the other managing partner, who, like Ricciardi, is not of African descent.

Pardee further claims that Ricciardi lobbied the Mercury Board for his termination, submitting Ricciardi's deposition testimony, in which Ricciardi admits that, in January or February 2020, he emailed Kapoor and Tayeh to suggest lessening Pardee's responsibilities, including his role as head of origination.  Pardee also submits an email that Ricciardi sent in March 2020 to AlixPartners, the consultants brought in to conduct Mercury's 360 Review, in which he recommended that Mercury's new owners dissolve the "triumvirate" of managing partners and replace it with an executive committee run by Ricciardi himself, and that they also "install a new head of private equity origination" in place of Pardee.

Finally, Pardee testifies that he was replaced on the origination team by Tom Donovan, a white male.  This is corroborated by Sanders, who confirms that, following Pardee's departure from Mercury, Donovan took on responsibilities for origination that had previously belonged to Pardee.  Pardee also submits Cuan's deposition testimony that he and Ricciardi hired Donovan, before the sale to Investcorp, with the intention that Donovan replace Pardee as head of origination in the U.S., but that they kept this intention secret from Pardee.  Similarly, Sanders states in his affidavit that Ricciardi discussed with him wanting to hire Donovan to take over origination responsibilities which were being managed by Pardee, and that Donovan's role would be characterized as a sales employee so that Pardee would be unaware of the plan to shift his origination responsibilities to Donovan.

650693/2021   PARDEE, ALAN A vs. MERCURY CAPITAL ADVISORS                    Page 23 of 29
Motion No.  008 009

23 of 29

An inference of discrimination "may be drawn from direct evidence, from statistical evidence, or merely from the fact that the position was filled or held open for a person not in the same protected class." Sogg v Am. Airlines, Inc., 193 AD2d 153, 156 (1st Dept. 1993); see Sass v Hewlett-Packard, 153 AD3d 1185 (1st Dept. 2017); Bailey v New York Westchester Sq. Med. Ctr., 38 AD3d 119 (1st Dept. 2007). Taken together, Pardee's evidentiary submissions regarding the circumstances of his allegedly forced departure from Mercury suffice to give rise to an inference of discrimination.

Mercury, in turn, presents evidence, including the testimony of its principals and Board members, as well as documents relating to the 360 Review, that indicates the suggested changes to Pardee's role within the firm were based upon a company review process that identified leadership deficiencies, thus articulating a legitimate, nondiscriminatory reason for Pardee's potential change of duties. In so doing, Mercury shifts the burden back to Pardee to demonstrate, with respect to his NYSHRL claim, that the company's articulated nondiscriminatory reason for its challenged conduct is pretextual (see Baldwin v Cablevision Sys. Corp., supra), or, with respect to the lesser burden under the NYCHRL, that the subject conduct "was motivated at least in part by . . . discrimination" (Melman v Montefiore Med. Ctr., supra at 127).

To establish the existence of pretext, Pardee must demonstrate that Mercury's articulated nondiscriminatory reasons for its actions are false, and that discrimination was the real reason for its conduct. See Bailey v New York Westchester Sq. Med. Ctr., supra. Here, Pardee's evidence demonstrates that Ricciardi and Cuan hired Donovan before the sale to Investcorp with the intention, kept secret from Pardee, that he would replace Pardee as head of origination; that Ricciardi was lobbying Mercury's Board to reduce Pardee's role as head of origination in January/February 2020, before the 360 Review process was initiated; and that, in March 2020, at the very outset of the 360 Review process, Ricciardi was suggesting to AlixPartners that they recommend Pardee's removal as managing partner and head of origination. Viewed in the light

650693/2021    PARDEE, ALAN A vs. MERCURY CAPITAL ADVISORS    Page 24 of 29
Motion No.  008 009

24 of 29

most favorable to Pardee, this evidence could permit a factfinder to infer that the results of the 360 Review were predetermined, or at least influenced, by Mercury's principals to justify the subsequent changes to Pardee's role. See Asabor v Archdiocese of New York, supra ("In reviewing defendants' motion for summary judgment, we must accept plaintiff's facts as true, and draw all reasonable inferences in the light most favorable to [him]."). As such, Pardee's evidence is sufficient to raise an issue of fact as to whether Mercury's articulated nondiscriminatory reason for its actions is false.

Furthermore, Pardee's submissions, including evidence that he was replaced in his position by a white employee, also suffice to raise a question of fact as to whether Mercury's actions regarding his employment and potential change in role were motivated, at least in part, by discrimination. See Bailey v New York Westchester Square Med. Ctr., supra at 123 (inference of discrimination arises from showing that position was subsequently filled by, or held open for, an individual outside the employee's protected class).

### c. **Retaliation**

Mercury seeks the dismissal of Pardee's *fourth* and *fifth* causes of action, which allege retaliation in violation of the NYSHRL and the NYCHRL. Under both the NYSHRL and the NYCHRL, it is unlawful to retaliate or discriminate against someone because he or she opposed discriminatory practices. Executive Law § 296 (7); Administrative Code § 8-107 (7); see Forrest v Jewish Guild for the Blind, 3 NY3d 295, 312 (2004); Brook v Overseas Media, Inc., 69 AD3d 444, 445 (1st Dept. 2010). Under the broader interpretation of the NYCHRL, "[t]he retaliation . . . need not result in an ultimate action . . . or in a materially adverse change . . . [but] must be reasonably likely to deter a person from engaging in protected activity." Administrative Code § 8-107 (7).

650693/2021   PARDEE, ALAN A vs. MERCURY CAPITAL ADVISORS          Page 25 of 29
Motion No.  008 009

25 of 29

When analyzing claims for retaliation, courts apply the burden shifting test as set forth in McDonnell Douglas Corp. v Green, (supra at 802), which places the "initial burden" for establishing a prima facie case of retaliation on the plaintiff.  For Pardee to successfully make out a prima facie claim of retaliation under the NYSHRL, he must demonstrate that: "(1) [he] has engaged in a protected activity, (2) [his] employer was aware of such activity, (3) [he] suffered an adverse employment action based upon the activity, and (4) a causal connection exists between the protected activity and the adverse action." Harrington v City of New York, 157 AD3d 582, 585 (1st Dept. 2018). Under the NYCHRL, instead of demonstrating that he suffered from an adverse action, Pardee need only show that "the defendant took an action that disadvantaged [him]." Id. (internal quotation marks and citations omitted).  Under both the NYSHRL and NYCHRL, temporal proximity between the protected activity and adverse/disadvantageous action, e.g., between the plaintiff's complaint and termination, is a factor to be considered in inferring a causal connection. See id; Bantomoi v St. Barnabas Hosp., 146 AD3d 420 (1st Dept. 2017); Krebaum v Capital One, N.A., 138 AD3d 528 (1st Dept. 2016).

On summary judgment, "[w]here . . . defendants are the moving party, they have the initial burden to establish prima facie why the claim should be dismissed. If the defendant offers legitimate, nonretaliatory reasons for its conduct, then the plaintiff must produce evidence showing that the defendant was motivated, at least in part, by an impermissible motive." Franco v Hyatt Corp., 189 AD3d 569, 571 (1st Dept. 2020) (citations omitted); see Suri v Grey Global Group, Inc., 164 AD3d 108 (1st Dept. 2018).

As discussed, Mercury submits evidence that it had a legitimate reason for its decision to change Pardee's terms of employment, specifically, Pardee's lack of leadership as evidenced by the 360 Review process and the overall performance of the company.  However, in opposition, Pardee submits evidence sufficient to raise an issue of

650693/2021   PARDEE, ALAN A vs. MERCURY CAPITAL ADVISORS                    Page 26 of 29
Motion No.  008 009

26 of 29

fact as to whether Mercury's conduct was motivated, at least in part, by an impermissible retaliatory motive.

Pardee submits several written employee complaints of sex discrimination at Mercury, including a formal sex discrimination complaint against Ricciardi, submitted to the company, through counsel, by Kristen Belfi, a female Mercury partner, in May 2019, shortly before the sale to Investcorp, as well as several informal written complaints lodged later the same year by another female partner, Julie Bauch. Pardee testifies that these complaints led to angry disagreements between himself and Ricciardi, as Pardee had long complained about Ricciardi's alleged mistreatment of women at the company. While these complaints were settled before the closing of Mercury's sale to Investcorp, Pardee testifies that Ricciardi's continued misconduct led to additional complaints by Bauch in or around February 2020.

As previously discussed, Ricciardi testified that, in January or February 2020, he emailed Kapoor and Tayeh to suggest lessening Pardee's responsibilities, including Pardee's role as head of origination. Pardee testifies that it was also at about this time, in January/February 2020, that he began to be told by other Mercury employees that he was likely to be terminated or otherwise forced out of the business, and that this coincided with his receipt of a directive from Kapoor to "have [Ricciardi's] back" in connection with the sex discrimination claims brought against Ricciardi by Mercury employees. Pardee testifies that he objected to and refused this directive, after which he was shut out of communications with Investcorp leadership. Pardee also proffers an email from Ricciardi to Kapoor and Tayeh, dated March 3, 2020, in which Ricciardi complained that Pardee was siding with the women at Mercury who had lodged sex discrimination claims against him, and that Pardee was committing a "betrayal" by doing so. And, as already discussed, it was also in March 2020 that Ricciardi emailed AlixPartners, at the very

outset of the 360 Review process, to suggest that they recommend Pardee's removal as managing partner and head of origination.

"In assessing retaliation claims that involve neither ultimate actions nor materially adverse changes in terms and conditions of employment, it is important that the assessment be made with a keen sense of workplace realities, of the fact that the 'chilling effect' of particular conduct is context-dependent, and of the fact that a jury is generally best suited to evaluate the impact of retaliatory conduct in light of those realities." Williams v New York City Hous. Auth., 61 AD3d 62, 71 (1st Dept. 2009).  Furthermore, where the parties' submissions present issues of credibility, such factual issues are to be resolved by a jury, not by the court on a summary judgment motion. See Vega c Restani Const. Corp., 18 NY3d 499 (2012); S. J. Capelin Assocs., Inc. v Globe Mfg. Corp., 34 NY2d 338 (1974); Cresco Labs New York, LLC v Fiorello Pharmaceuticals, Inc., 217 AD3d 539 (1st Dept. 2023).

Pardee's evidentiary submissions indicating that he opposed sex discrimination by Ricciardi and refused a directive to "have [Ricciardi's] back" with respect to sex discrimination complaints from employees, and that this coincided with Ricciardi's efforts to lobby for changes to Pardee's role at the company, suffice to raise an issue of fact as to whether Mercury's decision to change Pardee's role was driven, at least in part, by an impermissible retaliatory motive, precluding summary judgment.  See Franco v Hyatt Corp., supra; Suri v Grey Global Group, Inc., supra.

## IV.    CONCLUSION

Remaining for trial are all of the plaintiff's causes of action against the defendants and all of the defendants' counterclaims save for the fourth, alleging tortious interference.

650693/2021   PARDEE, ALAN A vs. MERCURY CAPITAL ADVISORS                Page 28 of 29
Motion No.  008 009

24-12328-dsj    Doc 11-2    Filed 01/10/25    Entered 01/10/25 13:19:08    Exhibit
Exhibit B    Pg 30 of 30

Accordingly, upon the foregoing papers and after oral argument, it is

ORDERED that plaintiff's motion for summary judgment seeking dismissal of

defendants' counterclaims (MOT SEQ 008) is granted to the extent that the fourth

counterclaim for tortious interference with contract is dismissed, and the motion is

otherwise denied; and it is further

ORDERED that defendants' motion for summary judgment seeking dismissal of

the amended complaint (MOT SEQ 009) is denied; and it is further

ORDERED that the parties shall promptly comply with any ADR order issued by

the court, and it is further

ORDERED that the Clerk shall mark the file accordingly.

This constitutes the Decision and Order of the court.

NANCY M. BANNON, J.S.C.
**HON. NANCY M. BANNON**

| <u>7/12/2024</u> | | | | |
|---|---|---|---|---|
| **DATE** | | | | |
| CHECK ONE: | ☐ CASE DISPOSED | ☒ NON-FINAL DISPOSITION | | |
| | ☐ GRANTED ☐ DENIED | ☒ GRANTED IN PART | ☐ OTHER | |
| APPLICATION: | ☐ SETTLE ORDER | ☐ SUBMIT ORDER | | |
| CHECK IF APPROPRIATE: | ☐ INCLUDES TRANSFER/REASSIGN | ☐ FIDUCIARY APPOINTMENT | ☐ REFERENCE | |

650693/2021   PARDEE, ALAN A vs. MERCURY CAPITAL ADVISORS                Page 29 of 29
Motion No.  008 009