# EXHIBIT "C"



Dear Policyholder,

Thank you for choosing Zurich for your Management Liability Product(s). We truly appreciate your business and welcome the opportunity to work with you.

We wanted to inform you that under the terms of this transaction you are entitled to online services and resources that are designed just for management solutions customers. These resources are available at no additional cost to you and include loss mitigation tips and techniques, industry-related articles and more. Here are just some examples of what is available to you:

- **eDiscovery website** – a real-time information tool, including a readiness assessment for this rapidly growing phenomena
- **Thought leadership materials** – dedicated to your top-of-mind needs, including timely webinars and engaging white papers, even specific to your industry segment
- **Security & Privacy readiness self assessment** – this exposure makes headlines daily. How ready is your organization for this fast-growing threat?
- **Strategic Risk Services and Enterprise Risk Management** – on-line information source for related hot topics and ERM videos to minimize barriers to achieving expected business outcomes

To access this information and all other resources, simply visit www.ZurichMgmtSolutions.com. Please be sure to have your policy number handy.

*Deliver for our customers when it matters most.* At Zurich, that's the promise we make every day. I thank you again for choosing Zurich.

Sincerely,

Brian F. Winters

Brian Winters
Head of Specialty Products

© 2011 Zurich American Insurance Company. All rights reserved.

*Mercury 000035*

# Disclosure Statement



It is our pleasure to present the enclosed policy to you
for presentation to your customer.

**INSTRUCTION TO AGENT OR BROKER:**

WE REQUIRE THAT YOU TRANSMIT THE ATTACHED/ENCLOSED DISCLOSURE STATEMENT TO THE CUSTOMER
WITH THE POLICY.

Once again, thank you for your interest, and we look forward to meeting your needs and those of your customers.

*Mercury 000036*

# Disclosure Statement



**NOTICE OF DISCLOSURE FOR AGENT & BROKER COMPENSATION**

If you want to learn more about the compensation Zurich pays agents and brokers visit:

http://www.zurichnaproducercompensation.com

or call the following toll-free number:  (866) 903-1192.

This Notice is provided on behalf of Zurich American Insurance Company

and its underwriting subsidiaries.

*Mercury 000037*

# Important Notice – In Witness Clause

**ZURICH**

In return for the payment of premium, and subject to the terms of this policy, coverage is provided as stated in this policy.

IN WITNESS WHEREOF, this Company has executed and attested these presents and, where required by law, has caused this policy to be countersigned by its duly Authorized Representative(s).

[ *Mark G. Kompfer* ]     [ *Laura J Kanroyef* ]

*President*                          *Corporate Secretary*

---

**QUESTIONS ABOUT YOUR INSURANCE?** Your agent or broker is best equipped to provide information about your insurance. Should you require additional information or assistance in resolving a complaint, call or write to the following (please have your policy or claim number ready):

Zurich in North America
Customer Inquiry Center
1299 Zurich Way
Schaumburg, Illinois 60196-1056
**1-800-382-2150** (Business Hours: 8am - 4pm [CT])
**Email**: info.source@zurichna.com

---

U-GU-319-F (01/09)
Page 1 of 1

**Mercury 000038**



**ZURICH**

## PROFESSIONAL EMPLOYER ORGANIZATION EMPLOYMENT PRACTICES LIABILITY POLICY

NOTICE: EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THIS POLICY IS LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN.

THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR DEFENSE COSTS. AMOUNTS INCURRED FOR DEFENSE COSTS SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.

THE INSURER HAS THE RIGHT AND THE DUTY TO DEFEND ANY CLAIM UNDER THIS POLICY.

PLEASE READ THIS POLICY CAREFULLY AND DISCUSS THE COVERAGE HEREUNDER WITH YOUR INSURANCE BROKER.

---

## DECLARATIONS

**POLICY NUMBER: EPL 0508351-02**

| ITEM 1: | **NAMED INSURED PEO**: | TRINET GROUP, INC. |
|---|---|---|
| | **ADDRESS:** | 1 Park Place<br>Suite 600<br>Dublin, CA 94568<br>United States of America |

| ITEM 2: | **POLICY PERIOD**: | Inception Date: | April 1, 2020 |
|---|---|---|---|
| | | Expiration Date: | April 1, 2021 |
| | | (12:01 a.m. Standard Time at the address stated in Item 1) | |

**ITEM 3:   LIMIT OF LIABILITY:**

I. Applicable to TriNet HR III, Inc., TriNet HR III-A, Inc.; TriNet HR III-B, Inc.; TriNet HR IV LLC, TriNet Employer Group Canada, Inc. and TriNet USA, Inc., hereinafter collectively referred to as "Group 1 Entities":

| A. | **Named Insured PEO** Limit of Liability for each **Claim** | |
|---|---|---|
| B. | **Named Insured PEO** Aggregate Limit of Liability for all **Claims** | |
| C. | **PEO Client Company** Limit of Liability for each **Claim** | USD 1,000,000 |
| D. | **PEO Client Company** Aggregate Limit of Liability for all **Claims** against any one **PEO Client Company** | USD 1,000,000 |
| E. | Aggregate Limit of Liability for all Group 1 Entities **Claims** | USD 15,000,000 |

*Mercury 000039*

It is understood and agreed that the Aggregate Limit of Liability of the **Insurer** for all **Claims** in respect of Group 1 Entities shall be USD 15,000,000.

II.   Applicable to TriNet HR I, Inc.; TriNet HR II, Inc.; TriNet HR II-A, Inc.; and TriNet HR XI, Inc., hereinafter collectively referred to as "Group 2 Entities":

| A. | **Named Insured PEO** Limit of Liability for each **Claim** | |
|----|----|----|
| B. | **Named Insured PEO** Aggregate Limit of Liability for all **Claims** | |
| C. | **PEO Client Company** Limit of Liability for each **Claim** | USD 1,000,000 |
| D. | **PEO Client Company** Aggregate Limit of Liability for all **Claims** against any one **PEO Client Company** | USD 1,000,000 |
| E. | Aggregate Limit of Liability for all Group 2 Entities **Claims** | USD 10,000,000 |

It is understood and agreed that the Aggregate Limit of Liability of the **Insurer** for all **Claims** in respect of Group 2 Entities shall be USD 10,000,000.

III.  Policy Aggregate Limit of Liability

| Policy Aggregate Limit of Liability for all **Claims** | USD 25,000,000 |
|----|----|

It is further understood and agreed that the maximum amount that the **Insurer** is obligated to pay under this Policy for all **Loss**, including **Defense Costs**, from all **Claims** shall be USD 25,000,000.

**Item 4. Retention:**

I.  **Applicable to Group 1 Entities:**

| A. | **Named Insured PEO** (All **Claims**, except **Claims** brought by **Worksite Employees**) (**Claims** brought by **Worksite Employees**) | |
|----|----|----|
| B. | **PEO Client Company** | USD 225,000 each and every **Claim** except USD 500,000 for California Claims |
| C. | **Named Insured PEO & PEO Client Company** (Both entities are parties to the same **Claim**) | USD 225,000 each and every **Claim** except USD 500,000 for California Claims |

MEPL MAN (04/20)

*Mercury 000040*

II.    **Applicable to Group 2 Entities:**

| A. | **Named Insured PEO**<br><br>(All **Claims**, except **Claims** brought by **Worksite Employees**) | |
|----|----|----|
| | (**Claims** brought by **Worksite Employees**) | |
| B. | **PEO Client Company** | USD 100,000<br>each and every **Claim** |
| C. | **Named Insured PEO & PEO Client Company**<br><br>(Both entities are parties to the same **Claim**) | USD 100,000<br>each and every **Claim** |

**ITEM 5:**    **PENDING OR PRIOR DATE:**

| A. | **Named Insured PEO** | Please refer to<br>ENDORSEMENT NUMBER 1 |
|----|----|----|
| B. | **PEO Client Company** | Please refer to<br>ENDORSEMENT NUMBER 1 |

**ITEM 6:**    **DISCOVERY PERIOD:**

| 1 Year: | 100% |
|---------|------|
| 2 Year: | 125% |
| 3 Year: | 150% |

**ITEM 7:**    **PREMIUM:**

**ITEM 8:**    **INSURER: ADDRESS OF INSURER FOR NOTICES UNDER THIS POLICY:**

**ITEM 9**: **NOTICE:** Notice of all Claims and/or Circumstances should be sent to:
Attn: Management Solutions Group-EPL Claims
PO Box 968041
Schaumburg, IL 60196-8041
Facsimile: (866) 255-2962
Email: msgclms@zurichna.com

**Mercury 000041**



**PROFESSIONAL EMPLOYER ORGANIZATION EMPLOYMENT PRACTICES LIABILITY
POLICY**

In consideration of the payment of the premium and in reliance upon the **Application**, which
shall be deemed to be attached to, incorporated into, and made a part of this Policy, TBD
(the **"Insurer"**) and the **Named Insured PEO**, on behalf of all **Insureds**, agree as follows:

**I.    INSURING AGREEMENTS**

**A.    Employment Practices Liability Coverage**

The **Insurer** shall pay on behalf of any **Insured**, subject to the Limits of
Liability set forth in Item 3. of the Declarations, the **Loss** arising from a **Claim**
first made by or on behalf of an **Insured Person** during the **Policy Period** (or
Discovery Period, if applicable) against such **Insured** for any **Wrongful Act**,
other than a **Third Party Wrongful Act**, and reported to the **Insurer** in
accordance with the terms of this Policy.

**B.    Third-Party Liability Coverage**

The **Insurer** shall pay on behalf of any **Insured**, subject to the Limits of
Liability set forth in Item 3. of the Declarations, the **Loss** arising from a **Claim**
first made during the **Policy Period** (or Discovery Period, if applicable)
against such **Insured** for any **Third- Party Wrongful Act**, and reported to the
**Insurer** in accordance with the terms of this Policy.

**II.   DEFINITIONS** When used in this Policy, the terms below (whether in the singular or plural)
are defined as follows:

A.    **"Application"** means the signed application, including any attachments and
other materials provided therewith or incorporated therein, submitted in
connection with the underwriting of this Policy. The Application shall not
include any publicly available documents filed with any governmental agency
that were filed more than twenty-four months prior to the Inception Date of
this Policy

B.    **"Benefits"** means perquisites, fringe benefits, deferred compensation or
payments (including insurance premiums) in connection with any employee-
related plan. **Benefits** shall not include salary, wages, bonuses or non-
deferred cash incentive compensation.

C.    **"Claim"** means any:

(1)    written demand for monetary, non-monetary or injunctive relief made
against an **Insured**;

(2)    judicial, administrative or regulatory proceeding, whether civil or

*Mercury 000042*

criminal, for monetary, non-monetary or injunctive relief commenced against an **Insured**, including any appeal therefrom, which is commenced by:

   (i)      service of a complaint, notice of charges or similar pleading;
   (ii)     return of an indictment, information or similar document (in the case of a criminal proceeding); or
   (iii)    receipt or filing of a notice of charges;

It is further understood that criminal proceedings for monetary, non-monetary or injunctive relief commenced against a **PEO Client Company** is not covered under this coverage section

(3)     mediation or arbitration proceeding commenced against an **Insured** by service of a demand for mediation or arbitration;

(4)     notification of an investigation of an **Insured** by the Equal Employment Opportunity Commission ("EEOC") or similar governmental agency, commenced by the filing of a notice of charges. formal investigative order or similar document;

(5)     audit of an **Insured** conducted by the United States of America Office of Federal Contract Compliance Programs ("OFCCP"), but only if commenced by the receipt of a notice of violation, order to show cause, or a written demand for monetary or non-monetary or injunctive relief; or

(6)     written request to toll or waive the applicable statute of limitations relating to a potential **Claim** against an **Insured** for a **Wrongful Act**.

A **Claim** shall not include any grievance, arbitration or other proceeding pursuant to a collective bargaining agreement.

A **Claim** shall be deemed first made when any **Insured** receives notice of the **Claim**.

More than one **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to constitute a single **Claim** and shall be deemed to have been first made in accordance with the previous sentence.

D.    **"Client Service Agreement"** means a written contract or agreement between the **Named Insured PEO** and **PEO Client Company** pursuant to which the **Named Insured PEO** assumes the legal and administrative responsibilities of the **PEO Client Company** for payroll, benefits and other human resource functions on behalf of more than fifty percent (50%) of such **PEO Client Company's** workforce.

E.    **"Defense Costs"** means:

(1)     reasonable and necessary fees, costs, charges or expenses resulting from the investigation, defense or appeal of a **Claim**;

(2)     premium for an appeal, attachment or similar bond, but without any obligation to apply for and obtain such bond; or

(3)     legal and investigation fees incurred by the **Insured**, at the specific written request and direction of the **Insurer**, to assist the **Insurer** in responding to a notice of circumstances under Clause VI.C.

**Defense Costs** shall not include: (a) amounts incurred prior to the date a **Claim** is first made and reported to the **Insurer**, pursuant to the terms of this Policy; or (b) compensation or benefits of any **Insured Person** or any

*Mercury 000043*

overhead expenses of an **Insured Entity**.

F.    **"Discrimination"** means any violation of employment discrimination laws, including but not limited to: any actual, alleged or constructive employment termination, dismissal, or discharge; employment demotion; denial of tenure; modification of any term or condition of employment; any failure or refusal to hire or promote; and any limitation or segregation that in any way that would deprive a person of employment opportunities based on such person's race, color, religion, creed, age, sex, disability, marital status, national origin, pregnancy, HIV status, sexual orientation or preference, veteran status or any other status that is protected pursuant to any foreign, federal, state, or local statutory law or common law.

G.    **"Employee"** means any:

(1)    person who was, now is, shall become or is alleged to be an employee of a **Named Insured PEO** or of any **Subsidiary**, including applicants for employment, but only while that person is acting in the capacity as such; or

(2)    volunteer whose labor and service is or would be engaged and directed by the **Named Insured PEO** or by any **Subsidiary**, including applicants for such labor and service, but only while that person is acting in the capacity as such; or

(3)    **Worksite Employee** including any applicant applying for a position as a **Worksite Employee**, but only while that person is acting in their capacity as such;

H.    **"Executive"** means:

(1)    any past, present or future duly elected or appointed director, officer, trustee, governor, management committee member or member of the board of managers of an **Insured Entity**, but only while that person is acting in the capacity as such; or

(2)    any past, present or future person in a duly elected or appointed position in an **Insured Entity** which is organized and operated in a foreign jurisdiction that is equivalent to an executive position listed in paragraph (1) immediately above, but only while that person is acting in his or her capacity as such; or

(3)    any person with an ownership interest in a **PEO Client Company**, but only while that person is acting in his or her capacity as manager of the **PEO Client Company.**

I.    **"Financial Impairment"** means an entity becoming a debtor-in-possession, an entity's assignment for the benefit of creditors, or the appointment of a receiver, conservator, liquidator, trustee, rehabilitator or similar official to control, supervise, manage or liquidate the entity.

J.    **"Harassment"** means:

(1)    sexual harassment, including unwelcome sexual advances, requests for sexual favors, or other conduct of a sexual nature that is made a condition of employment with, used as a basis for employment decisions by, interferes with performance or creates an intimidating,

*Mercury 000044*

hostile or offensive working environment within the **Insured Entity**; or

(2) workplace harassment, including work-related harassment of a non-sexual nature that interferes with performance or creates an intimidating, hostile or offensive working environment within the **Insured Entity**.

K. **"Independent Contractor"** means any natural person working in the capacity of an independent contractor for the **Named Insured PEO** or any **Subsidiary**, pursuant to a written contract or agreement which specifies the terms of engagement of the **Independent Contractor**.

L. **"Insured"** means any **Insured Entity** or **Insured Person**.

M. **"Insured Entity"** means:

(1) the **Named Insured PEO**;
(2) any **Subsidiary;**
(3) the **Named Insured PEO** or a **Subsidiary** as a debtor, a debtor-in-possession or equivalent status; and
(5) any **PEO Client Company**.

N. **"Insured Person"** means any:

(1) **Executive**;
(2) **Employee**;
(3) **Independent Contractor** but only: (a) if such person is working solely for the **Named Insured PEO** or a **Subsidiary** and to the extent of services performed for such **Named Insured PEO** or **Subsidiary**; (b) for conduct within the scope of his or her duties as such; and (c) if the **Named Insured PEO** or the **Subsidiary** indemnifies such **Independent Contractor** in the same manner as it indemnifies its own **Employees**; or
(4) **Worksite Employee**.

O. **"Interrelated Wrongful Acts"** means **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, occurrence, cause or series of related facts or circumstances, situations, events, transactions, occurrences or causes. **Claims** which allege **Wrongful Acts** can be interrelated regardless of whether such **Wrongful Acts** involve the same or different claimants or legal causes of action.

P. **"Loss"** means:

(1) damages (including back pay and front pay), settlements or judgments;
(2) pre-judgment or post-judgment interest;
(3) costs or fees awarded in favor of the claimant;
(4) punitive, exemplary and multiplied damages (including any multiplied damages awarded pursuant to the Age Discrimination in Employment Act or Equal Pay Act), but only to the extent such damages are insurable under the applicable law most favorable to the insurability of such damages;
(5) fines or penalties, other than criminal fines or penalties, and only to the extent that such fines or penalties are insurable under the applicable law most favorable to the insurability of such fines or

**Mercury 000045**

penalties; or

(6)     **Defense Costs**.

**"Loss"** does not include:

(a)     any amounts for which the **Insureds** are not legally liable;
(b)     any amounts which are without legal recourse to the **Insureds**;
(c)     taxes, or criminal fines or penalties;
(d)     matters which may be deemed uninsurable under applicable law;
(e)     any costs or liability incurred by any **Insured** to modify any building or property to make it more accessible or accommodating to any disabled person, or in connection with any educational, sensitivity or other corporate program, policy or seminar;
(f)     **Stock Benefits** due or to become due or the equivalent value of such **Stock Benefits**;
(g)     **Benefits**;
(h)     the cost of instating or reinstating employment, or providing any non-monetary relief;
(i)     severance pay;
(j)     compensation earned by a claimant in the course of employment but not paid by the **Named Insured PEO** or the **PEO Client Company** including but not limited to unpaid salary, overtime, bonuses or wages. **Loss** also does not include vested and non-vested stock options, retirement benefits, severance pay, prerequisites, fringe benefits, vacation days or sick days;
(k)     payment of insurance plan benefits claimed by or on behalf of any retired **Worksite Employee**, or amounts representing insurance premiums for insurance that a claimant would have been entitled to as a **Worksite Employee** had the Insured provided the claimant with a continuation of insurance.

However, this Policy shall provide coverage for **Defense Costs** incurred in a **Claim** involving paragraphs (a) through (i) above, subject to all other terms, conditions and exclusions of this Policy.

Q.     **"Management Control"** means:

(1)     owning interests representing more than fifty percent (50%) of the voting, appointment or designation power for the selection of a majority of: the board of directors of a corporation; the management committee members of a joint venture; or the members of the management board of a limited liability company; or
(2)     having the right, pursuant to written contract or the by-laws, charter, operating agreement or similar documents of an entity, to elect, appoint or designate a majority of either: (a) the board of directors of a corporation; (b) the management committee of a joint venture; or (c) the management board of a limited liability company.

R.     **"Material Organizational Change"** means:

(1) TriNet Group, Inc. consolidates with, merges into, or sells all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert; or

(2) any person or entity or group of persons or entities acting in concert

**Mercury 000046**

acquires more than 50% of the assets or voting rights of TriNet Group, Inc.;

S.   "**Named Insured PEO**" means the entity named in Item 1. of the Declarations.   Group 1 Entities, including TriNet USA, Inc., and Group 2 Entities are part of the **Named Insured PEO** and each is considered to be a **Named Insured PEO**. While TriNet USA, Inc. is not a PEO, it is explicitly eligible for and included in the coverages afforded to the **Named Insured PEO** in this Policy.

T.   "**PEO Client Company**" means an entity that has entered into a **Client Service Agreement**; provided, however, that such entity is a **PEO Client Company** only during the period of time that the **Client Service Agreement** is in effect.

This Policy shall not afford coverage for any **Claim** brought against a **PEO Client Company**, or any of its respective **Insured Persons**, before the effective date of the **Client Service Agreement**, regardless of when the **Wrongful Acts** alleged in the **Claim** were actually or allegedly committed. Moreover, in the event that a **Client Service Agreement** is terminated for any reason, this Policy shall not afford coverage for any **Claim** brought against the **PEO Client Company** that is a party to such **Client Service Agreement**, or any of its respective **Insured Persons**, after the effective date of the termination, regardless of when the **Wrongful Acts** alleged in the **Claim** were actually or allegedly committed.

U.   "**Policy Period**" means the period from the Inception Date shown in Item 2. of the Declarations to the earlier of the Expiration Date shown in Item 2. of the Declarations or the effective date of cancellation of this Policy.

V.   "**Retaliation**" means retaliatory treatment of an **Employee** of the **Named Insured PEO** or any **Subsidiary**, or of a **Worksite Employee** of a **PEO Client Company**, alleged to be on account of such individual:

    (1)   exercising his or her rights under law, including rights under worker's compensation laws, the Family and Medical Leave Act, the Americans with Disabilities Act or any other law relating to employee rights;

    (2)   refusing to violate any law or opposing any unlawful practice;

    (3)   having assisted or testified in or cooperated with any legal proceeding or formal governmental investigation regarding alleged violations of law by an **Insured**;

    (4)   disclosing or expressing an intent to disclose to a superior or to any governmental agency any alleged violations of law; or

    (5)   filing or expressing an intent to file any claim against the **Insured Entity** under the Federal False Claims Act or any other foreign, federal, state, or local "whistle blower" law.

W.   "**Stock Benefits**" means any offering, plan or agreement between an **Insured Entity** and any **Insured Person** thereof, which grants stock or stock options or stock appreciation rights to such individual, including but not limited to stock options, restricted stock or any other stock grant, but not including employee stock ownership plans or employee stock purchase plans.

X.   "**Subsidiary**" means any privately held for-profit entity (except a partnership) of which the **Named Insured PEO**:

*Mercury 000047*

(1)     has **Management Control** ("Controlled Entity") before the inception of the **Policy Period**, either directly or indirectly through one or more other Controlled Entities;

(2)     first acquires **Management Control** during the **Policy Period**, either directly or indirectly through one or more other Controlled Entities, if such entity's employee count totals less than five percent (5%) of the consolidated employee count of the **Named Insured PEO**; or

(3)     first acquires **Management Control** during the **Policy Period**, either directly or indirectly through one or more other Controlled Entities, if such entity's employee count totals five percent (5%) or more of the consolidated employee count of the **Named Insured PEO**, but only if the **Named Insured PEO** provides the **Insurer** with full particulars of the new **Subsidiary** within ninety (90) days after its creation or acquisition and pays any additional premium with respect to such entity within thirty (30) days after being requested to do so by the **Insurer.**

"**Subsidiary**" also means any not-for-profit entity which is under **Management Control** of the **Named Insured PEO**.

With respect to a **Claim** made against any **Subsidiary** or any **Insured Person** thereof, this Policy shall only apply to **Wrongful Acts** committed or allegedly committed after the effective time such entity becomes a **Subsidiary** and prior to the effective time that such entity ceases to be a **Subsidiary**.

Y.    "**Third-Party**" means any natural person who is a customer, vendor, service provider or other business invitee of an **Insured Entity**. **Third-Party** shall not include an **Insured Person**.

Z.    "**Third-Party Wrongful Act**" means any actual or alleged:

(1)     discrimination against a **Third-Party** based upon race, color, religion, creed, age, sex, disability, marital status, national origin, pregnancy, HIV status, sexual orientation or preference, veteran status or any other status that is protected pursuant to any foreign, federal, state, or local statutory law or common law; or

(2)     sexual harassment against a **Third-Party**, including unwelcome sexual advances, requests for sexual favors or other conduct of a sexual nature.

AA.    "**Workplace Tort**" means any employment-related:

(1)     misrepresentation, defamation (including libel and slander), false arrest, detention, imprisonment, invasion of privacy, negligent evaluation, wrongful discipline or wrongful deprivation of a career opportunity; or

(2)     negligent retention, supervision, hiring or training, wrongful infliction of emotional distress, mental anguish or humiliation or failure to provide or enforce consistent employment-related corporate policies and procedures.

*Mercury 000048*

BB.    "**Worksite Employee**" means any individual working, or any applicant applying for a position as a **Worksite Employee**, at the **PEO Client Company's** worksite pursuant to a **Client Service Agreement** or applicable state statute, but only while that person is acting in their capacity as such.

CC.    **"Wrongful Act(s)"** means:

(1)    any actual or alleged **Discrimination**, **Harassment**, **Retaliation**, **Workplace Tort** or **Wrongful Employment Decision** committed by an **Insured** but only if such act relates to any **Worksite Employee** or applicant for a position as a **Worksite Employee**;

(2)    any actual or alleged **Discrimination, Harassment, Retaliation, Workplace Tort** or **Wrongful Employment Decision** committed by the **Named Insured PEO** or any **Subsidiary** or their respective **Insured Persons**, but only if such act relates to any **Employee** of the **Named Insured PEO** or any **Subsidiary** or an applicant for employment with the **Named Insured PEO** or any **Subsidiary; and**

(3)    any **Third Party Wrongful Act** committed by an **Insured.**

DD.    **"Wrongful Employment Decision"** means any actual or alleged:(1) wrongful termination, dismissal, or discharge of employment, demotion, denial of tenure, or failure or refusal to hire or promote; or (2) breach of any implied employment contract or obligation, including but not limited to any such obligation arising out of any personnel manual, employee handbook or policy statement.


## III.    EXCLUSIONS

This Policy shall not cover any **Loss** in connection with any **Claim**:

A.    brought by or on behalf of any person or entity other than an **Insured Person**; provided, however, that this Exclusion shall not apply to an otherwise covered **Claim** for a **Third-Party Wrongful Act** under Insuring Agreement B.

B.    alleging, arising out of, based upon or attributable to any deliberate criminal or deliberate fraudulent act by an **Insured** if a final judgment or adjudication in the underlying proceeding establishes that such criminal or fraudulent act occurred.

In determining the applicability of Exclusion B., the facts pertaining to, the knowledge possessed by, or any **Wrongful Act** committed by any **Insured** shall not be imputed to any other **Insured;** however, the facts pertaining to, the knowledge possessed by, or any **Wrongful Act** committed by, an **Insured Person** who is a past or current Chairman of the Board, Chief Executive Officer, President or Chief Financial Officer of an **Insured Entity** shall be imputed to such **Insured Entity**.

C.    alleging, arising out of, based upon or attributable to as of the applicable Pending or Prior Date set forth in Item 5. of the Declarations, any pending or prior: (i) litigation; or (ii) administrative or regulatory proceeding or investigation of which an **Insured** had notice, including all **Claims** arising from **Wrongful Act(s)** that have as a common nexus any fact, circumstance, situation, event, transaction or series of related facts, circumstances situations, events, or transactions as alleged in such pending or prior litigation

*Mercury 000049*

or administrative or regulatory proceeding or investigation.

D.   all **Claims** arising from **Wrongful Act(s)** that have as a common nexus any fact, circumstance, situation, event, transaction to the same or related **Wrongful Act(s)** alleged or contained in any **Claim** which has been reported, or in any circumstances of which notice has been given, before the Inception Date of this Policy as set forth in Item 2. of the Declarations, under any policy, whether excess or underlying, of which this Policy is a renewal or replacement or which it may succeed in time.

E.   alleging, arising out of, based upon or attributable to the the Fair Labor Standards Act (except the Equal Pay Act); the refusal, failure or inability of any **Insured** to pay wages or overtime pay for services rendered (exclusive of tort-based front pay or back pay); improper classification of any **Employee;** improper payroll deductions taken by any **Insured** from any **Employee;** failure to provide or enforce legally required meal or rest break periods; failure to reimburse expenses; unjust enrichment or conversion as specifically related to wage and hour claims; and failure to comply with any other law concerning wage and hour practices. Provided, however, that this Exclusion shall not apply to that portion of a **Claim** for **Retaliation**.

F.   alleging, arising out of, based upon or attributable to any actual or alleged violation of the Employee Retirement Income Security Act of 1974, the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder or any amendments thereto, or any similar foreign, federal, state or statutory law or common law. Provided, however, that this Exclusion shall not apply to that portion of a **Claim** for **Retaliation**.

G.   alleging, arising out of, based upon or attributable to any obligation pursuant to any worker's compensation, disability benefits, unemployment compensation, unemployment insurance, retirement benefits, social security benefits, or any similar law; provided, however, that this Exclusion shall not apply to that portion of a **Claim** for **Retaliation**.

H.   alleging, arising out of, based upon or attributable to any lockout, strike, picket line, hiring of replacement workers, or other similar actions in connection with labor disputes or labor negotiations; provided, however, that this Exclusion shall not apply to that portion of a   **Claim** for **Retaliation** or **Wrongful Employment Decision**.

I.   alleging, arising out of, based upon or attributable to any actual or alleged act or omission of an **Insured Person** to the extent serving in any capacity, other than as an **Insured Person**.

J.   for bodily injury, sickness, disease or death of any person, or damage to or destruction of any tangible property, including the loss of use thereof, including any emotional distress or mental anguish resulting therefrom; provided, however, that this Exclusion shall not apply to that portion of a **Claim** alleging emotional distress or mental anguish resulting from an otherwise covered **Wrongful Act**.

K.   alleging, arising out of, based upon or attributable to any actual or alleged liability of an **Insured** under an express contract or agreement; provided,

*Mercury 000050*

however, that this Exclusion shall not apply: (1) to the extent that the **Named Insured PEO** would have been liable in the absence of such contract or agreement, or (2) to the payment of **Defense Costs** incurred in connection with that portion of any **Claim** against an **Insured Person** of the **Named Insured PEO**; further, and solely with respect to a **Client Services Agreement,** this Exclusion shall not apply: (1) to the extent that the **Named Insured PEO** would have been liable in the absence of such contract or agreement; or (2) to the payment of **Defense Costs** incurred in connection with that portion of any **Claim** against the **Named Insured PEO**.

L.   resulting from any **Wrongful Act** which occurred or first commenced prior to the effective date of the most recent **Client Service Agreement** between the **Named Insured PEO** and the **PEO Client Company**. In the event the **Client Service Agreement** has been continuously renewed, the effective date of that **Client Service Agreement** is considered to be the earliest effective date.

## IV.   LIMITS OF LIABILITY

A.   The Aggregate Limit of Liability, as set forth in Item 3. of the Declarations, is the maximum amount that the **Insurer** is obligated to pay under this Policy for all **Loss**, including **Defense Costs**, from all **Claims**, under all **Insuring Agreements**, first made during the **Policy Period** (or Discovery Period, if applicable) and reported to the **Insurer** in accordance with the terms of this Policy.

B.   If the Aggregate Limit of Liability, as set forth in Item 3. of the Declarations, is exhausted by the payment of **Loss**, including **Defense Costs**, all obligations of the **Insurer** under this Policy will be completely fulfilled and the **Insurer** will have no further obligations under this Policy of any kind, and the Premium, as set forth in Item 7. of the Declarations, will be fully earned

C.   **Defense Costs** are part of, and not in addition to, the Limits of Liability as set forth in Item 3. of the Declarations, and payment by the **Insurer** of **Defense Costs** shall reduce and may exhaust such Limits of Liability.

D.   If a Discovery Period is purchased by the **Insured** pursuant to Clause IX. of this Policy, the Limit of Liability for the Discovery Period shall be part of, and not in addition to, the Limits of Liability as set forth in Item 3. of the Declarations, and shall neither increase nor reinstate such Limits of Liability.

## V.   RETENTION

A.   Subject to all other terms and conditions of this Policy, the **Insurer** shall only be liable for the amount of **Loss** arising from a **Claim** which is in excess of the applicable Retention amount as set forth in Item 4. of the Declarations. A single Retention amount, and a single Limit of Liability, shall apply to all **Loss** from **Claims** alleging the same **Wrongful Acts** or **Interrelated Wrongful Acts**. The Retention amount shall not be borne by the **Insurer**.

B.   In the event that both a **Named Insured PEO** and a **PEO Client Company** are both parties to the same **Claim**, a single Retention amount shall apply, which shall be the Retention amount applicable to the **PEO Client Company**. In the event that a **Group 1 Entity** and a **Group 2 Entity** are both parties to

*Mercury 000051*

the same **Claim**, a single Retention amount shall apply, which shall be the highest of the two Retention amounts.

C.    The certificate of incorporation, charter, articles of association or other organizational documents, including any by-laws or resolutions of the **Insured Entities**, will be deemed to have been adopted or amended to provide indemnification to **Insured Persons** to the fullest extent permitted by law.

D.    The applicable Retention amount set forth in Item 4. of the Declarations will apply to any **Loss**, incurred by or on behalf of the **Insured Persons**, to which indemnification by an **Insured Entity** is legally required or permissible, whether or not actual indemnification is made, unless such indemnification is not made by the **Insured Entity** solely by reason of **Financial Impairment**.

E.    If an **Insured Entity** is legally required to indemnify its **Insured Person** for any **Loss**, and does not do so for any reason, the **Insurer** shall not require payment of the applicable Retention by the **Insured Person**. However, the **Insured Entity** hereby agrees to reimburse the **Insurer** for the full amount of such applicable Retention immediately upon request, unless the **Insured Entity** is unable to do so solely by reason of **Financial Impairment**.

F.    In the event that payment of **Loss** or Retention is made under any other insurance coverage provided to an **Insured** or if payment is made by any other source, such payment will be deemed to erode the Retention by the equivalent amount of such payment.

## VI.  NOTICE OF CLAIM

A.    The **Named Insured PEO** shall, as a condition precedent to the obligations of the **Insurer** under this Policy, give written notice to the **Insurer**, at the address, facsimile number or email address indicated in Item9. of the Declarations of a **Claim** as soon as practicable,  after TRINET GROUP HR INC.'S General Counsel, Associate General Counsel, Risk Manager, Head of Human Resources, any past, present or future duly elected or appointed director, officer, trustee, governor, management committee member or member of the board of managers, or any individual that provides a similar function to any of the foregoing, first becomes aware or receives notification of the **Claim** but in all events no  later than sixty (60) days  after            the Expiration date. The **Insureds** will provide the **Insurer**, as identified in the Declarations, with copies of all documentation comprising the **Claim** as well as all authorization, cooperation, or assistance as we may require throughout the duration of the **Claim.**

The Insurer is not obligated to pay or credit toward the Retention any **Defense Costs** incurred prior to **Claim** notification.

B.    A **PEO Client Company** shall, as a condition precedent to the obligations of the **Insurer** under this Policy, give written notice to the **Named Insured PEO** of a **Claim** as soon as practicable, but in all events no later than 60 days after the **PEO Client Company** becomes aware of the **Claim**.   However, in the event the **PEO Client Company** is named in any **Claim** and fails to provide notice to the **Named Insured PEO** within sixty (60) days after becoming

*Mercury 000052*

aware of such **Claim**, the **Named Insured PEO's** rights under this Policy as respects such **Claim** shall not be prejudiced because of the **PEO Client Company's** failure to provide notice, provided however the **Insurer** reserves the right to deny coverage of any portion of such **Claim** against the **PEO Client Company**.

C.   If during the **Policy Period** the **Named Insured PEO** becomes aware of any circumstances which may reasonably be expected to give rise to a **Claim** being made against the **Named Insured PEO**, the **Named Insured PEO** may provide written notice to the **Insurer** of such circumstances. This written notice shall include a description of the **Wrongful Act(s)**, the anticipated allegations and the reasons for anticipating a **Claim**, with full particulars as to dates, persons and entities involved. If a **Claim** is subsequently made against the **Named Insured PEO** and reported to the **Insurer** arising out of, based upon or attributable to the previously noticed circumstances, such **Claim** shall be considered first made at the time notice of such circumstances was provided to the **Insurer**.

The Insurer is not obligated to pay or credit toward the Retention any amounts incurred in response to or otherwise related to circumstances referenced above prior to the time a **Claim** is made.

This Provision (Section VI.C) only applies to the **Named Insured PEO**, and does not apply to any **PEO Client Company**.

## VII.   DEFENSE OF CLAIM AND SETTLEMENT

A.   The **Insurer** has the right and duty to defend any **Claim** against any **Insured** covered under this Policy, even if such **Claim** is false, fraudulent or groundless.

B.   The **Insured(s)** shall not admit or assume any liability, incur any **Defense Costs**, offer to settle, enter into any settlement agreement or stipulate to any judgment without the prior written consent of the **Insurer**, such consent not to be unreasonably withheld. Any **Loss** incurred by the **Insured(s)** or any settlements or judgments agreed to by the **Insured(s)** without such consent shall not be covered by this Policy. However, the **Insurer's** consent is not required for the **Insured** to settle a **Claim** for a **Loss** amount within the applicable Retention, but solely in the event that such settlement fully resolves such **Claim** with respect to the **Insurer** and all **Insureds**.

C.   Each and every **Insured** shall give the **Insurer** full cooperation and provide such information as the **Insurer** may reasonably require relating to the defense and settlement of any **Claim** and the prosecution of any counterclaim, cross-claim or third-party claim, including without limitation the assertion of any indemnification or contribution rights.  The Insurer shall not assert that the failure to cooperate under this provision by an **Insured Person** applies to limit or restrict coverage as to any other **Insured Person**.

D.   The **Insurer** shall have the right to investigate and conduct negotiations and, with the **Insured's** consent, which shall not be unreasonably withheld, enter into the settlement of any **Claim** that the **Insurer** deems appropriate.

*Mercury 000053*



ii.   The following paragraph applies to a **Claim** against a **PEO Client Company**:

In the event a **PEO Client Company** refuses to either continue participating in reasonable settlement negotiations or consent to a settlement acceptable to the claimant in accordance with the **Insurer's** recommendation, the **Insurer's** liability for **Loss** on account of such **Claim** shall not exceed: (1) the amount for which the **Insurer** could have settled the **Claim**; plus (2) any **Defense Costs** incurred up to the date the **PEO Client Company** refused to settle such **Claim**. However, in no event shall the **Insurer's** liability exceed the Limits of Liability as set forth in Item 3. of the Declarations.

E.   The **Insurer** shall pay **Defense Costs** on a current basis prior to the final disposition of any **Claim**, excess of the applicable Retention and subject to all other terms and conditions of this Policy. In the event and to the extent that the **Insureds** shall not be entitled to payment of such **Defense Costs** under the terms and conditions of this Policy, such payments by the **Insurer** shall be repaid to the **Insurer** by the **Insureds**, severally according to their respective interests.

## VIII.   ALLOCATION

A.   In the event the **Insured(s)** incur **Loss** that is both covered and not covered by this Policy, either because the **Claim** includes both covered and uncovered matters or because the **Claim** includes both insured and uninsured parties, the **Insured** and the **Insurer** agree to allocate between covered and uncovered **Loss**, including **Defense Costs**, based on the relative legal and financial exposures of the insured parties to covered and non-covered matters.

In the event of a settlement of such **Claim**, the allocation of **Loss** shall also be based upon the relative legal and financial exposures of the insured parties to covered and non-covered matters and the benefits to the **Insureds** from such a settlement.

The **Insurer** shall not be liable under this Policy for the portion of such amount allocated to non-covered loss.

*Mercury 000054*

If an allocation of **Loss** cannot be agreed to by the **Insurer** and the **Insured(s)**, then: (1) the **Insurer** shall pay those amounts which it believes to be fair and equitable until an amount shall be agreed upon or determined pursuant to the provisions of this Policy; and (2) there will be no presumption of allocation of **Loss**, in any arbitration, suit or other proceeding.



## IX.   DISCOVERY CLAUSE

A.   Automatic Discovery Period

If the **Named Insured PEO** or the **Insurer** refuses to renew this Policy, or if a **Material Organizational Change** occurs, and this Policy has been in force for at least six (6) months, the **Named Insured PEO** shall have the right to an Automatic Discovery Period of sixty (60) days immediately following the effective date of such non-renewal or **Material Organizational Change**, requiring no additional premium. During the Automatic Discovery Period, the **Named Insured PEO** may provide the **Insurer** with notice pursuant to Clause VI. of this Policy, of **Claims** first made against the **Named Insured PEO** or its **Insured Persons** during the Automatic Discovery Period, solely with respect to **Wrongful Acts** occurring prior to the effective date of the non-renewal or **Material Organizational Change**, and otherwise covered by this Policy.

Provided, however, that the Automatic Discovery Period shall remain in effect only as long as no other policy of insurance is in effect that would apply to a **Claim** made during such Automatic Discovery Period.

B.   Optional Discovery Period

**Mercury 000055**

If the **Named Insurer PEO** or the **Insurer** refuses to renew this Policy, , or if a **Material Organizational Change** occurs, the **Named Insured PEO** shall have the right to purchase an Optional Discovery Period of up to three (3) years immediately following the effective date of such non-renewal or Organizational Change. During the Optional Discovery Period, the **Named Insured PEO** may provide the **Insurer** with the notice pursuant to Clause VI of this Policy, of **Claims** first made against the **Named Insured PEO** or its **Insured Persons** during the Optional Discovery Period, solely with respect to **Wrongful Acts** occurring prior to the effective date of the non-renewal or **Material Organizational Change**, and otherwise covered by this Policy.

C.     The **Named Insured PEO's** right to purchase an Optional Discovery Period shall lapse unless written notice of its election to purchase such Optional Discovery Period and the additional premium for such Optional Discovery Period is received by the **Insurer** within sixty (60) days after such non-renewal or **Material Organizational Change**. The additional premium for an Optional Discovery Period of one (1) to six (6) years shall be determined by multiplying the applicable percentage set forth in Item 6. of the Declarations by the Premium set forth in Item 7. of the Declarations.

D.     The Limits of Liability for the Automatic and Optional Discovery Periods shall be part of, and not in addition to, the Limits of Liability set forth in Item 3. of the Declarations, and shall not increase or reinstate such Limits of Liability.

E.     The Optional Discovery Period premium shall be fully earned at the inception of the Discovery Period. The Optional Discovery Period is non-cancellable.

## X.     OTHER INSURANCE

A.     The insurance provided by this Policy shall apply as primary insurance for **Claims** made against the **Named Insured PEO**, its **Subsidiary(ies)** or any of their **Insured Person(s)**.

B.     In connection with any covered **Claim** made against a **PEO Client Company**, or any of its **Insured Person(s)**, and subject to all other terms and conditions herein, this Policy shall apply specifically excess of and shall not contribute with any indemnification and any other insurance coverage that is valid and collectible to the **PEO Client Company**, or any of its **Insured Person(s)**. In the event such other insurance coverage is provided by the **Insurer** (or would be provided except for the application of any retention, exhaustion of a limit of liability or failure to submit notice of a claim) then the **Insurer's** aggregate limit of liability for all **Loss** combined in connection with a **Claim** covered, in whole or in part, by this Policy and such other insurance policy, shall be the greater of: (1) the Limits of Liability available under this Policy; or (2) the limit of liability of such other insurance policy.

## XI.     REPRESENTATIONS AND SEVERABILITY

It is agreed that the **Insurer** has relied upon the information contained in the **Application** in issuing this Policy. In regard to the statements, warranties, representations and information contained in the **Application**, no knowledge of any **Insured Person** shall be imputed to any other **Insured Person** for the purpose of

*Mercury 000056*

determining whether coverage is available under this Policy for any **Claim** made against such **Insured Person**. However, the knowledge possessed by any past or current **Executive** shall be imputed to the **Insured Entity** for which the **Executive** is acting in his or her capacity as such.

## XII.    COVERAGE EXTENSIONS

A.    This Policy shall cover **Loss** arising from any **Claims** made against the estates, heirs, or legal representatives of any deceased person who was an **Insured Person** at the time the **Wrongful Acts** upon which such **Claims** are based were committed; provided, however, that this extension shall not afford coverage for any **Claim** for any actual or alleged **Wrongful Act** by or on the part of any such estates, heirs, or legal representatives, but shall apply only to **Claims** arising out of any actual or alleged **Wrongful Acts** of an **Insured Person**.

B.    This Policy shall also cover **Loss** arising from any **Claims** made against the legal representatives of any incompetent, insolvent or bankrupt person who was an **Insured Person** at the time the **Wrongful Acts** upon which such **Claims** are based were committed; provided, however, that this extension shall not afford coverage for any **Claim** for any actual or alleged **Wrongful Act** by or on the part of any such legal representatives, but shall apply only to **Claims** arising out of any actual or alleged **Wrongful Acts** of an **Insured Person**.

C.    This Policy shall also cover **Loss** arising from any **Claims** made against the lawful spouse or domestic partner (whether such status is derived by reason of statutory law, common law or otherwise of any applicable jurisdiction in the world or any formal program established by the **Insured Entity**) of an **Insured Person** for all **Claims** arising solely out of his or her status as the spouse or domestic partner of an **Insured Person**, including a **Claim** that seeks damages recoverable from marital community property, property jointly held by the **Insured Person** and the spouse or domestic partner, or property transferred from the **Insured Person** to the spouse or domestic partner; provided, however, that this extension shall not afford coverage for any **Claim** for any actual or alleged **Wrongful Act** by or on the part of the spouse or domestic partner, but shall apply only to **Claims** arising out of any actual or alleged **Wrongful Acts** of an **Insured Person**.

D.    The coverage extensions set forth in this Clause XII. are subject to all other terms and conditions of this Policy.

## XIII.    CANCELLATION AND NON-RENEWAL CLAUSE

A.    This Policy may be cancelled by TriNet Group, Inc. by sending written prior notice to the **Insurer**, at the address set forth in Item 8. of the Declarations, stating when thereafter the cancellation of the Policy shall be effective. The Policy terminates at the date and hour specified in such notice. The **Insurer** shall retain the customary short rate proportion of the premium, or the minimum earned premium of whichever is greater, unless stated otherwise herein.

B.    This Policy shall not be cancelled by the **Insurer**, except by reason of non-

*Mercury 000057*

payment of the Premium set forth in Item 7. of the Declarations. The **Insurer** may cancel the Policy by delivering to the **TriNet Group, Inc.**, or by mailing to the **TriNet Group, Inc.**, by registered mail, or by courier, to the attention of the Chief Legal Officer, at TriNet Group, Inc.'s address set forth in Item 1. of the Declarations, written notice stating when, not less than twenty (20) days thereafter, the cancellation shall be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice. In the event of such cancellation, the Policy will be deemed terminated as of the date indicated in the **Insurer's** written notice of cancellation to the **Named Insured PEO** unless payment of the Premium is received by the **Insurer** prior to the date of the termination.

C.   Payment or tender of any unearned premium by the **Insurer** shall not be a condition precedent to the effectiveness of cancellation, but such payment shall be made as soon as practicable. If the period of limitation relating to the giving of notice is prohibited or made void by any law controlling the construction thereof, such period shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

D.   The **Insurer** shall have no obligation to renew this Policy. In the event the **Insurer** decides to non-renew this Policy, it shall deliver or mail to TriNet Group, Inc., at the address set forth in the Declarations, written notice of such decision at least sixty (60) days prior to the expiration of the **Policy Period**.

## XIV.   ORGANIZATIONAL CHANGES

A.   If during the **Policy Period, a Material Organizational Change occurs** then this Policy shall continue in full force and effect as to **Wrongful Acts** occurring prior to the effective time of a **Material Organizational Change**. However, there shall be no coverage afforded by this Policy for any actual  or alleged **Wrongful Act** occurring after the effective time of the **Material Organizational Change**. This Policy shall be non-cancellable and the entire premium shall be deemed fully earned upon the effective time of the **Material Organizational Change**. The **Named Insured PEO** shall also have the right to purchase a Discovery Period described in Clause IX. in the event of a **Material Organizational Change**.

B.   If the **Named Insured PEO** engages in an intra-company reorganization that may affect the legal entity name or structure of the **Named Insured PEO** but does not affect substantially the control or assets of the **Named Insured PEO,** the **Named Insured PEO** may request an assignment of this Policy as outlined below in Section XVIII and the **Insurer** shall not unreasonably withhold its agreement.
The **Named Insured PEO** shall give the **Insurer** written notice of a **Material Organizational Change** or a reorganization described in Section B, above, as soon as practicable, but no later than thirty (30) days after the effective date of the **Material Organizational Change** or reorganization.

## XV.   AUTHORIZATION AND NOTICES

TriNet Group, Inc. shall act on behalf of all **Insureds** with respect to all matters pertaining to this Policy including: (1) giving notice of any **Claim** or circumstance which may result in a **Claim**; (2) giving and receiving of all correspondence and

*Mercury 000058*

information; (3) giving and receiving notice of cancellation; (4) payment of premiums; (5) receiving of any return premiums; (6) receiving and accepting of any endorsements issued to form a part of this Policy; and (7) the exercising of any right to a Discovery Period.

## XVI. VALUATION AND CURRENCY

All amounts stated in this Policy are expressed in United States dollars and all amounts payable under this Policy are payable in United States dollars. If a judgment rendered or settlement entered into under this Policy are stated in a currency other than United States dollars, then payment under this Policy shall be made in United States dollars at the rate of exchange published in the *Wall Street Journal* on the date the final judgment is rendered or the settlement payment is established.

## XVII. TERRITORY

This Policy extends to **Wrongful Acts** occurring, or **Claims** made, anywhere in the world, to the extent permitted by law.

## XVIII. ASSIGNMENT AND CHANGES TO THE POLICY

A. This Policy and any and all rights hereunder are not assignable without the prior written consent of the **Insurer**

B. Notice to any agent or knowledge possessed by any agent or person acting on behalf of the **Insurer**, will not result in a waiver or change in any part of this Policy or prevent the **Insurer** from asserting any right under the terms and conditions of this Policy. The terms and conditions of this Policy may only be waived or changed by written endorsement signed by the **Insurer**.

## XIX. BANKRUPTCY

A. Bankruptcy or insolvency of any **Insured** shall not relieve the **Insurer** of any of its obligations hereunder.

B. It is understood and agreed that the coverage provided under this Policy is intended to protect and benefit the **Insured Persons**. Further, if a liquidation or reorganization proceeding involving the **Insured Entity** is commenced (whether voluntarily or involuntarily) under Title 11 of the United States Code (as amended), or any similar state, local or foreign law (collectively "Bankruptcy Law") then, in regard to a covered **Claim** under this Policy, the **Insureds** and the **Insurer** hereby:

1. waive and release any automatic stay or injunction to the extent it may apply in such proceeding to the Policy or its proceeds under such Bankruptcy Law; and

2. agree not to oppose or object to any efforts by any **Insured** or the **Insurer** to obtain relief from any such stay or injunction

C. In the event the **Named Insured PEO** or any **Subsidiary** becomes a debtor-in-possession or equivalent status under such Bankruptcy Law, and the total

*Mercury 000059*

covered **Loss** under this Policy exceeds the available applicable Limit of Liability, the **Insurer** shall:

1.  first pay the **Loss** allocable to **Wrongful Acts** that are actually or allegedly caused, committed, or attempted prior to the **Named Insured PEO** or **Subsidiary** becoming a debtor-in-possession or some equivalent status, then

2.  pay any remaining **Loss** allocable to **Wrongful Acts** that are actually or allegedly caused, committed, or attempted after the **Named Insured PEO** or **Subsidiary** became a debtor-in-possession or some equivalent status.

## XX.   SUBROGATION

In addition to any right of subrogation existing at law, in equity or otherwise, in the event of any payment by the **Insurer** under this Policy, the **Insurer** shall be subrogated to the extent of such payment to all of the **Insured(s)'** rights of recovery. The **Insured(s)** shall execute all papers required (including those documents necessary for the **Insurer** to bring suit or other form of proceeding in their name) and do everything that may be necessary to pursue and secure such rights. The **Insurer** shall not exercise its subrogation rights against an **Insured Person**, unless Exclusion B. above applies to such **Insured Person**.

## XXI.   ACTION AGAINST THE INSURER

No action may be taken against the **Insurer** unless, as a condition precedent thereto, there shall have been full compliance with all material terms of this Policy and the amount of the **Insured's** obligation has been fully determined either by judgment against the **Insured** after actual trial, or by written agreement of the **Insured**, the claimant and the **Insurer**.

No person or entity shall have any right under this Policy to join the **Insurer** as a party to any action against any **Insured** to determine such **Insured's** liability nor shall the **Insurer** be impleaded by such **Insured** or legal representatives of such **Insured**.

## XXII.   LIBERALIZATION CLAUSE

In the event the **Insurer** introduces a new Professional Employer Organization Employment Practices Liability policy form, then the **Named Insured PEO** shall have the right to any broader coverage available under such new policy form, if allowed by law, as of the date that such new policy is made available to all insureds, but only with respect to **Claims** first made after such date.

## XXIII.   CONFORMITY TO STATUTE

Any terms of this Policy which are in conflict with the terms of any applicable laws construing this Policy, including any endorsement to this Policy which is required by any state Department of Insurance, or equivalent authority ("State Amendatory Endorsement"), are hereby amended to conform to such laws. Nothing herein shall

*Mercury 000060*

be construed to restrict the terms of any State Amendatory Endorsement.

In the event any portion of this Policy shall be declared or deemed invalid or unenforceable under applicable law, such invalidity or unenforceability shall not affect the validity or enforceability of any other portion of this Policy.

## XXIV. HEADINGS

The descriptions in the headings and any subheading of this Policy (including any titles given to any endorsement attached hereto) are inserted solely for convenience and do not constitute any part of this Policy's terms or conditions.

*Mercury 000061*

# Schedule of Forms and Endorsements



| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Producer | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|---|
| EPL 0508351-02 | 04/01/2020 | 04/01/2021 | 04/01/2020 | 28235000 | ---- | ---- |

**Policyholder:** TRINET GROUP, INC.

| Form Name | Form Number | Edition Date | Endorsement No. |
|---|---|---|---|
| Disclosure Statement | U-GU-873-A CW | 06/11 | |
| Disclosure Statement | U-GU-874-A CW | 06/11 | |
| Important Notice – In Witness Clause | U-GU-319-F | 01/09 | |
| EPL PEO Declaration | MEPL-MAN | 03/19 | |
| Pending and Prior Date Endorsement | M-EPL-2188N CW | 03/19 | 01 |
| ▉ | M-EPL-2189N CW | 03/19 | 02 |
| OFAC Exclusion Endorsement | M-EPL-2190N CW | 03/19 | 03 |
| Delete Third-Party Liability Coverage For PEO Client Companies | M-EPL-2191N CW | 04/19 | 04 |
| Choice of Law, Jurisdiction and Service of Suit Endorsement | M-EPL-2192N CW | 03/19 | 05 |
| Specific Client Company Exclusion Amended Endorsement | M-EPL-2469N CW | 04/20 | 06 |
| Revised Definition of Spouse Endorsement | U-GU-1223-B CA | 09/16 | 07 |
| ▉ | M-EPL-2294N CW | 01/19 | 08 |
| Assigned Counsel Duty to Defend Contingent | M-EPL-2470N CW | 04/20 | 09 |
| ▉ | M-EPL-2197N CW | 03/19 | 10 |
| ▉ | M-EPL-2198N CW | 03/19 | 11 |
| Sanctions Exclusion Endorsement | U-GU-1191-A CW | 03/15 | 12 |
| California Amendatory (PEO) Endorsement | M-EPL-2201N CW | 05/18 | 13 |
| Special Cancellation/Insured Downgrade Clause Endorsement | M-EPL-2199N CW | 03/19 | 14 |
| Biometric Information Claim Exclusion Added | M-EPL-2471N CW | 04/20 | 15 |
| | | | |

**ENDORSEMENT NUMBER # 01**
**Effective Date:** 04/01/2020
**Policy Number:** EPL 0508351-02
**Policyholder:** TRINET GROUP, INC.


### Pending and Prior Date

In consideration of the premium charged, it is understood and agreed that:

I.      In respect of Group 1 Entities:

    A.  Coverage under this Policy for each **PEO Client Company** and its Insured Persons shall only apply
to Claims brought on or after the later of, the Inception Date set forth in Item 2. of the
Declarations, or the effective date of the applicable Client Service Agreement between the
Group 1 Entities and the respective **PEO Client Company** and before the earlier of the Expiration
Date set forth in Item 2. of the Declarations or the effective date of termination of such Client
Service Agreement.

    B.  As respects Exclusion C., the applicable Pending or Prior Date for each **PEO Client Company** and
its Insured Persons, shall be the later of the effective date of the applicable Client Service
Agreement between the Group 1 Entitiy and the respective **PEO Client Company**; or January 1,
1998.

    C.  However, notwithstanding the above, with regard to each **PEO Client Company** that is party to a
Client Service Agreement with TriNet HR IV LLC, as respects Exclusion C., the applicable Pending
or Prior Date for such **PEO Client Company** and its **Insured Persons**, shall be the later of the
effective date of the applicable **Client Service Agreement** between TriNet HR IV LLC and  the
respective **PEO Client Company;** or June 28, 2013;


II.     In respect of Group II Entities:

    A.  Coverage under this Policy for each **PEO Client Company** and its **Insured Persons** shall only
apply to **Claims** brought on or after the later of, the Inception Date set forth in Item 2. of the
Declarations, or the effective date of the applicable **Client Service Agreement** between Group 2
Entities and the respective **PEO Client Company** and before the earlier of the Expiration Date set
forth in Item 2. of the Declarations or the effective date of termination of such **Client Service
Agreement.**

    B.  However, notwithstanding the above, with regard to each **PEO Client Company** that is party to a
Client Service Agreement with TriNet HR I, Inc., as respects Exclusion C.,the applicable Pending
or Prior Date for each **PEO Client Company** and its **Insured Persons**, shall be the later of the
effective date of the applicable **Client Service Agreement** between TriNet HR I, Inc. and the
respective **PEO Client Company**; or May 3, 2012.

    C.  However, notwithstanding the above, with regard to each **PEO Client Company** that is party to a
Client Service Agreement with TriNet HR II, Inc., TriNet HR II-A, Inc., or TriNet HR XI, Inc., as

M-EPL-2188N CW (03/19)

*Mercury 000063*

respects Exclusion C., the applicable Pending or Prior Date for each **PEO Client Company** and its **Insured Persons**, shall be the later of the effective date of the **Client Service Agreement** between TriNet HR II, Inc., TriNet HR II-A, Inc., or TriNet HR XI, Inc. and the **PEO Client Company**; or October 25, 2012.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

M-EPL-2188N CW (03/19)

**ENDORSEMENT NUMBER # 02**
**Effective Date:** 04/01/2020
**Policy Number:** EPL 0508351-02
**Policyholder:** TRINET GROUP, INC.



ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

M-EPL-2189N CW (03/19)

*Mercury 000065*

**ENDORSEMENT NUMBER # 03**

### OFAC Exclusion

**Policy Number:** EPL 0508351-02
**Policyholder:** TRINET GROUP, INC.
**Effective Date:** 04/01/2020

It is understood and agreed that Clause III, EXCLUSIONS, is amended by adding the following exclusion:

This policy shall not cover any **Loss** in connection with that portion of any **Claim** made against an **Insured Person** in the event that such coverage would not be in compliance with any United States of America economic or trade sanctions, laws or regulations, including but not limited to the U.S. Treasury Department's Office of Foreign Assets Control, or any similar foreign, federal, state or statutory law or common law.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHAGED.

M-EPL-2190N CW (03/19)

*Mercury 000066*

**ENDORSEMENT NUMBER 04**
**Effective Date:** 04/01/2020
**Policy Number:** EPL 0508351-02
**Policyholder:** TRINET GROUP, INC.

### Delete Third Party Liability Coverage for PEO Client Companies

It is understood and agreed that the coverage provided pursuant to Insuring Agreement B, Third-Party Liability Coverage, shall not apply to any **Claim** made against any **PEO Client Company** or any **Worksite Employee**.



ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

M-EPL-2191N CW (04/19)

*Mercury 000067*

**ENDORSEMENT NUMBER # 05**
**Policy Number:** EPL 0508351-02
**Policyholder:** TRINET GROUP, INC.
**Effective Date:** 04/01/2020

### Choice of Law, Jurisdiction and Service of Suit

A.    This contract in all respects, including with respect to its negotiation, validity or
      enforceability, is to be construed in accordance with and governed by the laws of the
      State of New York, without regard to conflicts of law principles.

B.    If the **Insurer** brings against any **Insured**, or any **Insured** brings against the **Insurer**,
      any proceeding arising out of or in connection with this contract, including its negotiation,
      validity or enforceability, such proceeding may be brought only in a federal court of the
      United States or, solely in the event that there is no federal subject matter jurisdiction, in
      any state court of competent jurisdiction in the United States. The **Insurer** and the
      **Insureds** agree to submit to the exclusive jurisdiction of those courts for purposes of any
      such proceeding.

C.    The **Insurer** agrees that service of process in a proceeding by an **Insured** against the
      **Insurer** may be made upon General Counsel, Law Department, Zurich American
      Insurance Company 1299 Zurich Way, Schaumburg, Illinois 60196-1056.

D.    Pursuant to any statute of any state, territory or district of the United States that makes
      provision therefore, the **Insurer** hereby designates the Superintendent, Commissioner or
      Director of Insurance, or other officer specified for that purpose in the statute, or his or
      her successors in office, as its true and lawful attorney upon whom may be served any
      lawful process in any action, suit or proceeding instituted by or on behalf of any **Insured**
      or any beneficiary hereunder arising out of this policy of insurance and hereby
      designates the above named Counsel as the person to whom the said officers is
      authorized to mail such process or a true copy thereof.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

M-EPL-2192N CW (03/19)

*Mercury 000068*

**ENDORSEMENT NUMBER # 06**
**Policy Number:** EPL 0508351-02
**Policyholder:** TRINET GROUP, INC.

## Specific Client Company Exclusion Amended
## (Remove Entity)

| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|
| EPL 0508351-02 | 04/01/2020 | 04/01/2021 | 04/01/2020 | ---- | ---- |

It is hereby understood and agreed that as of the effective date of this endorsement, no coverage is afforded to the following **PEO Client Company(s)**:



If, before or during the **Policy Period**, the **Named Insured PEO** executes a "Waiver of EPLI Coverage" with a **PEO Client Company**, then no coverage will be afforded to such **PEO Client Company** under this Policy.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

M-EPL-2469N CW (04/20)

*Mercury 000069*

Endorsement # 07

# Revised Definition of Spouse
# Endorsement



| THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY. | | |
|---|---|---|
| Policyholder :<br><br>TRINET GROUP, INC. | Policy No. EPL 0508351-02 | Effective Date: 04/01/2020 |

It is hereby understood and agreed that the following changes are made and incorporated into the Policy/Certificate:

**PURPOSE:** California law provides that registered domestic partners have the same rights, protections, and benefits, and are subject to the same responsibilities, obligations, and duties under law, whether they derive from statutes, administrative regulations, court rules, government policies, common law, or any other provisions or sources of law, as are granted to and imposed upon spouses. Existing law requires, where necessary to implement the rights of registered domestic partners, gender-specific terms referring to spouses to be construed to include domestic partners.

**DEFINITIONS, TERMS, CONDITIONS AND PROVISIONS:**
The definitions, terms, conditions or any other provisions of the policy, contract, certificate and/or riders and endorsements to which this mandatory endorsement is attached are hereby amended and superseded as follows:

**Spouse** includes a Registered Domestic Partner.

Except for the above, this endorsement does not vary, alter, waive, or extend any of the terms of the **Policy/Certificate** to which it is attached.

Endorsement No. [07___]

Insurance Company STEADFAST INSURANCE COMPANY

_____Date:04/21/2020

Countersigned by

U-GU-1223-B CA  (09/16)

**Mercury 000070**

**Endorsement # 08**

**Effective Date:** 04/01/2020

**ZURICH**

**Policy Number:** EPL 0508351-02

**Policyholder:** TRINET GROUP, INC.

M-EPL-2294N CW (01/19)
Page 1 of 1

*Mercury 000071*

**ENDORSEMENT NUMBER # 09**
**Policy Number: EPL 0508351-02**
**Policyholder: TRINET GROUP, INC.**
**Effective Date: 04/01/2020**

<u>Assigned Counsel, Duty to Defend Contingent</u>

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

In consideration of the premium charged, it is hereby agreed that:

   I. Part VII. **DEFENSE OF CLAIM AND SETTLEMENT** is amended to add**:**

      F. All **Claims** that implicate the Insurer's duty to defend under this Policy will be defended by counsel assigned by the **Insurer.**

      G. The **Insurer's** obligation to pay **Defense Costs** to such counsel is expressly conditioned on the following:

         **(1)** **Insurer** shall pay such counsel at pre-approved rates; and

         **(2)** Such counsel shall in all respects, adhere to any Litigation Management Guidelines or Billing and Reporting Guidelines issued by the **Insurer** which may be updated from time to time. However, if the Fisher Phillips law firm is assigned defense counsel, adherence with Guidelines issued by the **Named Insured PEO** is required and will satisfy this condition.

      H. It is further agreed that the Fisher Phillips law firm is specifically approved to defend any **Named Insured PEO** or **PEO Client Company** in accordance with rates and terms approved by the **Insurer.**

   II. Part VII. **DEFENSE OF CLAIM AND SETTLEMENT,** Subsection A of the policy is replaced with:

      A. The **Insurer** has the right and duty to defend any **Claim** against any **Insured** covered under this Policy, even if such **Claim** is false, fraudulent or groundless.

         i.   However, for any **Claim**, if an **Insured** refuses to accept, or refuses to cooperate in the assignment of, defense counsel assigned by the **Insurer** in accordance with the provisions of this endorsement, the **Insurer** shall have no duty to defend that **Claim** and will not pay any **Loss** arising from same, including but not limited to **Defense Costs**, and will not apply any amounts incurred by the **Insured** to the applicable Retention obligation for that **Claim**. Provided, however, that if the **Insured's** refusal to accept **Insurer** assigned counsel is justified by and in accordance with applicable state law governing a right to independent counsel, or is justified by applicable rules regarding conflicts of interest, the **Insurer's**

M-EPL-2196N CW (04/20)

*Mercury 000072*

duties will not be affected by such refusal and will remain.

ii.  Regardless of whether no duty to defend exists pursuant to the provisions of
Subsection VII.A.i. for a particular **Insured**, the **Insurer** shall have the right and
shall be given the opportunity to make any investigation it deems necessary and
to effectively associate with the **Insured** in the investigation, defense and
settlement, including but not limited to the negotiation of a settlement, of any
**Claim** that is or reasonably could be covered in whole or in part by this
insurance.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED

M-EPL-2196N CW (04/20)

*Mercury 000073*

**ENDORSEMENT NUMBER # 10**
**Policy Number:** EPL 0508351-02
**Policyholder:** TRINET GROUP, INC.
**Effective Date:** 04/01/2020



ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

M-EPL-2197N CW (03/19)

*Mercury 000074*

**ENDORSEMENT NUMBER # 11**
**Effective Date:** 04/01/2020
**Policy Number:** EPL 0508351-02
**Policyholder:** TRINET GROUP, INC.



M-EPL-2198N CW (03/19)

*Mercury 000075*

**Endorsement #** 12

# SANCTIONS EXCLUSION
# ENDORSEMENT



**Policyholder:**  TRINET GROUP, INC.

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY

The following exclusion is added to the policy to which it is attached and supersedes any existing sanctions language in the policy, whether included in an Exclusion Section or otherwise:

SANCTIONS EXCLUSION

Notwithstanding any other terms under this policy, we shall not provide coverage nor will we make any payments or provide any service or benefit to any insured, beneficiary, or third party who may have any rights under this policy to the extent that such cover, payment, service, benefit, or any business or activity of the insured would violate any applicable trade or economic sanctions law or regulation.

The term policy may be comprised of common policy terms and conditions, the declarations, notices, schedule, coverage parts, insuring agreement, application, enrollment form, and endorsements or riders, if any, for each coverage provided. Policy may also be referred to as contract or agreement.

We may be referred to as insurer, underwriter, we, us, and our, or as otherwise defined in the policy, and shall mean the company providing the coverage.

Insured may be referred to as policyholder, named insured, covered person, additional insured or claimant, or as otherwise defined in the policy, and shall mean the party, person or entity having defined rights under the policy.

These definitions may be found in various parts of the policy and any applicable riders or endorsements.

## ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED

*Mercury 000076*

**Endorsement # 13**

# California Amendatory (PEO)



| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|
| EPL 0508351-02 | 04/01/2020 | 04/01/2021 | 04/01/2020 | ---- | ---- |

**Named Insured PEO:** TRINET GROUP, INC.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the:

**Employment Practices Liability Insurance Policy**

Subsection XIII is replaced with the following:

This policy shall terminate at the earliest of the expiration of the **Policy Period** shown in Item 2 of the Declarations or the effective date of cancellation.

1. Cancellation

    a. The **Named Insured PEO** may cancel this policy by surrender of it to the **Insurer** or by mailing prior written notice to the **Insurer** stating when such cancellation shall take effect.  In such event, the **Underwriter** shall retain the pro rata proportion of the premium.  In no event may the requested date of cancellation be greater than ten (10) days prior to the date the request is received by the **Insurer**.

    b. The **Insurer** may cancel this policy only for nonpayment of premium.  In such event, the **Insurer** shall mail written notice thereof by certified mail to the **Named Insured PEO** at the address shown in Item 1 of the Declarations, and by mail or electronic mail to the producer of record, if any.  Cancellation shall take effect ten (10) days from the date of mailing.

    c. If the policy is canceled by the **Insurer**, the earned premium shall be computed pro rata.  Premium adjustment may be made at the time cancellation is effected or as soon as practicable thereafter.  Failure to pay any premium adjustment at, on, or around the time of the effective date of cancellation shall not alter the effectiveness of cancellation.

2. Nonrenewal

    a. If the **Insurer** elects not to renew this policy, the **Insurer** shall mail written notice stating the reason for nonrenewal by certified mail to the **Named Insured PEO** at the address shown in Item 1 of the Declarations, and by mail or electronic mail to the producer of record, if any, at least sixty (60) days, but not more than one hundred and twenty (120) days, prior to the expiration of this policy.  If the **Insurer** fails to provide such timely written notice, the coverage provided to the **Named Insured PEO** shall remain in effect with no change in its terms and conditions, for a period of sixty (60) days.

    b. The **Insurer** is not required to send notice of nonrenewal in the following situations:

        (1) if the transfer or renewal of a policy, without any changes in terms, conditions or rates, is between the **Insurer** and a member of the **Insurer's** insurance group;

        (2) if the policy has been extended for ninety (90) days or less, provided that notice has been given in accordance with Subsection 2.a above;

        (3) if the **Named Insured PEO** has obtained replacement coverage, or has agreed, in writing, within sixty (60) days of the termination of the policy, to obtain that coverage;

        (4) if the policy is for a period of no more than sixty (60) days and the **Named insured PEO** is notified at the time of issuance that it will not be renewed;

M-EPL-2201N CW (05/18)
Page 1 of 2

*Mercury 000077*

    (5) if the **Named Insured PEO** requests a change in the terms or conditions or risks covered by the policy within sixty (60) days of the end of the **Policy Period**; or

    (6) if the **Insurer** has made a written offer to the **Named Insured PEO**, in accordance with Subsection 3 below, to renew the policy under changed terms or conditions or at an increased premium rate, when the increase exceeds twenty-five percent (25%).

  c.  The transfer of a policy between companies with the same insurance group or changes in premium, Self-Insured Retention, Limits of Liability or coverage are not refusals to renew.

3.  Conditional Renewal

If the **Insurer** elects to renew this policy and the renewal is subject to any of the following:

  a.  an increase in Self-Insured Retention;

  b.  a reduction in Limits of Liability;

  c.  the elimination of coverages; or

  d.  a twenty-five percent (25%) or more rate increase,

then the **Insurer** shall mail written notice of the change(s) by certified mail to the **Named Insured PEO** at the address shown in Item 1 of the Declarations, and by mail or electronic mail to the producer of record, if any, at least sixty (60) days, but not more than one hundred and twenty (120) days, prior to the expiration of this policy.

4.  Mailing Time Requirements

Mailing time must be added to the notice periods as follows:

  1.  add five (5) days if the place of address and place of mailing is in California;

  2.  add ten (10) days if the place of address or place of mailing is outside of California; or

  3.  add twenty (20) days if the place of address or place of mailing is outside the United States.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY SHALL APPLY AND REMAIN UNCHANGED.

*Mercury 000078*

**ENDORSEMENT NUMBER # 14**
**Policy Number:** EPL 0508351-02
**Policyholder:** TRINET GROUP, INC.
**Effective Date:** 04/01/2020

### Special Cancellation and Insurer Downgrade Clause

1.  The **Insurer** shall give notice to the **Named Insured PEO's** representative as identified in the Risk Details as soon as practicable and in any event within 14 days, or as soon as permitted by its regulator if later, where the **Insurer**:

    (i)  a. ceases underwriting entirely; or
         b. ceases underwriting the type of insurance provided by this policy in a territory where the **Named Insured PEO** is domiciled; or
         c. formally announces its intention to cease underwriting as per (i)a or (i)b above; or

    (ii)  voluntarily or involuntarily elects to wind up, run off its business, enter a scheme of arrangement or enter into any form of bankruptcy protection or related formal or informal termination of its insurance operations; or

    (iii)  has its authority to carry on insurance business withdrawn.

2.  The **Named Insured PEO** or the **Named Insured PEO's** representative may terminate an **Insurer's** participation on this risk by giving written notice:

    (i)  When one of the events identified above at Condition 1 takes place; or

    (ii)  In the event that an **Insurer** has its financial strength rating downgraded below A- by Standard & Poor's or A- by AM Best.

The effective date of termination shall not be earlier than the date notice is actually given by The **Named Insured PEO** or the **Named Insured PEO's** representative.

Upon notice of cancellation having been given by the **Named Insured PEO** or the **Named Insured PEO's** representative to the **Insurer**, the **Insurer** shall pay to the **Named Insured PEO** a pro rata return premium for the unexpired period of the policy. Such pro rata return premium shall be paid in accordance with the terms of trade previously agreed between the **Named Insured PEO's** representative and the **Insurer** to whom notice of cancellation has been given.

In the event that there are any notifications under this policy or the **Insurer** has made any payments pursuant to any policy term or condition providing coverage under this policy to the **Named Insured PEO**, the premium shall be deemed fully earned unless the **Named Insured PEO** withdraws such notifications and/or reimburses the **Insurer** for any payment(s) made or coverage is denied.

All other terms and conditions of this Policy remain unchanged.

M-EPL-2199N CW (03/19)

*Mercury 000079*

Endorsement # 15

# Biometric Information Claim Exclusion Added
**(PEO Client Company)**



| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|
| EPL 0508351-02 | 04/01/2020 | 04/01/2021 | 04/01/2020 | ---- | ---- |

**Policyholder:** TRINET GROUP, INC.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**Professional Employer Organization Employment Practices Liability Policy**

It is agreed:

I.   Section II. DEFINITIONS is amended to add the following:

**Biometric Information** means any information used to identify a natural person based on an anatomical scan or any record of biological pattern or characteristic, including but not limited to such natural person's retina or iris scan, fingerprint, voiceprint, or any record of hand or face geometry. **Biometric Information** shall not include any information that is protected or regulated pursuant to the Health Insurance Portability and Accountability Act of 1996.

**Biometric Information Claim** shall not include any **Claim** brought or maintained against a **PEO Client Company** for a **PEO Client Company's** violation of any federal, state or local law that regulates or restricts the storage, collection or use of **Biometric Information**.

All other terms, conditions, provisions and exclusions of this policy remain the same.

*Mercury 000080*



**XL Insurance**

**AXA XL - Professional Insurance**
100 Constitution Plaza, 17th Floor,
Hartford, CT 06103
Phone 860-246-1863, Fax 860-246-1899

December 21, 2020

Graig Vicidomino
Alliant Insurance Services (Crystal & Co.)
32 Old Slip
17th Floor
New York, NY 10005

**Re:  Mercury Capital Advisors Group LP**
**Financial Services Policy**

Dear Graig,

Enclosed, please find the policy for Mercury Capital Advisors Group LP. Thank you for choosing AXA XL Insurance. Please call if you have any questions or concerns.

Sincerely,

Nicolas Carlson

ko

*Mercury 000081*

**Policy Number:**      **ELU172207-20**

**Renewal of Number:**  ELU165296-19

**XL Specialty Insurance Company**

Members of the XL America Companies

---

### FINANCIAL SERVICES LIABILITY POLICY DECLARATIONS

Executive Offices
70 Seaview Avenue
Stamford, CT 06902-6040
Telephone 877-953-2636

---

THIS IS A CLAIMS MADE POLICY. EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS POLICY ONLY APPLIES TO CLAIMS FIRST MADE DURING THE POLICY PERIOD OR, IF APPLICABLE, THE OPTIONAL EXTENTION PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY THE PAYMENT OF DEFENSE EXPENSES. THIS POLICY DOES NOT PROVIDE FOR ANY DUTY BY THE INSURER TO DEFEND ANY INSURED. PLEASE READ AND REVIEW THE POLICY CAREFULLY.

---

**NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.**

---

**Item 1.**   **Name and Mailing Address of Named Insured:**

Mercury Capital Advisors Group LP
2 World Financial Center
36th Floor
New York, NY  10281

---

**Item 2.**   **Policy Period:**   **From:**   December 14, 2020   **To:**   December 14, 2021

At 12:01 A.M. Standard Time at your Mailing Address Shown Above

---

**Item 3.**   **Limits of Liability:**

(a)   $3,000,000   Maximum Aggregate Limit of Liability each **Policy Period** (including **Defense Expenses**) for all **Claims** under the Investment Advisers Management Liability Coverage Part

(b)   $3,000,000   Maximum Aggregate Limit of Liability each **Policy Period** (including **Defense Expenses**) for all **Claims** under the Investment Advisers Professional Liability Coverage Part

(c)   N/A   Maximum Aggregate Limit of Liability each **Policy Period** (including **Defense Expenses**) for all **Claims** under the Mutual Fund Management and Professional Liability Coverage Part

(d)   $3,000,000   Maximum Aggregate Limit of Liability each **Policy Period** (including **Defense Expenses**) for all **Claims** under the Investment Fund Management and Professional Liability Coverage Part

(e)   N/A   Maximum Aggregate Limit of Liability each **Policy Period** (including **Defense Expenses**) for all **Claims** under the Employment Practices Liability Coverage Part

---

*Mercury 000082*

(f)    N/A    Maximum Aggregate Limit of Liability each **Policy Period** (including **Defense Expenses**) for all **Claims** under the Pension and Welfare Benefit Plan Fiduciary Liability Coverage Part

(g)    $3,000,000    Maximum Aggregate Limit of Liability each **Policy Period** (including **Defense Expenses**) for all **Claims** under the Policy

**NOTE:** If there is no Limit for a Coverage Part, no coverage is available under that Coverage Part.

---

**Item 4.**    **Retentions:**

(a)    $0    each **Insured Person** under any Coverage Part, but only for **Loss** as to which indemnification by the **Adviser**, **Mutual Fund**, **Investment Fund**, or **Company** is not legally permissible or is not made solely by reason of financial insolvency

(b)    $500,000    each **Claim** under the Investment Advisers Management Liability Coverage Part

(c)    $500,000    each **Claim** under the Investment Advisers Professional Liability Coverage Part

(d)    N/A    each **Claim** under the Mutual Fund Management and Professional Liability Coverage Part

(e)    $500,000    each **Claim** under the Investment Fund Management and Professional Liability Coverage Part

(f)    N/A    each **Claim** under the Employment Practices Liability Coverage Part

(g)    N/A    each **Claim** under the Pension and Welfare Benefit Plan Fiduciary Liability Coverage Part

---

**Item 5.**    **Optional Extension Period:**

Premium for One Year Optional Extension Period:

Premium for Two Year Optional Extension Period:

---

**Item 6.**    **Pending and Prior Proceeding Date(s):**

(a)    December 01, 2009    for the Investment Advisers Management Liability Coverage Part
(b)    December 01, 2009    for the Investment Advisers Professional Liability Coverage Part
(c)    N/A    for the Mutual Fund Management and Professional Liability Coverage Part
(d)    December 14, 2018    for the Investment Fund Management and Professional Liability Coverage Part
(e)    N/A    for the Employment Practices Liability Coverage Part
(f)    N/A    for the Pension and Welfare Benefit Plan Fiduciary Liability Coverage Part

---

**Item 7.**    **Notices required to be given to the Insurer must be addressed to:**

XL Professional Insurance
100 Constitution Plaza, 17th Floor
Hartford, CT  06103
Toll Free Telephone: 877-953-2636

---

**Item 8.**     **Premium:**

Taxes, Surcharges or Fees:                    

Total Policy Premium:

---

**Item 9.**     **Policy Forms and Endorsements Attached at Issuance:**
FD 71 04 09 00   FD 71 00 09 00   FD 71 01 09 00   FD 71 05 09 00   XL 80 24 03 03   FD 72 09 11 06
FD 72 10 11 06   FD 72 07 11 06   FD 72 08 11 06   Manuscript 17927 07 15   FD 80 405 08 11
Manu 16442 02 14   FD 80 114 11 04   FD 80 205 12 06   FD 80 425 12 11   FD 80 142 05 05
FD 80 06 09 00

---

THESE **DECLARATIONS** AND THE POLICY, WITH THE ENDORSEMENTS, ATTACHMENTS, AND THE **APPLICATION** SHALL
CONSTITUTE THE ENTIRE AGREEMENT BETWEEN THE INSURER AND THE **INSURED** RELATING TO THIS INSURANCE.

---

**In Witness Whereof, the Insurer has caused this Policy to be executed by its authorized officers, but
this Policy will not be valid unless countersigned on the Declarations page, if required by law, by a duly
authorized representative of the Insurer.**


John R. Glancy                              Kenneth P. Meagher
President                                   Secretary

**XL Specialty Insurance Company**

*Mercury 000084*

# IN WITNESS

## XL SPECIALTY INSURANCE COMPANY

REGULATORY OFFICE
505 EAGLEVIEW BOULEVARD, SUITE 100
DEPARTMENT:  REGULATORY
EXTON, PA  19341-1120
PHONE:  800-688-1840

It is hereby agreed and understood that the following In Witness Clause supercedes any and all other In Witness clauses in this policy.

All other provisions remain unchanged.

IN WITNESS WHEREOF, the Insurer has caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by a duly authorized representative of the Insurer.

Joseph Tocco
President

Toni Ann Perkins
Secretary

*Mercury 000085*

# POLICYHOLDER DISCLOSURE

## NOTICE OF TERRORISM
## INSURANCE COVERAGE

**Coverage for acts of terrorism is already included in your current policy. You are hereby notified that under the Terrorism Risk Insurance Act, as amended in 2015, the definition of act of terrorism has changed. As defined in Section 102(1) of the Act: The term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security, and the Attorney General of the United States—to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. Under your existing coverage, any losses resulting from certified acts of terrorism may be partially reimbursed by the United States Government under a formula established by federal law. Under this formula, the United States Government generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019; and 80% beginning on January 1, 2020, of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. However, your policy may contain other exclusions that may affect your coverage. The Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.**

**The portion of your annual premium that is attributable to coverage for acts of terrorism is:**
██████████. **Any premium waiver is only valid for the current Policy Period.**

I ACKNOWLEDGE THAT I HAVE BEEN NOTIFIED THAT UNDER THE TERRORISM RISK INSURANCE ACT, AS AMENDED, ANY LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM UNDER MY POLICY COVERAGE MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT AND I HAVE BEEN NOTIFIED OF THE AMOUNT OF MY PREMIUM ATTRIBUTABLE TO SUCH COVERAGE.

Name of Insurer: **XL Specialty Insurance Company**

Policy Number: **ELU172207-20**

_____
Signature of Insured

_____
Print Name and Title

_____
Date

NOTICE TO POLICYHOLDERS

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC")

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy.  You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Policyholder Notice provides information concerning possible impact on your insurance coverage due to the impact of U.S. Trade Sanctions[1].  Please read this Policyholder Notice carefully.

In accordance with the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") regulations, or any other U.S. Trade Sanctions applied by any regulatory body, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law, is a Specially Designated National and Blocked Person ("SDN"), or is owned or controlled by an SDN, this insurance will be considered a blocked or frozen contract. When an insurance policy is considered to be such a blocked or frozen contract, neither payments nor premium refunds may be made without authorization from OFAC.  Other limitations on the premiums and payments also apply.

[1] "U.S Trade Sanctions" may be promulgated by Executive Order, act of Congress, regulations from the U.S. Departments of State, Treasury, or Commerce, regulations from the State Insurance Departments, etc.

©2019 X.L. America, Inc.  All rights reserved.  May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

*Mercury 000087*

## NOTICE TO POLICYHOLDERS

### PRIVACY POLICY

The AXA XL insurance group (the "Companies"), believes personal information that we collect about our customers, potential customers, and proposed insureds (referred to collectively in this Privacy Policy as "customers") must be treated with the highest degree of confidentiality.  For this reason and in compliance with the Title V of the Gramm-Leach-Bliley Act ("GLBA"), we have developed a Privacy Policy that applies to all of our companies.  For purposes of our Privacy Policy, the term "personal information" includes all information we obtain about a customer and maintain in a personally identifiable way.  In order to assure the confidentiality of the personal information we collect and in order to comply with applicable laws, all individuals with access to personal information about our customers are required to follow this policy.

### Our Privacy Promise

Your privacy and the confidentiality of your business records are important to us.  Information and the analysis of information is essential to the business of insurance and critical to our ability to provide to you excellent, cost-effective service and products.  We understand that gaining and keeping your trust depends upon the security and integrity of our records concerning you.  Accordingly, we promise that:

1.  We will follow strict standards of security and confidentiality to protect any information you share with us or information that we receive about you;
2.  We will verify and exchange information regarding your credit and financial status only for the purposes of underwriting, policy administration, or risk management and only with reputable references and clearinghouse services;
3.  We will not collect and use information about you and your business other than the minimum amount of information necessary to advise you about and deliver to you excellent service and products and to administer our business;
4.  We will train our employees to handle information about you or your business in a secure and confidential manner and only permit employees authorized to use such information to have access to such information;
5.  We will not disclose information about you or your business to any organization outside the XL Catlin insurance group of Companies or to third party service providers unless we disclose to you our intent to do so or we are required to do so by law;
6.  We will not disclose medical information about you, your employees, or any claimants under any policy of insurance, unless you provide us with written authorization to do so, or unless the disclosure is for any specific business exception provided in the law;
7.  We will attempt, with your help, to keep our records regarding you and your business complete and accurate, and will advise you how and where to access your account information (unless prohibited by law), and will advise you how to correct errors or make changes to that information; and
8.  We will audit and assess our operations, personnel and third party service providers to assure that your privacy is respected.

### Collection and Sources of Information

We collect from a customer or potential customer only the personal information that is necessary for (a) determining eligibility for the product or service sought by the customer, (b) administering the product or service obtained, and (c) advising the customer about our products and services.  The information we collect generally comes from the following sources:

•   Submission – During the submission process, you provide us with information about you and your business, such as your name, address, phone number, e-mail address, and other types of personal identification information;
•   Quotes – We collect information to enable us to determine your eligibility for the particular insurance product and to determine the cost of such insurance to you.  The information we collect will vary with the type of insurance you seek;

© 2019 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

*Mercury 000088*

## NOTICE TO POLICYHOLDERS

- Transactions – We will maintain records of all transactions with us, our affiliates, and our third party service providers, including your insurance coverage selections, premiums, billing and payment information, claims history, and other information related to your account;
- Claims – If you obtain insurance from us, we will maintain records related to any claims that may be made under your policies. The investigation of a claim necessarily involves collection of a broad range of information about many issues, some of which does not directly involve you. We will share with you any facts that we collect about your claim unless we are prohibited by law from doing so. The process of claim investigation, evaluation, and settlement also involves, however, the collection of advice, opinions, and comments from many people, including attorneys and experts, to aid the claim specialist in determining how best to handle your claim. In order to protect the legal and transactional confidentiality and privileges associated with such opinions, comments and advice, we will not disclose this information to you; and
- Credit and Financial Reports – We may receive information about you and your business regarding your credit. We use this information to verify information you provide during the submission and quote processes and to help underwrite and provide to you the most accurate and cost-effective insurance quote we can provide.

### Retention and Correction of Personal Information

We retain personal information only as long as required by our business practices and applicable law. If we become aware that an item of personal information may be materially inaccurate, we will make reasonable effort to re-verify its accuracy and correct any error as appropriate.

### Storage of Personal Information

We have in place safeguards to protect data and paper files containing personal information.

### Sharing/Disclosing of Personal Information

We maintain procedures to assure that we do not share personal information with an unaffiliated third party for marketing purposes unless such sharing is permitted by law. Personal information may be disclosed to an unaffiliated third party for necessary servicing of the product or service or for other normal business transactions as permitted by law.

We do not disclose personal information to an unaffiliated third party for servicing purposes or joint marketing purposes unless a contract containing a confidentiality/non-disclosure provision has been signed by us and the third party. Unless a consumer consents, we do not disclose "consumer credit report" type information obtained from an application or a credit report regarding a customer who applies for a financial product to any unaffiliated third party for the purpose of serving as a factor in establishing a consumer's eligibility for credit, insurance or employment. "Consumer credit report type information" means such things as net worth, credit worthiness, lifestyle information (piloting, skydiving, etc.) solvency, etc. We also do not disclose to any unaffiliated third party a policy or account number for use in marketing. We may share with our affiliated companies information that relates to our experience and transactions with the customer.

### Policy for Personal Information Relating to Nonpublic Personal Health Information

We do not disclose nonpublic personal health information about a customer unless an authorization is obtained from the customer whose nonpublic personal information is sought to be disclosed. However, an authorization shall not be prohibited, restricted or required for the disclosure of certain insurance functions, including, but not limited to, claims administration, claims adjustment and management, detection, investigation or reporting of actual or potential fraud, misrepresentation or criminal activity, underwriting, policy placement or issuance, loss control and/or auditing.

© 2019 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

*Mercury 000089*

## NOTICE TO POLICYHOLDERS

<u>Access to Your Information</u>

Our employees, employees of our affiliated companies, and third party service providers will have access to information we collect about you and your business as is necessary to effect transactions with you.  We may also disclose information about you to the following categories of person or entities:

- Your independent insurance agent or broker;
- An independent claim adjuster or investigator, or an attorney or expert involved in the claim;
- Persons or organizations that conduct scientific studies, including actuaries and accountants;
- An insurance support organization;
- Another insurer if to prevent fraud or to properly underwrite a risk;
- A state insurance department or other governmental agency, if required by federal, state or local laws; or
- Any persons entitled to receive information as ordered by a summons, court order, search warrant, or subpoena.

<u>Violation of the Privacy Policy</u>

Any person violating the Privacy Policy will be subject to discipline, up to and including termination.

For more information or to address questions regarding this privacy statement, please contact your broker.

© 2019 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

*Mercury 000090*

NOTICE TO POLICYHOLDERS

## FRAUD NOTICE

| Alabama | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or who knowingly presents false information in an application for insurance is guilty of a crime and may be subject to restitution fines or confinement in prison, or any combination thereof. |
|---|---|
| Arkansas | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| Colorado | **It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.** |
| District of Columbia | **WARNING:** It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant. |
| Florida | Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree. |
| Kansas | A "fraudulent insurance act" means an act committed by any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker or any agent thereof, any written, electronic, electronic impulse, facsimile, magnetic, oral, or telephonic communication or statement as part of, or in support of, an application for the issuance of, or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance which such person knows to contain materially false information concerning any fact material thereto; or conceals, for the purpose of misleading, information concerning any fact material thereto. |
| Kentucky | Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime. |
| Louisiana | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| Maine | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines, or denial of insurance benefits. |
| Maryland | Any person who knowingly or willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| New Jersey | Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties. |
| New Mexico | ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME |

© 2019 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

*Mercury 000091*

## NOTICE TO POLICYHOLDERS

| | |
|---|---|
| | AND MAY BE SUBJECT TO CIVIL FINES AND CRIMINAL PENALTIES. |
| **New York** | **General: All applications for commercial insurance, other than automobile insurance:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation. |
| | **All applications for automobile insurance and all claim forms:** Any person who knowingly makes or knowingly assists, abets, solicits or conspires with another to make a false report of the theft, destruction, damage or conversion of any motor vehicle to a law enforcement agency, the department of motor vehicles or an insurance company, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the value of the subject motor vehicle or stated claim for each violation. |
| | **Fire:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime. |
| | The proposed insured affirms that the foregoing information is true and agrees that these applications shall constitute a part of any policy issued whether attached or not and that any willful concealment or misrepresentation of a material fact or circumstances shall be grounds to rescind the insurance policy. |
| **Ohio** | Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud. |
| **Oklahoma** | **WARNING:** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony. |
| | **WARNING: All Workers Compensation Insurance:** |
| | Any person or entity who makes any material false statement or representation, who willfully and knowingly omits or conceals any material information, or who employs any device, scheme, or artifice, or who aids and abets any person for the purpose of: |
| | 1.  obtaining any benefit or payment, |
| | 2.  increasing any claim for benefit or payment, or |
| | 3.  obtaining workers' compensation coverage under this act, shall be guilty of a felony punishable pursuant to Section 1663 of Title 21 of the Oklahoma Statutes. |
| **Pennsylvania** | Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties. |
| | **Automobile Insurance:** Any person who knowingly and with intent to injure or defraud any insurer files an application or claim containing any false, incomplete or misleading information shall, upon conviction, be subject to imprisonment for up to seven years and the payment of a fine of up to $15,000. |
| **Puerto Rico** | **Any person who knowingly and with the intention of defrauding presents false information in an insurance application, or presents, helps, or causes the presentation of a fraudulent claim for the payment of a loss or any other benefit, or presents more than one claim for the same damage or loss, shall incur a** |

© 2019 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

*Mercury 000092*

| | |
|---|---|
| | **felony and, upon conviction, shall be sanctioned for each violation by a fine of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), or a fixed term of imprisonment for three (3) years, or both penalties. Should aggravating circumstances [be] present, the penalty thus established may be increased to a maximum of five (5) years, if extenuating circumstances are present, it may be reduced to a minimum of two (2) years.** |
| **Rhode Island** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **Tennessee** | **All Commercial Insurance, Except As Provided for Workers' Compensation** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.<br><br>**Workers' Compensation:**  It is a crime to knowingly provide false, incomplete or misleading information to any party to a workers' compensation transaction for the purpose of committing fraud. Penalties include imprisonment, fines and denial of insurance benefits. |
| **Utah** | **Workers' Compensation:**  Any person who knowingly presents false or fraudulent underwriting information, files or causes to be filed a false or fraudulent claim for disability compensation or medical benefits, or submits a false or fraudulent report or billing for health care fees or other professional services is guilty of a crime and may be subject to fines and confinement in state prison. |
| **Virginia** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits. |
| **Washington** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits. |
| **West Virginia** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **All Other States** | Any person who knowingly and willfully presents false information in an application for insurance may be guilty of insurance fraud and subject to fines and confinement in prison.  (In Oregon, the aforementioned actions may constitute a fraudulent insurance act which may be a crime and may subject the person to penalties). |

© 2019 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

*Mercury 000093*

**XL 80 24 03 03**

| | |
|---|---|
| **Endorsement No.: 1** | **Effective: December 14, 2020** |
| **Named Insured: Mercury Capital Advisors Group LP** | **12:01 A.M. Standard Time** |
| **Policy No.: ELU172207-20** | **Insurer: XL Specialty Insurance Company** |

# TERRORISM PREMIUM ENDORSEMENT

Please note: The portion of your annual premium set forth in Item 8. of the Declarations that is attributable to coverage for acts of terrorism is: ▮▮▮▮▮▮.

All other terms, conditions and limitations of this Policy shall remain unchanged.

*Mercury 000094*

FD 72 09 11 06

| | |
|---|---|
| Endorsement No.: 2 | Effective: December 14, 2020 |
| Named Insured: Mercury Capital Advisors Group LP | 12:01 A.M. Standard Time |
| Policy No.: ELU172207-20 | Insurer: XL Specialty Insurance Company |

# NEW YORK AMENDATORY ENDORSEMENT – GENERAL TERMS AND CONDITIONS

This endorsement modifies insurance provided under the following:

FINANCIAL SERVICES LIABILITY INSURANCE COVERAGE FORM

1.  Section I. GENERAL DEFINITIONS of the General Terms and Conditions of the Policy is amended to include the following:

    (L)   "**Termination of Coverage**" means (1) the Expiration Date set forth in ITEM 2 of the Declarations, or its earlier cancellation date, or (2) a decrease in limits, a reduction in coverage, increased deductible or self-insured retention, new exclusion, or any other change in coverage less favorable to the **Insured**.

2.  Notwithstanding anything to the contrary in the Declarations and Section II. GENERAL CONDITIONS (C) NOTICE (3) of the General Terms and Conditions of the Policy, notice of any **Claim** may also be provided to any authorized agent of the Insurer located within the state of New York.

3.  Section II. GENERAL CONDITIONS (F) CANCELLATION AND RENEWAL OF COVERAGE (2) of the General Terms and Conditions of the Policy is amended to include the following:

    The notice shall state the reason for cancellation.

4.  Section II. GENERAL CONDITIONS (F) CANCELLATION AND RENEWAL OF COVERAGE (3) of the General Terms and Conditions of the Policy is deleted and amended to read as follows:

    (3)   The Insurer is under no obligation to renew this Policy upon its expiration.  Once the Insurer chooses to non-renew this Policy or conditions its renewal upon a change in the Limit of Liability, change in type of coverage, reduction of coverage, increased retention, the addition of any exclusion or an increase in premium in excess of 10%, then the Insurer shall mail or deliver written notice of the refusal to renew or the conditional renewal to the **Named Insured** at the mailing address shown on the Policy and to the **Insureds**' authorized agent at least sixty (60) days but not more than one hundred and twenty (120) days in advance of the Policy Expiration Date.  Such notice shall contain the specific reasons for the refusal to renew or the conditional renewal and shall set forth the amount or a reasonable estimate of any premium increase and describe any additional proposed changes.

    If the Insurer does not provide notice of non-renewal or conditional renewal as provided in Section II.(F)(3), coverage will remain in effect at the same terms and conditions of this Policy at the lower of the current rates or the prior period's rates until 60 days after such notice is mailed or delivered, unless the **Named Insured**, during this 60-day period, has replaced the coverage or elects to cancel.

    If the Insurer provides notice of non-renewal or conditional renewal on or after the Policy Expiration Date, coverage will remain in effect at the same terms and conditions of this Policy for another policy period, at the lower of the current rates or the prior period's rates, unless the **Named Insured**, during the additional policy period, has replaced the coverage or elects to cancel.

    The Insurer will not send the **Insureds** notice of non-renewal or conditional renewal if the **Insureds**, their authorized agent or another insurer of the **Insureds** mail or deliver notice that the Policy has been replaced or is no longer desired.

© 2014 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

*Mercury 000095*

If the **Insureds** elect to accept the terms, conditions and rates of the conditional renewal notice pursuant to Section II.(F)(3), a new maximum aggregate Limit of Liability shall become effective as of the inception date of renewal, subject to regulations promulgated by the Superintendent of Insurance.

5.  Section II. GENERAL CONDITIONS (G) OPTIONAL EXTENSION PERIOD of the General Terms and Conditions of the Policy is deleted and amended to read as follows:

(1)  If either the **Named Insured** or the Insurer cancels or does not renew this Policy, or if the **Named Insured** or Insurer offers to renew this Policy on terms which involve a decrease in the Limit of Liability, a reduction in coverage, an increase in Retention, an addition of an exclusion, an increase in premium in excess of 10% over the current Policy's premium, or any change in coverage less favorable to the **Insured**, then, without any additional premium being required, there shall be an automatic extension of the coverage granted by this Policy with respect to any **Claim** first made during a period of sixty (60) days immediately following the **Termination of Coverage**, but only with respect to a **Wrongful Act** committed before the **Termination of Coverage**, provided such **Wrongful Act** is otherwise covered by this Policy. This 60-day period shall be referred to as the "Automatic Extension Period". The granting of such Automatic Extension Period shall not serve to increase the Limits of Liability set forth in ITEM 3 of the Declarations applicable to the Policy Period and Automatic Optional Extension Period.

(2)  If either the **Named Insured** or the Insurer cancels or does not renew this Policy, or if the **Named Insured** or Insurer offers to renew this Policy on terms which involve a decrease in the Limit of Liability, a reduction in coverage, an increase in Retention, an addition of an exclusion, an increase in premium in excess of 10% over the current Policy's premium, or any change in coverage less favorable to the **Named Insured**, then the **Named Insured** shall have the right, upon payment of an additional premium set forth in ITEM 5 of the Declarations, to a one or two year extension of the coverage provided by this Policy with respect only to any **Claim** first made during the one or two year period of time after the date upon which the Automatic Extension Period ends. However, the extension of coverage applies only to a **Wrongful Act** committed before the **Termination of Coverage** provided such **Wrongful Act** is otherwise covered by this Policy. This additional period of coverage shall be referred to as the "Optional Extension Period". Except in the Declarations to the Policy and this Section II., the Automatic Extension Period may also be referred to as the Optional Extension Period.

(3)  The Limits of Liability applicable to the Optional Extension Period, if any, shall be at least equal to the amount of coverage remaining in the Policy's applicable Limits of Liability set forth in ITEM 3 of the Declarations.

(4)  The Insurer shall provide written notice to the Named Insured of the Automatic Optional Extension Period and the availability of, the premium for, and the importance of purchasing, the Optional Extension Period within thirty (30) days after the **Termination of Coverage**.

(5)  The right to purchase the Optional Extension Period shall terminate unless written notice is given to the Insurer within sixty (60) days from the **Termination of Coverage**, or within thirty (30) days after the mailing or delivery of the notice provided by the Insurer under Section II.(G)(4), above, whichever is greater, together with full payment of the premium for the Optional Extension Period. If such notice and premium payment are not so given to the Insurer, the **Named Insured** will not be able to exercise the right to purchase the Optional Extension Period.

(6)  If the Optional Extension Period is purchased, the entire premium shall be deemed earned at its commencement and if the **Named Insured** terminates the Optional Extension Period before its term, the Insurer shall not be liable to return any portion of the premium paid for the Optional Extension Period. The premium charged for the Optional Extension Period shall be based upon the rates in effect on the date this Policy was last issued or renewed.

(7)  In the event the **Named Insured** is in liquidation or bankruptcy, or permanently ceases operation, and if the **Named Insured** or its designated trustee, although entitled to, does not purchase the Optional Extension Period, any **Insured Person** who requests the Optional Extension Period

© 2014 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

**Mercury 000096**

within 120 days of the **Termination of Coverage** may purchase the Optional Extension Period, as provided in Section II.(G)(2), above.

(8)     After an **Insured Person** has ceased to be affiliated with the **Named Insured** or any **Subsidiary** as an **Insured Person,** that **Insured Person** shall continue to be covered under this Policy and any Optional Extension Period for his or her covered **Wrongful Acts** during his or her affiliation with the **Named Insured** or any **Subsidiary** as an **Insured Person**.

(9)     Upon **Termination of Coverage**, any return premium due the **Named Insured** shall be applied to the premium for the Optional Extension Period if the **Named Insured** elects to purchase such coverage. Where the premium is due to the Insurer, any payment received by the Insurer from the **Insured** as payment for the Optional Extension Period shall be first applied to any premium due for the Policy.

(10)    In the event similar insurance to that provided by this Policy is in force during the Optional Extension Period, the coverage afforded during the Optional Extension Period shall be excess over any such valid and collectible insurance.

6.     Section II. GENERAL CONDITIONS (L) ACTION AGAINST THE INSURER, ASSIGNMENT, AND CHANGES TO THE POLICY (1) of the Policy is amended to include the following:

If the Insurer does not pay any judgment covered by the terms of this Policy within thirty (30) days from the service of notice of the judgment upon the **Insured** or its attorney and the Insurer, then an action may be brought against the Insurer under the terms of the Policy for the amount of judgment not exceeding the amount of the applicable Limit of Liability under the Policy, except during a stay or limited stay of execution against the Insured on such judgment.

7.     Section II. GENERAL CONDITIONS of the Policy is amended to include the following:

The insolvency or bankruptcy of the **Insureds**, or the insolvency of their estates, shall not release the Insurer from the payment of **Loss** not otherwise excluded under this Policy.

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2014 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

**Mercury 000097**

FD 72 10 11 06

**Endorsement No.: 3**
**Named Insured: Mercury Capital Advisors Group LP**
**Policy No.: ELU172207-20**

**Effective: December 14, 2020**
**12:01 A.M. Standard Time**

**Insurer: XL Specialty Insurance Company**

# NEW YORK COINSURANCE ENDORSEMENT – INVESTMENT ADVISERS MANAGEMENT LIABILITY COVERAGE PART

This endorsement modifies insurance provided under the following:

**FINANCIAL SERVICES LIABILITY INSURANCE COVERAGE FORM**

Solely for the purpose of the coverage provided under Section I. Insuring Agreements (A) of the Investment Advisers Management Liability Coverage Part, in accordance with New York State Laws BCL section 726(a)(3):

1.    the Insured Persons are liable to coinsure 0.5% of Loss in excess of the retention for the first $1,000,000 of coverage; and

2.    the retention shall be $5,000 each Insured Person, not to exceed $50,000 in the aggregate.

The Insured Persons shall not be liable to coinsure any Loss in excess of the first $1,000,000 of Loss in excess of the retention under Section I. Insuring Agreements (A).

All other terms, conditions and limitations of this Policy remain unchanged.

*Mercury 000098*

FD 72 07 11 06

**Endorsement No.: 4**
**Named Insured: Mercury Capital Advisors Group LP**
**Policy No.: ELU172207-20**

**Effective: December 14, 2020**
**12:01 A.M. Standard Time**

**Insurer: XL Specialty Insurance Company**

# NEW YORK DISCLOSURE STATEMENT

This endorsement modifies insurance provided under the following:

**FINANCIAL SERVICES LIABILITY INSURANCE COVERAGE FORM**

This Policy is a claims-made policy.

Coverage under this Policy or any subsequent renewal of this Policy, subject to the terms of the applicable policy, applies only to any "Claim" (as defined herein) made against the Insureds, for a specific Wrongful Act reported during the Policy Period of this Policy or the applicable renewal policy. All coverage under this Policy ceases upon Termination of Coverage, except for the Automatic Extension Period unless the Optional Extension Period is purchased.

The below officer of the Named Insured, on behalf of the Insureds, acknowledges that he/she has received information from the Insurer or its agent explaining the limitations and potential gaps in coverage of a claims-made policy and that he/she understands these limitations and potential gaps in coverage.

This Policy includes a 60-day automatic extended reporting period, referred to as the Automatic Extension Period.

This Policy provides the Insured with the option to purchase for an additional premium at least a one-year Optional Extension Period from the termination of this Policy. The premium for the Optional Extension Period is indicated in Item 5 of the Policy's Declarations.

During the first several years of a claims-made relationship between the Insureds and the Insurer, claims-made rates are relatively lower than occurrence rates, and the Insured can expect substantial annual premium increases independent of overall rate level increases, until the claims-made relationships reaches maturity.

All other terms, conditions and limitations of this Policy shall remain unchanged.

*Mercury 000099*

FD 72 08 11 06

| | |
|---|---|
| **Endorsement No.: 5** | **Effective: December 14, 2020** |
| **Named Insured: Mercury Capital Advisors Group LP** | **12:01 A.M. Standard Time** |
| **Policy No.: ELU172207-20** | **Insurer: XL Specialty Insurance Company** |

# NEW YORK DEFENSE EXPENSES DISCLOSURE

This endorsement modifies insurance provided under the following:

**FINANCIAL SERVICES LIABILITY INSURANCE COVERAGE FORM**

Defense Expenses reduce and may completely exhaust the applicable Limit of Liability. To the extent the applicable Limit of Liability is exceeded, the Insurer shall not be liable for Defense Expenses or for the amount of any judgment or settlement. Defense Expenses are also applied to the applicable retention.

This form shall be attached to and made part of the Policy.

The below Officer of the Named Insured, on behalf of the Insureds, acknowledges that he/she read this form and understands the above provisions.

All other terms, conditions and limitations of this Policy shall remain unchanged.

*Mercury 000100*

Manuscript 17927 07 15

| | |
|---|---|
| Endorsement No.: 6 | Effective: December 14, 2020 |
| Named Insured: Mercury Capital Advisors Group LP | 12:01 A.M. Standard Time |
| Policy No.: ELU172207-20 | Insurer: XL Specialty Insurance Company |

Coverage Part:  Investment Advisers Management Liability; Investment Advisers Professional Liability

# CRYSTAL & CO ENDORSEMENT

In consideration of the premium charged:

(1)     The term "Application," as defined in Section I General Definitions of the General Terms & Conditions of the Policy, shall include any public documents filed by an Insured with any federal, state, local or foreign regulatory agency (including but not limited to the Securities and Exchange Commission (SEC)) within the one (1) year period immediately preceding the Inception Date of this Policy.

(2)     Section I General Definitions (G) of the General Terms & Conditions of the Policy is amended to read in its entirety as follows:

"(G)     'Loss' means damages, judgments, settlements or other amounts (including pre-judgment and post-judgment interest, punitive, exemplary or multiplied damages where insurable by law) in excess of the Retention that the Insured is obligated to pay, and Defense Expenses, whether incurred by the Insurer or the Insured, in excess of the Retention.  Loss, other than Defense Expenses, will not include:

(1)     matters which are uninsurable under the law pursuant to which this Policy is construed; and

(2) fines, penalties or taxes imposed by law.

NOTE:  With respect to judgments in which punitive damages are awarded, the law of the jurisdiction most favorable to the insurability of punitive damages shall control, provided such jurisdiction:

(1) is where such punitive damages where awarded;

(2)     is where the Named Insured is incorporated or otherwise organized or has a place of business, or

(3) is where the Insurer is incorporated or has its principal place of business."

(3)     The term "Subsidiary," as defined in Section I General Definitions (J) of the General Terms and Conditions of the Policy, is amended to read in its entirety as follows:

"(J)     'Subsidiary' means any entity during any time in which the Named Insured owns, directly or through one or more Subsidiary(ies), more than fifty percent (50%) of the outstanding securities representing the present right to vote for the election of such entity's directors or members of such entity's Board of Managers."

(4)     Section II General Conditions (C)(1) of the General Terms and Conditions of the Policy is amended to read in its entirety as follows:

"(1)     As a condition precedent to any right to payment under this Policy, the Insured shall give written notice to the Insurer of any Claim as soon as practicable after it is first made and the Chief Executive Officer, Chief Financial Officer or General Counsel of the Insured first becomes aware of such Claim, but in no event later than sixty (90) days after the expiration of the Policy Period."

Page 1 of 7

© 2015 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

*Mercury 000101*

(5)     Section II General Conditions (C)(3) of the General Terms and Conditions of the Policy is amended to read in its entirety as follows:

"(3)     All notices under General Conditions (C)(1) and (2) must be sent:

(a)       to the address set forth in ITEM 7 of the Declarations:  Attention: Claim Department; or

(b) by electronic mail (email) to:  proclaimnewnotices@xlcatlin.com."

(6)     Section II General Conditions (E) of the General Terms and Conditions of the Policy is amended to read in its entirety as follows:

"(E)     All Loss payable under this Policy will be specifically excess of, and will not contribute with, any other valid and collectible insurance, including but not limited to any insurance under which there is a duty of defend, unless such other insurance is specifically excess of this Policy.  This Policy will not be subject to the terms of any other insurance policy."

(7)     Section II General Conditions (F)(1) of the General Terms & Conditions of this Policy is amended to read in its entirety as follows:

"(1)     Except for the nonpayment of premium, as set forth in (F)(2) below, the Named Insured has the exclusive right to cancel this Policy. Cancellation may be effected by mailing to the Insurer written notice when such cancellation shall be effective, provided the date of cancellation is not later than the Expiration Date set forth in ITEM 2 of the Declarations. In such event, the Insurer shall return to the Named Insured the gross pro rata unearned premium (minus brokerage commission). Return or tender of the unearned premium is not a condition of cancellation."

(8)     The coverage afforded under this Policy shall, subject to all of its terms, conditions and exclusions, extend to any domestic partner of any Insured Person, but only to the extent the domestic partner is a party to any Claim solely in their capacity as a domestic partner to such Insured Person and only for the purposes of any Claim seeking damages recoverable from community property, property jointly held by any such person and domestic partner, or property transferred from any such person to the domestic partner. Accordingly, Section II General Conditions (H) of the General Terms and Conditions of the Policy shall be deemed amended to effect the purpose and intent of this endorsement.

(9)     It is understood and agreed that, in the event of payment under the Policy, the Insurer will not be subrogated to any Insured's potential or actual rights of recovery in connection therewith against any Insured Person unless it is established, by final, non-appealable adjudication in the underlying Claim, admission of the Insured Person or otherwise, that such Insured Person committed any intentionally dishonest, fraudulent or criminal act or omission, willfully violated any statute, rule or law, or obtained any profit or remuneration to which such Insured Person was not legally entitled, and Section II General Conditions (I)(2) will be deemed to have been amended accordingly.

(10)    Section II General Conditions (K) of the General Terms and Conditions of the Policy is amended to read in its entirety as follows:

"(K)     WARRANTY

The Insured represents that the statements and particulars contained in the Application are true, accurate and complete, and agrees that this Policy is issued in reliance on the truth of that representation, and that such particulars and statements, which are deemed to be incorporated into and constitute a part of this Policy, are the basis of this Policy.  No knowledge or information possessed by any Insured will be imputed to any other Insured.  In the event that any of the particulars or statements in the Application are untrue, this Policy will be void with respect to any Insured who knew of such untruth."

Page 2 of 7

Manuscript 17927 07 15
© 2015 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

**Mercury 000102**

(11)    Upon the written request of an Insured, the Insurer will advance Defense Expenses within ninety (90) days of receipt of documentation of such, in excess of the applicable Retention, if any, before the disposition of the Claim for which this Policy provides coverage.  As a condition of the advancement of Defense Expenses, the Insurer may require a written undertaking, in a form satisfactory to the Insurer, which will guarantee the repayment of any Loss including Defense Expenses paid to or on behalf of the Insured if it is finally determined that the Loss incurred is not covered under this Policy.

(12)    Solely with respect to any Claim against an Insured Person as to which indemnification by the Adviser, Investment Fund or Company is not legally permissible or is not made solely by reason of financial insolvency, the Insurer may not void and/or rescind this Policy with respect to such Claim.

(13)    Coverage under this Policy shall extend anywhere in the world.

(14)    It is understood and agreed that no conduct of any Insured will be imputed to any other Insured to determine the application of any of the EXCLUSIONS in the Policy.

(15)    Section III Exclusion (I) of the Investment Advisers Professional Liability Coverage Part and Section III Exclusion (J) of the Investment Advisers Management Liability Coverage Part are deleted in their entirety.

(16)    No coverage shall be available under this Policy for any Claim for any actual or alleged violation of the Employee Retirement Income Security Act of 1974 (ERISA), as amended, or any regulation promulgated thereunder or any similar federal, state or local law or regulation; however this Exclusion will only apply to any Insured's pension, employee benefit or welfare plan.

(17)    Section IV Condition (A)(2)(c) of each Coverage Part is deleted in its entirety.

(18)    The term "Insured Person," as defined in Section II Definitions (C) of the Investment Advisers Professional Liability Coverage Part, is amended to read in its entirety as follows:

"(C)    'Insured Person' means any past, present or future director, officer, partner, principal, member, trustee or employee of the Adviser and those persons serving in a functionally equivalent role for the Named Insured or any Subsidiary operating or incorporated outside the United States;"

(19)    Section III Exclusion (C) of the Investment Advisers Professional Liability Coverage Part is amended to read in its entirety as follows:

"(C)    for any actual or alleged bodily injury, sickness, libel, slander, invasion of privacy, malicious use or abuse of process, malicious prosecution, wrongful entry or eviction, false arrest, false imprisonment, assault, battery, oral or written publication of defamatory or disparaging material, disease or death of any person, or damage or destruction of any tangible property including loss of use thereof; however, this EXCLUSION (C) will not apply to any:

(1) actual or alleged libel, slander, oral or written publication of defamatory or disparaging material committed by an Insured in the performance of Professional Services; or

(2)    Claim arising from damage to, destruction of, or loss of use of, client records in an Insured's possession;"

(20)    Section III Exclusion (F) of the Investment Advisers Professional Liability Coverage Part will not apply to any Claim to the extent that such Claim is brought by a bankruptcy trustee, examiner, receiver, conservator, rehabilitator, liquidator or comparable authority of the Adviser, or by any assignee of any of the foregoing.

(21)    Section III Exclusion (G) of the Investment Advisers Professional Liability Coverage Part is amended to read in its entirety as follows:

Manuscript 17927 07 15
© 2015 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

**Mercury 000103**

"(G)    for any actual or alleged liability of the Adviser under any written contract or agreement (other than organizational, management, monitoring, consulting or advisory documents of any entity, including but not limited to a partnership agreement, limited partnership agreement, operating agreement, limited liability company agreement or other organizational, management, monitoring, consulting or advisory and/or subscription agreement); provided, that this EXCLUSION (G) will not apply to:

  (1)    any Claim against an Insured by a client or customer of the Adviser, if and to the extent that the Claim alleges a breach of contractual obligations in the rendering of or failure to render Professional Services; or

  (2)    liability which would attach to an Insured even in the absence of such contract or agreement;"

(22)    Section III Exclusions (L) of the Investment Advisers Professional Liability Coverage Part is deleted in its entirety.

(23)    Section III Exclusion (D) of the Investment Advisers Management Liability Coverage Part is amended to read in its entirety as follows:

"(D)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual, alleged or threatened discharge, dispersal, release, escape, seepage, transportation, emission, treatment, removal or disposal of pollutants, contaminants, or waste of any kind including but not limited to nuclear material or nuclear waste or any actual or alleged direction, request or voluntary decision to test for, abate, monitor, clean up, recycle, remove, recondition, reclaim, contain, treat, detoxify or neutralize pollutants, contaminants or waste of any kind including but not limited to nuclear material or nuclear waste. With respect to a Claim made under INSURING AGREEMENT (A) only, other than a Claim that is based upon, arising out of directly or indirectly resulting from, in consequence of, or in any way involving any actual, alleged or threatened discharge, dispersal, release, escape, seepage, transportation, emission, treatment, removal or disposal of nuclear material or nuclear waste, this EXCLUSION (D) will not apply to a Claim if a court of competent jurisdiction specifically determines the Adviser is not permitted to indemnify the Insured Persons;"

(24)    Section III Exclusion (F) of the Investment Advisers Management Liability Coverage Part, shall not apply to the extent that such Claim:

(a)    is brought and maintained by an Insured Person:

  (i)    who has not served as a director, officer, or member of the Board of Managers of the Adviser for at least two (2) years prior to the date such Claim is first made; and

  (ii)    who is acting independently of, and without the solicitation, assistance, participation or intervention of an Insured Person or the Adviser;

(b)    is brought by a creditors committee of the Adviser in the event such Adviser files for relief under Title 11 of the United States Code;

(c)    is brought by an Insured Person and brought and maintained in a jurisdiction outside the United States of America, including its territories and possessions; or

(d)    is brought by an employee of the Adviser pursuant to any federal or state whistleblower protection statute or any rule or regulation promulgated thereunder.

(25)    Section III Exclusion (G) of the Investment Advisers Management Liability Coverage Part is amended to read in its entirety as follows:

Manuscript 17927 07 15
© 2015 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

**Mercury 000104**

"(G)     for any actual or alleged liability of the Adviser under any written contract or agreement (other than organizational, management, monitoring, consulting or advisory documents of any entity, including but not limited to a partnership agreement, limited partnership agreement, operating agreement, limited liability company agreement or other organizational, management, monitoring, consulting or advisory and/or subscription agreement); provided, that this EXCLUSION (G) will not apply to liability which would attach to an Insured even in the absence of such contract or agreement;"

(26)    In addition to the coverage otherwise provided under the Investment Advisers Management Liability Coverage Part, but still subject to the Insurer's maximum aggregate Limit of Liability as set forth in Items 3(a) and 3(g) of the Declarations, the Insurer shall pay on behalf of the Adviser all Investigation Costs resulting solely from any Shareholder Derivative Demand first made during the Policy Period or, if applicable, the Optional Extension Period, for a Wrongful Act committed or attempted, or allegedly committed or attempted, by any Insured Person.

(27)    For the purposes of paragraph (26) above, the following shall apply:

(a)     "Investigation Costs" mean reasonable fees and expenses of attorneys and experts retained by the Adviser, or by its board of directors or any committee thereof, that are incurred by the Adviser in the Adviser's investigation or evaluation of a Shareholder Derivative Demand.  Investigation Costs will not include the Adviser's overhead expenses or any salaries, wages, fees or benefits of its directors, officers or employees.

(b)     "Shareholder Derivative Demand" means a written demand, made by one or more of the shareholders of the Adviser upon the Adviser's board of directors, for the Adviser to bring a civil proceeding in a court of law against an Insured Person.

(c)     The Insurer's maximum aggregate limit of liability under this Policy for Investigation Costs shall be $250,000, which amount shall be part of, and not in addition to, the Insurer's maximum aggregate Limit of Liability under this Coverage Part as set forth in Item 3(a) of the Declarations and the Insurer's maximum aggregate Limit of Liability under this Policy as set forth in Item 3(g) of the Declarations.  Payment by the Insurer of Investigation Costs shall reduce the Limit of Liability.

(d)     The coverage provided under paragraph (26) above will be subject to the exclusions set forth in Section III of the Investment Advisers Management Liability Coverage Part and to any exclusions that may be set forth in other endorsements to this Policy, and any references in those exclusions to Loss and Claims shall be deemed to refer instead to Investigative Costs and Shareholder Derivative Demands, respectively.

(e)     No retention will apply to Investigation Costs payable under paragraph (26) above.

(f)     It shall be the duty of the Adviser to investigate and evaluate any Shareholder Derivative Demand.

(g)     For purposes of the coverage provided under paragraph (26) above, all references in Section II General Conditions (B) – (N) of the General Terms and Conditions of this Policy and Section IV Conditions of this Coverage Part to Loss and Defense Expenses shall be deemed to refer instead to Investigative Costs, and all references in Sections II General Conditions (B)- (N) and Section IV Conditions to Claims shall be deemed to refer instead to Shareholder Derivative Demands.

(28)    Section II Definition (E) of the Investment Advisers Management Liability Coverage Part is amended to read in its entirety as follows:

"(E)     'Non-Profit Entity' means any not-for-profit corporation."

(29)    Solely with respect to the Investment Advisers Management Liability Coverage Part:

Page 5 of 7

Manuscript 17927 07 15

© 2015 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

**Mercury 000105**


(a)     The term "Loss," as defined in Section II Definitions (G)(2) of the General Terms and Conditions of the Policy, is amended to read in its entirety as follows:

> "(2)     matters which are uninsurable under the law pursuant to which this Policy is construed; provided that the Insurer will not assert that the portion of any settlement in a Securities Claim arising from an initial or subsequent public offering of the Advisers or Insured Entity's securities constitutes uninsurable loss due to the alleged violations of Section 11 and/or 12 of the Securities Act of 1933 as amended (including alleged violations of Section 11 and/or 12 of the Securities Act of 1933 by a Controlling Person pursuant to Section 15 of the Securities Act of 1933)."

(b)     For the purposes of this Endorsement, "Securities Claim" means a Claim for any actual or alleged violation of the Securities Act of 1933.

(c)     Section III Exclusions (A)(2) of the Coverage Part(s) will not apply to allegations in a Securities Claim asserted against any Insured under Section 11 and/or 12 of the Securities Act of 1933 as amended arising out of an initial or subsequent public offering of the Adviser's or Insured Entity's securities (including alleged violations of Section 11 and/or 12 of the Securities Act of 1933 by a Controlling Person pursuant to Section 15 of the Securities Act of 1933).

(30)     Section III Exclusions (A) of each Coverage Part is amended to read in its entirety as follows:

"(A)     brought about or contributed to in fact by:

(1)     any intentionally dishonest, fraudulent or criminal act or omission; or

(2)     profit or remuneration gained by any Insured to which such is not legally entitled;

as determined by a final, non-appealable adjudication in the underlying action. Each Insured agrees that, if the Insurer has no liability to an Insured for Loss as a result of a Claim by reason of this EXCLUSION (A), such Insured will repay the Insurer upon demand all Loss paid on behalf of such Insured in connection with such Claim;"

(31)     Section III Exclusions (B) of each Coverage Part of the Policy is amended to read in its entirety as follows:

"(B)     based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or Wrongful Act which, before the Inception Date of this Policy, was the subject or any notice given under any other Financial Services liability policy or similar policy of which this Policy is a renewal or replacement;"

(32)     Iit is understood and agreed that in the event that there is an inconsistency between a state amendatory endorsement attached to this Policy and any term or condition of this Policy modified by another endorsement attached to this Policy, then where permitted by law, the Insurer shall apply those terms and conditions of the endorsement which are more favorable to the Insured.

(33)     The Insurer shall not be entitled under any circumstances to rescind this Policy, other than for non-payment of premium.

(34)     It is understood and agreed that if Loss, including Defense Expenses, shall be payable under this Policy under any Coverage Part(s), then the Insurer shall, to the maximum extent practicable and subject at all times to the Insurer's maximum aggregate Limit of Liability as set forth in Item 3(g) of the Declarations, pay such Loss as follows:

(1)     first, the Insurer will pay Loss from such Claim made against the Insured Person(s) as to which indemnification by the Named Insured is not legally permissible or is not made solely by reason of the Named Insured's financial insolvency; then

Manuscript 17927 07 15
© 2015 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

**Mercury 000106**

(2)      second, the Insurer shall pay Loss from such Claim made against the Insured Person(s) as to which indemnification by the Named Insured is legally permissible, then

(3)      third, the Insurer shall pay that Loss, if any, which the Insurer may be liable to pay on behalf of any Insured which is not a natural person.

(35)    The term "Defense Expenses," as defined in Section II Definition (C) of the General Terms and Conditions of the Policy, is amended to include:

(a)      reasonable legal fees and costs incurred to facilitate an Insured's payment of amounts required to be paid pursuant to section 304 of the Sarbanes-Oxley Act of 2002 or section 954 of Dodd-Frank Wall Street Reform and Consumer Protection Act (but not the amounts repaid by the Insured pursuant to those sections); and

(b)      reasonable legal fees and costs incurred in the defense of Corporate Manslaughter Charges.

(36)    For the purposes of this endorsement, the term "Corporate Manslaughter Charges" means a formal criminal proceeding commenced in the United Kingdom against an Insured Person of a Company domiciled or incorporated in the United Kingdom for involuntary manslaughter (including constructive manslaughter or gross negligence manslaughter) in his or her capacity as a director or officer of such Company and directly related to the business of such Company.

(37)    The term "Claim," as defined in Section II Definition (B) of the General Terms and Conditions of the Policy, is amended to include Corporate Manslaughter Charges; provided however, that no coverage shall be available under this Policy for any Loss, other than Defense Expenses, incurred in connection with any Corporate Manslaughter Charges.

(38)    Section III Exclusions (A) of each Coverage Part of the Policy shall not apply to any Defense Expenses incurred in connection with any Corporate Manslaughter Charges.

(39)    Notwithstanding Section I General Definition (G)(3) of the General Terms & Conditions of this Policy, the term "Loss," as defined in Section I General Definition (G), will include civil penalties assessed against an Insured pursuant to Section 2(g)(2) of the Foreign Corrupt Practices Act of 1977 (15 U.S.C. 78dd-2(g)(2)).

All other terms, conditions and limitations of this Policy shall remain unchanged.

Manuscript 17927 07 15

© 2015 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

**Mercury 000107**

FD 80 405 08 11

| | |
|---|---|
| Endorsement No.: 7 | Effective: December 14, 2020 |
| Named Insured: Mercury Capital Advisors Group LP | 12:01 A.M. Standard Time |
| Policy No.: ELU172207-20 | Insurer: XL Specialty Insurance Company |
| Coverage Part:  General Terms and Conditions | |

# AMEND DEFINITION OF "CLAIM"

In consideration of the premium charged:

(1)  Section I. GENERAL DEFINITIONS (B) of the General Terms and Conditions is amended to read in its entirety as follows:

"(B)    'Claim' means:

(1)    any written demand for monetary or non-monetary relief;

(2)    any civil proceeding in a court of law or equity, or arbitration;

(3)    any criminal proceeding which is commenced by the return of an indictment, information or similar document;

(4)    a target letter identifying an Insured Person as the subject of a criminal investigation;

(5)    a subpoena issued to an Insured;

(6)    a Wells Notice from the Securities and Exchange Commission or similar state or foreign governmental authority;

(7)    a formal administrative or regulatory proceeding against, or formal investigation of, an Insured which is commenced by the filing or issuance of a notice of charges, formal investigative order or similar document identifying in writing such Insured as a person or entity against whom or which a proceeding as described within or above may be commenced, including any proceeding before the Equal Employment Opportunity Commission or any similar federal, state or local governmental body;

(8)    a written request or agreement for an Insured to toll any applicable statute of limitations;

(9)    any official written request for Extradition of any Insured Person or the execution of a warrant for the arrest of any Insured Person where such execution is an element of Extradition; and

(10)    with respect only to an Insured Person, any informal investigation or inquiry by, or request to appear for an interview from, any federal, state, local or foreign law enforcement or governmental authority or securities exchange; provided, however, that with respect to any Claim as defined in this subparagraph (10), such Claim will be deemed to have been first made only when such Claim is reported in writing to the Insurer and, further, it is understood and agreed that such Claim need not allege any Wrongful Act on the part of such Insured Person in order for the coverage otherwise afforded under this Policy to attach, it being further understood and agreed that the Insuring Agreements of the Coverage Parts comprising this Policy will be deemed to have been amended accordingly."

(2)    Solely for the purposes of this endorsement, the term "Extradition" means any formal process by which an Insured Person located in any country is surrendered to any other country for trial or otherwise to answer any criminal accusation.

© 2011 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

**Mercury 000108**

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2011 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

*Mercury 000109*

| | |
|---|---|
| **Endorsement No.: 8** | **Effective: December 14, 2020** |
| **Named Insured: Mercury Capital Advisors Group LP** | **12:01 A.M. Standard Time** |
| **Policy No.: ELU172207-20** | **Insurer: XL Specialty Insurance Company** |

# AMEND DEFINITION OF PROFESSIONAL SERVICES ENDORSEMENT

In consideration of the premium charged, the term "Professional Services," as defined in Section II Definition (D) of the Coverage Part is amended to read in its entirety as follows:

"(D)    'Professional Services' means:

(1)    financial, economic or investment advice given or investment management services, including but not limited to placement agent services, performed for others for consideration by the Adviser or on behalf of the Adviser by any person or entity;

(2)    the provision of computer and Internet services, administrative services, and publications prepared or written by any Insured, provided such services are performed in connection with the Adviser's financial or investment operations; or

(3)    the selection, oversight and direction by any Insured of any person or entity performing Professional Services on behalf of the Adviser.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Page 1 of 1

© 2014 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

**Mercury 000110**

**FD 80 114 11 04**

| | |
|---|---|
| **Endorsement No.: 9** | **Effective: December 14, 2020** |
| **Named Insured: Mercury Capital Advisors Group LP** | **12:01 A.M. Standard Time** |
| **Policy No.: ELU172207-20** | **Insurer: XL Specialty Insurance Company** |
| **Coverage Part:    Investment Fund Management and Professional Liability** | |

# ADVISORY BOARD MEMBER ENDORSEMENT

In consideration of the premium charged:

(1)    For the purposes of this endorsement, the term "Advisory Board Member" means an individual serving on an advisory board or advisory committee of an Investment Fund, which advisory board or advisory committee was created pursuant to a limited partnership agreement or equivalent documents of such Investment Fund.

(2)    The term "Insured Person," as defined in Section II Definitions of the Coverage Part, is amended to include any Advisory Board Member.

All other terms, conditions and limitations of this Policy shall remain unchanged.

*Mercury 000111*

**FD 80 205 12 06**

**Endorsement No.: 10**
**Named Insured: Mercury Capital Advisors Group LP**
**Policy No.: ELU172207-20**
**Coverage Part: Investment Advisers Management Liability**

**Effective: December 14, 2020**
**12:01 A.M. Standard Time**

**Insurer: XL Specialty Insurance Company**

# AMEND INSURED PERSON ENDORSEMENT

In consideration of the premium charged, the term "Insured Person," as defined in Section II Definitions (D)(1) of the Coverage Part, is amended to include any employee of the Adviser.

All other terms, conditions and limitations of this Policy shall remain unchanged.

FD 80 205 12 06

Page 1 of 1

*Mercury 000112*

**FD 80 425 12 11**

**Endorsement No.: 11**
**Named Insured: Mercury Capital Advisors Group LP**
**Policy No.: ELU172207-20**
**Coverage Part: Employment Practices Liability**

**Effective: December 14, 2020**
**12:01 A.M. Standard Time**

**Insurer: XL Specialty Insurance Company**

# AMEND WRONGFUL ACT DEFINITION ENDORSEMENT

In consideration of the premium charged, the term "Wrongful Act," as defined in Section II Definition (F) of the Coverage Part, shall include any actual or alleged negligent training and supervision by the Company or by any Insured Person in his or her capacity as such.

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2011 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

*Mercury 000113*

FD 80 142 05 05

| | |
|---|---|
| Endorsement No.: 12 | Effective: December 14, 2020 |
| Named Insured: Mercury Capital Advisors Group LP | 12:01 A.M. Standard Time |
| Policy No.: ELU172207-20 | Insurer: XL Specialty Insurance Company |
| Coverage Part: General Terms and Conditions | |

# GENERAL PARTNER LIABILITY ENDORSEMENT

In consideration of the premium charged, in addition to the other Coverage Parts, but still subject to the maximum aggregate Limit of Liability set forth in Item 3(g) of the Declarations applicable to all Loss resulting from all Claims under all Coverage Parts, including this endorsement, the following is added to the Policy:

I.    INSURING AGREEMENTS

(A)    Insurer shall pay on behalf of the General Partners Loss resulting from Claims first made against the General Partners during the Policy Period or, if applicable, the Optional Extension Period, for Wrongful Acts, except for Loss which the Limited Partnership is permitted or required to pay on behalf of the General Partners as indemnification.

(B)    The Insurer shall pay on behalf of the Limited Partnership Loss which the Limited Partnership is required or permitted to pay as indemnification to any of the Insureds resulting from Claims first made against the General Partners during the Policy Period or, if applicable, the Optional Extension Period, for Wrongful Acts.

(C)    The Insurer shall pay on behalf of the Limited Partnership Loss resulting solely from Securities Claims first made against the Limited Partnership during the Policy Period or, if applicable, the Optional Extension Period, for Limited Partnership Wrongful Acts.

II.    DEFINITIONS

(A)    "Change In Control" means:

(1)    the merger or acquisition of the Limited Partnership, or of all or substantially all of its assets by another individual or entity such that the Limited Partnership is not the surviving entity; or

(2)    the appointment of a Receiver, Conservator, Liquidator, Trustee, Rehabilitator, or any comparable authority, with respect to the Limited Partnership; or

(3)    the withdrawal or resignation of all or a majority of the General Partners or the replacement or substitution of all or a majority of the General Partners; or

(4)    with respect to any General Partner of a Limited Partnership which is a corporation, the acquisition of such General Partner or of all or substantially all of its assets by another entity, or the merger or consolidation of the General Partner into or with another entity in which the General Partner is not the surviving entity, or the withdrawal, resignation, replacement or substitution of more than fifty percent (50%) of the directors or officers of such General Partner.

(B)    "Claim" as defined in GENERAL CONDITIONS (B) of the General Terms and Conditions of this Policy, shall be deemed to include, for the purposes of this Endorsement, a formal civil, criminal, or administrative regulatory proceeding or formal investigation of a General Partner or the Limited Partnership (but with respect to the Limited Partnership only for a Limited Partnership Wrongful Act) which is commenced by the filing or issuance of a notice of charges, formal investigative order or similar document identifying in writing such General Partner or Limited Partnership as a person or entity against whom a proceeding as described in (B)(2) or (3) of the General Terms and Conditions of this Policy.

FD 80 142 05 05

*Mercury 000114*

(C)    "General Partner" means any general partner of the Limited Partnership, whether such general partner is an individual, corporation or other entity, and:

    (1)    any past, present or future director or officer of a corporate General Partner but only while such person is acting on behalf of such corporate General Partner with respect to its activities in a fiduciary capacity as a General Partner of the Limited Partnership;

    (2)    any natural person identified in (G)(1) above who, at the specific written request of the Limited Partnership, is serving as a director, officer, trustee, regent or governor of a Non-Profit Entity;

    (3)    the lawful spouse of any person set forth in the above provisions of this definition, but only to the extent the spouse is a party to any Claim solely in his or her capacity as a spouse of such persons and only for the purposes of any Claim seeking damages recoverable from marital community property, property jointly held by any such person and spouse, or property transferred from any such person to the spouse.

In the event of the death, incapacity or bankruptcy of an individual identified in (G)(1), (2) or (3) above, any Claim against the estate, heirs, legal representatives or assigns of such individual for a Wrongful of such individual will be deemed to be a Claim against such individual.

(D)    "Insured" means the General Partners and the Limited Partnership.  Insured also means and any past, present or future employee of the Limited Partnership to the extent any Claim is a Securities Claim.

(E)    "Limited Partnership" means the Limited Partnership(s) scheduled in Endorsement No. 1 of the Policy and any Subsidiary created or acquired on or before the Inception Date set forth in ITEM 2 of the Declarations or during the Policy Period, subject to Condition (A) of this Endorsement.

(F)    "Limited Partnership Wrongful Act" means any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty by the Limited Partnership in connection with a Securities Claim.

(G)    "Non-Profit Entity" means a corporation or organization other than the Limited Partnership, which is exempt from taxation under Section 501(c)(3), (4) and (10) of the Internal Revenue Code as amended or any rule or regulation promulgated thereunder.

(H)    "Securities Claim" means a Claim made against an Insured for:

    (1)    any actual or alleged violation of the Securities Act of 1933 as amended, the Securities Exchange Act of 1934 as amended, any similar federal or state statute or any rules or regulations promulgated thereunder; or

    (2)    any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty arising from or in connection with the purchase or sale of, or offer to purchase or sell any securities issued by the Limited Partnership, whether such purchase, sale or offer involves a transaction with the Limited Partnership or occurs in the open market.

(I)    "Wrongful Act" means any actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duty by any General Partner while acting in his or her capacity as a:

    (1)    General Partner of the Limited Partnership or a person serving in a functionally equivalent role for any Subsidiary; or

    (2)    General Partner of the Limited Partnership who at the specific written request of the Limited Partnership is serving as a director, officer, trustee, regent or governor of a Non-Profit Entity.

*Mercury 000115*

III.    EXCLUSIONS

The Insurer shall not be liable to make any payment for Loss in connection with any Claim made against a General Partner, or with respect to INSURING AGREEMENT (C), the Limited Partnership:

(A)    for any actual or alleged bodily injury, sickness, mental anguish, emotional distress, libel, slander, oral or written publication of defamatory or disparaging material, disease or death of any person, or damage or destruction of any tangible property including loss of use thereof;

(B)    for any actual, alleged or threatened discharge, dispersal, release, escape, seepage, transportation, emission, treatment, removal or disposal of pollutants, contaminants, or waste of any kind including but not limited to nuclear material or nuclear waste or any actual or alleged direction, request or voluntary decision to test for, abate, monitor, clean up, recycle, remove, recondition, reclaim, contain, treat, detoxify or neutralize pollutants, contaminants or waste of any kind including but not limited to nuclear material or nuclear waste.  This EXCLUSION (B) will not apply with respect to a Claim made under INSURING AGREEMENT (A) only, if a court of competent jurisdiction specifically determines the Limited Partnership is not permitted to indemnify the General Partner;

NOTE:  EXCLUSIONS (A) and (B) above will not apply with respect to a Securities Claim brought by a security holder of the Limited Partnership, or a derivative action brought by or on behalf of, or in the name or right of, the Limited Partnership, and brought and maintained independently of, and without the solicitation, assistance, participation or intervention of, an Insured.

(C)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged violation of the Employee Retirement Income Security Act of 1974 (ERISA) as amended or any regulations promulgated thereunder or any similar law, federal, state or local law or regulation;

(D)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any prior and/or pending litigation or administrative or regulatory proceeding or arbitration which was brought prior to the Pending and Prior Litigation Date set forth in ITEM 6 of the Declarations or any fact, circumstance, situation, transaction, event or Wrongful Act or Limited Partnership Wrongful Act underlying or alleged therein;

(E)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or Wrongful Act or Limited Partnership Wrongful Act which, before the Inception Date of this Policy, was the subject of any notice given under any other Management Liability policy, General Partners Liability policy or any policy of which this policy is a renewal or replacement or which it may succeed in time;

(F)    brought about or contributed to in fact by any:

(1)    intentionally dishonest, fraudulent or criminal act or omission or any willful violation of any statute, rule or law; or

(2)    profit or remuneration gained by any Insured to which such Insured is not legally entitled;

as determined by a final adjudication in the underlying action or in a separate action or proceeding;

(G)    by, on behalf of, at the direction of or in the name or right of a General Partner or the Limited Partnership, except and to the extent such Claim:

(1)    is brought derivatively by a security holder or limited partner of the Limited Partnership who, when such Claim is made and maintained, is acting independently of, and without the solicitation, assistance, participation or intervention of a General Partner or the Limited Partnership;

*Mercury 000116*

    (2)    is in the form of a crossclaim, third party claim or other claim for contribution or indemnity by an Insured which is part of or results directly from a Claim which is not otherwise excluded by the terms of this Policy; or

    (3)    is brought by the Bankruptcy Trustee or Examiner of the Limited Partnership or any assignee of such Trustee or Examiner, or any Receiver, Conservator, Rehabilitator, or Liquidator or comparable authority of the Limited Partnership;

(H)    by, on behalf of, at the direction of or in the name or right of any Non-Profit Entity against a General Partner for a Wrongful Act while acting in his or her capacity as a director, officer, trustee, regent or governor of such, or persons occupying elected or appointed positions having fiduciary, supervisory or managerial duties and responsibilities comparable to those of a General Partner of the Limited Partnership, regardless of the name or title by which such position is designated; or

(I)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving an General Partner acting in his or her capacity as a General Partner of any entity other than the Limited Partnership or Non-Profit Entity.

No conduct of any Insured will be imputed to any other Insured (other than the Limited Partnership) to determine the application of any of the above EXCLUSIONS.

## IV.  LIMIT OF LIABILITY, INDEMNIFICATION AND RETENTIONS

(A)    The Insurer's maximum aggregate limit of liability under this Endorsement for all Claims for Wrongful Acts will be $3,000,000, which amount is a part of, and not in addition to, the Insurer's maximum aggregate Limit of Liability set forth in Item 3(g) of the Declarations.

(B)    The Insurer shall pay under this Endorsement the amount of Loss for any Claim for Wrongful Acts in excess of a retention of $300,000 for each such Claim, which amount will be deemed to be the retention set forth in Item 4 of the Declarations with respect to such Claim.

(C)    With respect to the Limited Partnership's indemnification of its General Partners, the partnership agreement, certificate of incorporation, charter, by-laws, articles of association, or other organizational documents of the Limited Partnership, each Subsidiary and each Non-Profit Entity, will be deemed to provide indemnification to the General Partners to the fullest extent permitted by law.

## V.  GENERAL CONDITIONS

(A)    MERGERS AND ACQUISITIONS (CHANGES IN EXPOSURE OR CONTROL)

    (1)    If during the Policy Period, the Limited Partnership acquires any assets, acquires a Subsidiary, or acquires any entity by merger, consolidation or otherwise, or assumes any liability of another entity, coverage shall be provided for any Loss involving a Claim for a Wrongful Act, Limited Partnership Wrongful Act occurring after the consummation of the transaction.

    (2)    If, however, by reason of the transaction (or series of transactions) described in (D)(1) above, the entity, assets, Subsidiary or liabilities so acquired or so assumed exceed thirty five percent (35%) of the total assets or liabilities of the Limited Partnership, as represented in the Limited Partnership's most recent audited consolidated financial statements, coverage under this Policy shall be provided for a period of ninety (90) days for any Loss involving a Claim for a Wrongful Act, Limited Partnership Wrongful Act that occurred after the transaction has been consummated.  Coverage beyond the ninety (90) day period will be provided only if:

        (a)    the Insurer receives written notice containing full details of the transaction(s); and

*Mercury 000117*

(b)    the Insurer at its sole discretion agrees to provide such additional coverage upon such terms, conditions, limitations, and additional premium that it deems appropriate.

(3)    With respect to the acquisition, assumption, merger, consolidation or otherwise of any entity, asset, Subsidiary or liability as described in (D)(1) and (2) above, there will be no coverage available under this Policy for Claims made against the acquired, assumed, merged, or consolidated entity, asset, Subsidiary, liability, or General Partner for a Wrongful Act, Limited Partnership Wrongful Act committed any time during which such entity, asset, liability or Subsidiary is not an Insured.

(4)    If during the Policy Period any entity ceases to be a Subsidiary, the coverage provided under this Policy shall continue to apply to the General Partners who, because of their service with such Subsidiary, were covered under this Policy but only with respect to a Claim for a Wrongful Act, Limited Partnership Wrongful Act that occurred or allegedly occurred prior to the time such Subsidiary ceased to be a Subsidiary of the Limited Partnership.

(5)    If, during the Policy Period, there is a Change In Control, the coverage provided under this Policy shall continue to apply but only with respect to a Claim against an Insured for a Wrongful Act, Limited Partnership Wrongful Act committed or allegedly committed up to the time of the Change In Control; and

(a)    coverage will cease with respect to any Claim for a Wrongful Act, Limited Partnership Wrongful Act committed subsequent to the Change In Control; and

(b)    the entire premium for the Policy will be deemed to be fully earned immediately upon the consummation of a Change In Control.

(B)    SERVICE IN CONNECTION WITH NON-PROFIT ENTITIES

(1)    All coverage under this Policy for Loss from Claims made against the General Partners while acting in their capacity as a director, officer, trustee, regent or governor of a Non-Profit Entity will be specifically excess of and will not contribute with, any other insurance or indemnification available to such General Partner from such Non-Profit Entity by reason of their service as such.

(2)    The certificate of incorporation, charter, articles of association or other organizational documents of each Non-Profit Entity, including bylaws and resolutions, will be deemed to provide indemnification to the General Partners to the fullest extent permitted by law.

(3)    If, during the Policy Period, a General Partner discontinues his or her service with an Non-Profit Entity, coverage under this Endorsement will continue in full force and effect for the General Partner in connection with their service with such Non-Profit Entity, but only with respect to Claims for Wrongful Acts committed before the time the General Partner discontinued serving in such capacity.

All other terms, conditions and limitations of this Policy shall remain unchanged.

*Mercury 000118*

FD 80 06 09 00

**Endorsement No.: 13**
**Named Insured: Mercury Capital Advisors Group LP**
**Policy No.: ELU172207-20**
**Coverage Part**: Investment Fund Management and Professional Liability

**Effective: December 14, 2020**
**12:01 A.M. Standard Time**

**Insurer: XL Specialty Insurance Company**

# SCHEDULE OF INVESTMENT FUND(S)

In consideration of the premium charged, the term "Investment Fund" shall be deemed to include the following Investment Fund(s):

INVESTMENT FUND(S)

Mercury 400 Capital Credit Opportunities Fund

Mercury Calera Capital Partners V Fund

Mercury DAG Special Opportunities Fund

Mercury DSC Thomson Reuters VC/PE Index Partners Fund

Mercury Imperial Companies Fund

Mercury Invictus Opportunities Fund

Mercury Lion Capital Fund IV

Mercury Rialto Real Estate Fund III

Mercury Walton Street Real Estate Fund VIII

Mercury Cube Infrastructure Fund II

Mercury Beachhead Equity Hedge Dynamic Beta Fund

Mercury DSC PE-VC Index Fund

Mercury Efficient US Fund

Mercury MidOcean TEF

Mercury Mariner Partners Fund

Mercury Bain Capital Double Impact Fund

Mercury Teewinot Vista Fund

Mercury Pembrook Cummunity Investors LLC Fund

Mercury Windham Risk Premium Fund LP

Mercury Solariant Renewable Energy Fund I

Mercury Highland Argentina Regional Opportunity Fund

Mercury Wilshire Private Income Fund

Mercury Wilshire Private Markets Private Income Fund

Mercury Sandalwood Fund

All other terms, conditions and limitations of this Policy shall remain unchanged.

*Mercury 000119*

FINANCIAL SERVICES LIABILITY POLICY
**FD 71 04 09 00**

# GENERAL TERMS AND CONDITIONS

THIS IS A CLAIMS MADE POLICY WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY. PLEASE READ AND REVIEW THE POLICY CAREFULLY. THESE GENERAL TERMS AND CONDITIONS APPLY TO ALL APPLICABLE COVERAGE PARTS. IF THERE IS A CONFLICT BETWEEN THESE GENERAL TERMS AND CONDITIONS AND THE TERMS AND CONDITIONS OF ANY APPLICABLE COVERAGE PART, THE TERMS AND CONDITIONS OF THE APPLICABLE COVERAGE PART SHALL APPLY. THE PROVISIONS OF EACH COVERAGE PART SHALL APPLY ONLY TO THAT PARTICULAR COVERAGE PART AND SHALL IN NO WAY BE CONSTRUED TO APPLY TO ANY OTHER COVERAGE PART OF THIS POLICY.

In consideration of the payment of the premium, and in reliance on all statements made and information furnished to the Company identified in the Declarations (hereinafter the Insurer), including the Application, and subject to all of the terms, conditions and limitations of all of the provisions of this Policy, the Insurer and the Insureds agree as follows:

I.      **GENERAL DEFINITIONS**

(A)      "**Application**" means:

(1)      the **Application** attached to and forming part of this Policy; and

(2)      any materials submitted therewith, which shall be retained on file by the Insurer and shall be deemed to be physically attached to this Policy.

(B)      "**Claim**" means:

(1)      any written notice received by an **Insured** that any person or entity intends to hold any **Insured** responsible for a **Wrongful Act**;

(2)      any civil proceeding in a court of law or equity, or arbitration; or

(3)      any criminal proceeding which is commenced by the return of an indictment.

(C)      "**Defense Expenses**" means reasonable legal fees and expenses incurred in the defense of any **Claim** including the premium for an appeal bond, attachment bond or similar bond but will not include applying for or furnishing such bond. **Defense Expenses** will not include any **Insured's** overhead expenses or any salaries, wages, fees, or benefits of its directors, officers, trustees or employees.

(D)      "**Insured**" shall have the meaning given to that term in each Coverage Part attached hereto.

(E)      "**Insured Person**" shall have the meaning given to that term in each Coverage Part attached hereto.

(F)      "**Interrelated Wrongful Acts**" means **Wrongful Acts** which are based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any of the same or related or series of related facts, circumstances, situations, transactions or events.

(G)      "**Loss**" means damages, judgments, settlements or other amounts (including punitive or exemplary damages where insurable by law) in excess of the Retention that the **Insured** is obligated to pay, and **Defense Expenses**, whether incurred by the Insurer or the **Insured**, in excess of the Retention. **Loss** will not include:

(1)      the multiplied portion of any damage award;

**Mercury 000120**

**FINANCIAL SERVICES LIABILITY POLICY**
**FD 71 04 09 00**

(2)     matters which are uninsurable under the law pursuant to which this Policy is construed; and

(3)     fines, penalties or taxes imposed by law.

**NOTE**: With respect to judgments in which punitive damages are awarded, the coverage provided by this Policy shall apply to the broadest extent permitted by law.  If, based on the written opinion of counsel for the **Insured**, punitive damages are insurable under applicable law the Insurer will not dispute the written opinion of counsel for the **Insured**.

(H)     "**Named Insured**" means the entity named in ITEM 1 of the Declarations.

(I)     "**Policy Period**" means the period from the Inception Date to the Expiration Date set forth in ITEM 2 of the Declarations or to any earlier cancellation date.

(J)     "**Subsidiary**" means any entity during any time in which the **Named Insured** owns, directly or through one or more **Subsidiary(ies)**, more than fifty percent (50%) of the outstanding securities representing the present right to vote for the election of such entity's directors.

(K)     "**Wrongful Act**" shall have the meaning given to that term in each Coverage Part attached hereto.

## II.    GENERAL CONDITIONS

(A)     **LIMIT OF LIABILITY, RETENTIONS AND INDEMNIFICATION**

(1)     The amounts set forth in ITEM 3(a) – 3(f) of the Declarations as the Maximum Aggregate Limit of Liability for each Coverage Part shall be the Maximum Aggregate Limit of Liability of the Insurer under such Coverage Part for all **Loss**, including **Defense Expenses**, from all **Claims** made or deemed made under such Coverage Part during the **Policy Period**.  Each such amount shall be part of, and not in addition to, the amount set forth in ITEM 3(g) of the Declarations as the Maximum Aggregate Limit of Liability under the Policy for all **Loss** from all **Claims** for which this Policy provides coverage.

(2)     **Defense Expenses** incurred by the Insurer or by the **Insured** in defense of a **Claim** will be part of and not in addition to the Insurer's Limits of Liability, and payment of **Defense Expenses** by the Insurer will reduce and may exhaust the Limits of Liability.

(3)     If coverage is available for a **Claim** under more than one Coverage Part, the maximum applicable Limit of Liability for such **Claim** shall be the largest applicable remaining Limit of Liability under only one of the applicable Coverage Parts.

(4)     With respect to a **Claim** under any Coverage Part attached hereto, the Insurer shall only pay **Loss** which is in excess of the amount set forth in ITEM 4 of the Declarations as the Retention applicable to each **Claim** under the applicable Coverage Part.  If different Retentions are applicable to different parts of any **Loss** under this Policy, the applicable Retention will be applied separately to each part of such **Loss**, and the sum of such Retentions will not exceed the largest applicable Retention set forth in ITEM 4 of the Declarations.

(5)     The certificate of incorporation, charter, articles of association or other organizational documents of any **Insured** that is organized as a Corporation, Limited Liability Company, Limited Partnership, Investment Company or Trust, including bylaws and resolutions, will be deemed to provide indemnification to the **Insured Persons** to the fullest extent permitted by law.

(B)     **DEFENSE, SETTLEMENT AND ALLOCATION OF LOSS**

(1)     It shall be the duty of the **Insureds** to defend any **Claim** under this Policy.

**FINANCIAL SERVICES LIABILITY POLICY**
**FD 71 04 09 00**

(2)  No **Insured** may incur any **Defense Expenses** or admit any liability for, make any settlement offer with respect to, or settle any **Claim** without the Insurer's consent, such consent not to be unreasonably withheld. The Insurer will have the right to make investigations and conduct negotiations and, with the consent of the **Insured**, enter into such settlement of any **Claim** as the Insurer deems appropriate.

(3)  Notwithstanding GENERAL CONDITIONS (B)(2) above, the **Insured** may settle any **Claim** without the Insurer's prior written consent if the total **Loss**, including **Defense Expenses**, resulting from such **Claim** does not exceed fifty percent (50%) of the amount of the applicable Retention set forth in ITEM 4 of the Declarations; provided, however, the **Insured** must promptly advise the Insurer of any such settlement and provide any information in connection therewith that the Insurer may request. If the **Insured** reasonably expects that the total **Loss**, including **Defense Expenses**, resulting from any **Claim** will exceed fifty percent (50%) of the applicable retention, the Insurer shall have the right to participate in any settlement negotiations, and the **Insured** agrees to obtain the consent of the Insurer prior to making any settlement offer or responding to any settlement demand.

(4)  If both **Loss** covered by this Policy and loss not covered by this Policy are incurred, either because a **Claim** made against the **Insured** contains both covered and uncovered matters, or because a **Claim** is made against both the **Insured** and others not insured under this Policy, the **Insured** and the Insurer will use their best efforts to determine a fair and appropriate allocation of **Loss** between that portion of **Loss** that is covered under this Policy and that portion of loss that is not covered under this Policy. Additionally, the **Insured** and the Insurer agree that in determining a fair and appropriate allocation of **Loss**, the parties will take into account the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and/or settlement of the **Claim** by, the **Insured** and others.

(5)  In the event that an agreement cannot be reached between the Insurer and the **Insured** as to an allocation of **Loss**, as described in GENERAL CONDITIONS (B)(4), the Insurer shall advance that portion of **Loss** which the **Insured** and the Insurer agree is not in dispute until a final amount is agreed upon or determined pursuant to the provisions of this Policy and applicable law.

(C)  **NOTICE**

(1)  As a condition precedent to any right to payment under this Policy, the **Insured** shall give written notice to the Insurer of any **Claim** as soon as practicable after it is first made.

(2)  If, during the **Policy Period**, the **Insured** first becomes aware of a specific **Wrongful Act**, and if, during the **Policy Period**, the **Insured**:

(a)  provides the Insurer with written notice of the specific **Wrongful Act**, the consequences which have resulted or may result therefrom (including but not limited to actual or potential damages), the identities of the potential claimants, and the circumstances by which the **Insured** first became aware of such **Wrongful Act**; and

(b)  requests coverage under this Policy for any subsequently resulting **Claim** for such **Wrongful Act**;

then any **Claim** subsequently made arising out of such **Wrongful Act** will be treated as if it had been first made during the **Policy Period**.

(3)  All notices under GENERAL CONDITIONS (C)(1) and (2) must be sent by certified mail or the equivalent to the address set forth in ITEM 7 of the Declarations; Attention: Claim Department.

(D)  **INTERRELATED CLAIMS**

**FINANCIAL SERVICES LIABILITY POLICY**
**FD 71 04 09 00**

All **Claims** arising from **Interrelated Wrongful Acts** shall be deemed to constitute a single **Claim** and shall be deemed to have been made at the earliest time at which the earliest such **Claim** is made or deemed to have been made pursuant to GENERAL CONDITIONS (C)(1) or, if applicable, GENERAL CONDITIONS (C)(2).

(E)    **OTHER INSURANCE**

All **Loss** payable under this Policy will be specifically excess of, and will not contribute with, any other insurance, including but not limited to any insurance under which there is a duty to defend, unless such other insurance is specifically excess of this Policy.  This Policy will not be subject to the terms of any other insurance policy.

(F)    **CANCELLATION AND RENEWAL OF COVERAGE**

(1)    Except for the nonpayment of premium, as set forth in (F)(2) below, the **Named Insured** has the exclusive right to cancel this Policy.  Cancellation may be effected by mailing to the Insurer written notice when such cancellation shall be effective, provided the date of cancellation is not later than the Policy Expiration Date set forth in ITEM 2 of the Declarations.  In such event, the Insurer shall retain the customary short rate portion of the earned premium.  Return or tender of the unearned premium is not a condition of cancellation.

(2)    The Insurer may only cancel this Policy for nonpayment of premium.  The Insurer will provide not less than ten (10) days written notice stating when the Policy will be cancelled.  Notice of cancellation will be sent to the **Named Insured** and the agent of record for the **Insured**, if applicable.

(3)    The Insurer is under no obligation to renew this Policy upon its expiration.  Once the Insurer chooses to non-renew this Policy, the Insurer will deliver or mail to the **Named Insured** written notice stating such at least sixty (60) days before the Policy Expiration Date set forth in ITEM 2 of the Declarations.

(G)    **OPTIONAL EXTENSION PERIOD**

(1)    If either the **Named Insured** or the Insurer does not renew this Policy, the **Named Insured** shall have the right, upon payment of an additional premium set forth in ITEM 5 of the Declarations, to a one or two year extension of the coverage provided by this Policy with respect only to any **Claim** first made during the one or two year period of time after the Policy Expiration Date, but only with respect to **Wrongful Acts** occurring prior to the Policy Expiration Date.

(2)    As a condition precedent to the right to purchase the Optional Extension Period the total premium for this Policy must have been paid in full.  The right of the **Named Insured** to purchase the Optional Extension Period will be immediately terminated if the Insurer does not receive written notice by the **Named Insured** advising it wishes to purchase the Optional Extension Period together with full payment of the premium for the Optional Extension Period within thirty (30) days after the Policy Expiration Date.

(3)    If the **Named Insured** elects to purchase the Optional Extension Period as set forth in (G)(1) and (2) above, the entire premium for the Optional Extension Period will be deemed to be fully earned at the Inception Date of the Optional Extension Period.

(4)    The purchase of the Optional Extension Period will not in any way increase the Limits of Liability set forth in ITEM 3 of the Declarations, and the Limits of Liability with respect to **Claims** made during the Optional Extension Period shall be part of and not in addition to all applicable Limits of Liability for **Claims** made during the **Policy Period**.

(H)    **SPOUSES, ESTATES AND LEGAL REPRESENTATIVES OF INSURED PERSONS**

The coverage afforded under this Policy shall, subject to all of its terms, conditions and exclusions, extend to:

*Mercury 000123*

**FINANCIAL SERVICES LIABILITY POLICY**
**FD 71 04 09 00**

(1)    the lawful spouse of any **Insured Person**; provided however, that this GENERAL CONDITION (H)(1) will apply only:

    (a)    to the extent that the spouse is a party to any **Claim** solely in his or her capacity as a spouse of such **Insured Person**; and

    (b)    for the purposes of any **Claim** seeking damages recoverable from marital community property, property jointly held by such **Insured Person** and spouse, or property transferred from such **Insured Person** to the spouse.

(2)    the estate, heirs, legal representatives or assigns of any **Insured Person** or assigns of any **Insured Person** who is deceased, or against the legal representatives or assigns of any **Insured Person** who is incompetent, insolvent or bankrupt.

(I)    **ASSISTANCE, COOPERATION AND SUBROGATION**

(1)    The **Insured** agrees to provide the Insurer with all information, assistance and cooperation that the Insurer may reasonably request, and  further agrees that it will do nothing which in any way increases the Insurer's exposure under this Policy or in any way prejudices the Insurer's potential or actual rights of recovery.

(2)    In the event of any payment under this Policy, the Insurer shall be subrogated to all of the potential or actual rights of recovery of the **Insured**.  The **Insured** shall execute all papers required and will do everything necessary to secure such rights including but not limited to the execution of such documents as are necessary to enable the Insurer to effectively bring suit in their name, and will provide all other assistance and cooperation which the Insurer may reasonably require.

(J)    **EXHAUSTION**

If the Insurer's Limit of Liability for the Policy, as set forth in ITEM 3(g) of the Declarations, is exhausted by the payment of **Loss**, the premium as set forth in ITEM 8 of the Declarations will be fully earned, all obligations of the Insurer under this Policy will be completely fulfilled and exhausted, and the Insurer will have no further obligations of any kind whatsoever under this Policy.  If the Insurer's Limit of Liability for any Coverage Part, as set forth in ITEM 3(a) – (f) of the Declarations, is exhausted by the payment of **Loss**, all obligations of the Insurer under that Coverage Part will be completely fulfilled and exhausted, and the Insurer will have no further obligations of any kind whatsoever under that Coverage Part.

(K)    **WARRANTY**

The **Insured** represents that the statements and particulars contained in the **Application** are true, accurate and complete, and agrees that this Policy is issued in reliance on the truth of that representation, and that such particulars and statements, which are deemed to be incorporated into and constitute a part of this Policy, are the basis of this Policy.  No knowledge or information possessed by any **Insured** will be imputed to any other **Insured**.  In the event that any of the particulars or statements in the **Application** are untrue, this Policy will be void with respect to any **Insured** who knew of such untruth or to whom such knowledge is imputed.

(L)    **ACTION AGAINST THE INSURER, ASSIGNMENT, AND CHANGES TO THE POLICY**

(1)    No action may be taken against the Insurer unless, as a condition precedent thereto:

    (a)    there has been full compliance with all of the terms and conditions of this Policy; and

    (b)    the amount of the obligation of the **Insured** has been finally determined either by judgment against the **Insured** after actual trial, or by written agreement of the **Insured**, the claimant and the Insurer.

*Mercury 000124*

(2)    Nothing contained herein shall give any person or entity any right to join the Insurer as a party to any **Claim** against the **Insured** to determine its liability, nor may the **Insured** implead the Insurer in any **Claim**.

(3)    Assignment of interest under this Policy shall not bind the Insurer unless its consent is endorsed hereon.

(4)    Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Insurer will not cause a waiver or change in any part of this Policy or prevent the Insurer from asserting any right under the terms, conditions and limitations of this Policy.  The terms, conditions and limitations of this Policy may only be waived or changed by written endorsement signed by the Insurer.

(M)    **AUTHORIZATION AND NOTICES**

It is understood and agreed that the **Named Insured** will act on behalf of the **Insureds** with respect to:

(1)    the payment of the premiums,

(2)    the receiving of any return premiums that may become due under this Policy,

(3)    the giving of all notices to the Insurer as provided herein, and

(4)    the receiving of all notices from the Insurer.

(N)    **ENTIRE AGREEMENT**

The **Insured** agrees that the Declarations, Policy, including the endorsements, attachments and the **Application** shall constitute the entire agreement between the Insurer or any of its agents and the **Insured** relating to this insurance.

*Mercury 000125*

**FINANCIAL SERVICES LIABILITY POLICY**
**FD 71 00 09 00**

# INVESTMENT ADVISERS MANAGEMENT LIABILITY COVERAGE PART

**THIS IS A CLAIMS MADE COVERAGE PART WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY.  PLEASE READ AND REVIEW THE POLICY CAREFULLY.**

**In consideration of the payment of the premium, and in reliance on all statements made and information furnished to the Company identified in the Declarations (hereinafter the Insurer), including the Application, and subject to all of the terms, conditions and limitations of all of the provisions of this Policy, the Insurer and the Insureds agree as follows:**

## I.    INSURING AGREEMENTS

(A)    The Insurer shall pay on behalf of the **Insured Persons Loss** resulting from **Claims** first made against the **Insured Persons** during the **Policy Period** or, if applicable, the Optional Extension Period, for **Wrongful Acts**, except for **Loss** which the **Adviser** is permitted or required to pay on behalf of the **Insured Persons** as indemnification.

(B)    The Insurer shall pay on behalf of the **Adviser Loss** which the **Adviser** is required or is permitted to pay as indemnification to:

(1)    the **Insured Persons** resulting from **Claims** first made against the **Insured Persons**; or

(2)    the **Adviser** resulting from **Claims** first made against the **Adviser**;

during the **Policy Period** for **Wrongful Acts**.

## II.    DEFINITIONS

(A)    "**Adviser**" means the **Named Insured** and any **Subsidiary** created or acquired on or before the Inception Date set forth in ITEM 2 of the Declarations or, subject to CONDITION (A) of this Coverage Part, during the **Policy Period**.

(B)    "**Claim**," as defined in GENERAL DEFINITIONS (B), shall be deemed to include, for purposes of this Coverage Part, a formal civil, criminal, administrative, or regulatory investigation of an **Insured** which is commenced by the filing or issuance of notice of charges, formal investigative order or similar document identifying such **Insured** as a person or entity against whom a proceeding as described in GENERAL DEFINITIONS  (B)(2) or (3) may be commenced.

(C)    "**Insured**" means the **Insured Persons** and the **Adviser**.

(D)    "**Insured Person**" means:

(1)    any past, present or future director, officer, or member of the Board of Managers of the **Adviser**;

(2)    those persons serving in a functionally equivalent role for the **Named Insured** or any **Subsidiary** operating or incorporated outside the United States; and

(3)    an individual identified in (D)(1) or (2) above who, at the specific written request of the **Adviser**, is serving as a director, officer, trustee, regent or governor of a **Non-Profit Entity**;

*Mercury 000126*

FINANCIAL SERVICES LIABILITY POLICY
**FD 71 00 09 00**

In the event of the death, incapacity or bankruptcy of an individual identified in (D)(1), (2) or (3) above, any **Claim** against the estate, heirs, legal representatives or assigns of such individual for a **Wrongful Act** of such individual will be deemed to be a **Claim** against such individual.

(E)   "**Non-Profit Entity**" means a corporation or organization, other than the **Adviser**, which is exempt from taxation under Section 501(c)(3), (4) or (10) of the Internal Revenue Code as amended or any rule or regulation promulgated thereunder.

(F)   "**Wrongful Act**" means:

   (1)   with respect to any **Insured Person** of the **Adviser**, any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty but solely by reason of his or her status as such; and

   (2)   with respect to the **Adviser**, any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty by the **Adviser**.


## III.   EXCLUSIONS

The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured**:

(A)   brought about or contributed to in fact by any:

   (1)   intentionally dishonest, fraudulent or criminal act or omission or any willful violation of any statute, rule or law; or

   (2)   profit or remuneration gained by any **Insured** to which such **Insured** is not legally entitled;

   as determined by a final adjudication in the underlying action or in a separate action or proceeding. Each **Insured** agrees that, if the Insurer has no liability to an **Insured** for **Loss** as a result of a **Claim** by reason of this EXCLUSION (A), such **Insured** will repay the Insurer upon demand all **Loss** paid on behalf of such **Insured** in connection with such **Claim**;

(B)   based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **Wrongful Act** which, before the Inception Date of this Policy, was the subject of any notice given under any other policy of insurance;

(C)   for any actual or alleged bodily injury, sickness, mental anguish, emotional distress, libel, slander, oral or written publication of defamatory or disparaging material, disease or death of any person, or damage or destruction of any tangible property including loss of use thereof;

(D)   based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual, alleged or threatened discharge, dispersal, release, escape, seepage, transportation, emission, treatment, removal or disposal of pollutants, contaminants, or waste of any kind including but not limited to nuclear material or nuclear waste or any actual or alleged direction, request or voluntary decision to test for, abate, monitor, clean up, recycle, remove, recondition, reclaim, contain, treat, detoxify or neutralize pollutants, contaminants or waste of any kind including but not limited to nuclear material or nuclear waste;

(E)   based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **Wrongful Act** underlying or alleged in any prior and/or pending litigation or administrative or regulatory proceeding which incepted prior to the Pending And Prior Proceeding Date set forth in ITEM 6(a) of the Declarations;

(F)   brought by, or on behalf of, or at the direction of any **Insured**, except and to the extent such **Claim**:

*Mercury 000127*

**FINANCIAL SERVICES LIABILITY POLICY**
**FD 71 00 09 00**

(1)     is brought derivatively by a security holder of the **Adviser** who, when such **Claim** is made and maintained, is acting independently of, and without the solicitation, assistance, participation or intervention of any **Insured**;

(2)     is brought by the Bankruptcy Trustee or Examiner of the Company or any assignee of such Trustee or Examiner, or any Receiver, Conservator, Rehabilitator, or Liquidator or comparable authority of the **Adviser**;

(3)     is brought in the form of a crossclaim, third party claim or other claim for contribution or indemnity by an **Insured Person** which is part of or results directly from a **Claim** which is not otherwise excluded by the terms of this Policy; or

(4)     is brought for the actual or alleged wrongful termination of an **Insured Person**.

(G)     for any actual or alleged liability of the **Adviser** under any express contract or agreement; however, this EXCLUSION (G) will apply only to the coverage available to the **Adviser** under INSURING AGREEMENT (B)(2).  With respect to this EXCLUSION (G), an "express contract or agreement" is defined as an actual agreement of the parties, the terms of which are openly set forth or declared at the time of making in clear or distinct language;

(H)     based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving an **Insured Person** acting in his or her capacity as a director, officer, partner, principal, member, trustee or employee of any entity other than the **Adviser**;

(I)     for any actual or alleged violation of the Securities Act of 1933, the Securities Exchange Act of 1934 or any rule or regulation promulgated thereunder in connection with the offering, sale or purchase of securities of the **Adviser**; however, this EXCLUSION (I) shall not apply to any **Claim** arising out of the offering, sale or purchase of securities, whether debt or equity, in a transaction that is exempt from registration under the Securities Act of 1933;

(J)     based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged violation of the Employee Retirement Income Security Act of 1974 (ERISA), as amended, or any regulation promulgated thereunder or any similar, federal, state or local law or regulation;

(K)     by, on behalf of, at the direction of or in the name or right of any **Non-Profit Entity** against an **Insured Person** for a **Wrongful Act** while acting in his or her capacity as a director, officer, trustee, regent or governor of such **Non-Profit Entity**; or

(L)     for any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty in connection with the **Insured's** rendering, or actual or alleged failure to render, services for others; however, this EXCLUSION (L) will not apply to any **Claim** brought by a security holder of the **Adviser** solely in their capacity as a security holder of the **Adviser**.

No conduct of any **Insured Person** will be imputed to any other **Insured Person** to determine the application of any of the above EXCLUSIONS.

## IV.     CONDITIONS

(A)     MERGERS AND ACQUISITIONS (CHANGES IN EXPOSURE OR CONTROL):

(1)     If, during the **Policy Period**, the **Adviser** acquires any assets, acquires a **Subsidiary**, or acquires any entity by merger (each an "Acquired Entity") such that the **Adviser** is the surviving entity (a "Transaction"):

*Mercury 000128*

      (a)      there will be coverage available under this Coverage Part for any **Claim** made against the Acquired Entity and its directors, officers, or members of the Board of Managers for any **Wrongful Act** committed or allegedly committed after the effective date of the Transaction for a period of ninety (90) days after the effective date of the Transaction (not to exceed the Policy Expiration Date);

      (b)      there will be no coverage available under this Coverage Part for any **Claim** made against the Acquired Entity or any of its directors, officers, or members of the Board of Managers for any **Wrongful Act** committed or allegedly committed after the effective date of the Transaction beyond the ninety (90) day period, unless:

           (i)      any of the gross annual fees, assets under management or assets of the Acquired Entity are less than thirty-five percent (35%) of the gross annual fees, assets under management or assets, respectively, of the **Adviser** at the time immediately preceding the Transaction; and

           (ii)      the **Named Insured** gives the Insurer written notice, with full details, of the Transaction within the ninety (90) day period;

      (c)      there will be no coverage available under this Coverage Part for any **Claim** made against the Acquired Entity or any of its directors, officers, or members of the Board of Managers for any **Wrongful Acts** committed or allegedly committed before the effective date of the Transaction.

(2)      If, during the **Policy Period**, any of the following events occurs:

      (a)      the merger or acquisition of the **Adviser**, or of all or substantially all of its assets by another entity such that that the **Adviser** is not the surviving entity;

      (b)      the acquisition by any person, entity or affiliated group of persons or entities of the right to vote for, select or appoint more than fifty percent (50%) of the directors, trustees, or members of the Board of Managers of the **Adviser**; or

      (c)      the appointment of a Receiver, Conservator, Liquidator, Trustee, Rehabilitator, or any comparable authority, with respect to the **Adviser**;

coverage under this Coverage Part will continue in full force and effect with respect to **Claims** for **Wrongful Acts** committed before such event, but coverage will cease with respect to any **Claims** for **Wrongful Acts** committed after such event.  Immediately upon the consummation of any such event the entire premium for this Coverage Part will be deemed fully earned.

(3)      If, during the **Policy Period**, any entity ceases to be a **Subsidiary**, the coverage provided under this Coverage Part shall continue to apply to the **Insureds** that were covered under this Coverage Part but only with respect to a **Claim** for a **Wrongful Act** that occurred or allegedly occurred prior to the time such **Subsidiary** ceased to be a **Subsidiary** of the **Named Insured**.

.

*Mercury 000129*

# INVESTMENT ADVISERS PROFESSIONAL LIABILITY COVERAGE PART

**THIS IS A CLAIMS MADE COVERAGE PART WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY.  PLEASE READ AND REVIEW THE POLICY CAREFULLY.**

**In consideration of the payment of the premium, and in reliance on all statements made and information furnished to the Company identified in the Declarations (hereinafter the Insurer), including the Application, and subject to all of the terms, conditions and limitations of all of the provisions of this Policy, the Insurer and the Insureds agree as follows:**

## I.    INSURING AGREEMENT

The Insurer shall pay on behalf of the **Insureds Loss** resulting from **Claims** first made against the **Insureds** during the **Policy Period** or, if applicable, the Optional Extension Period, for **Wrongful Acts**.

## II.    DEFINITIONS:

(A)    "**Adviser**" means the **Named Insured** and any **Subsidiary** created or acquired on or before the Inception Date set forth in ITEM 2 of the Declarations or, subject to CONDITION (A) of this Coverage Part, during the **Policy Period**.

(B)    "**Insured**" means the **Insured Persons** and the **Adviser**.

(C)    "**Insured Person**" means any past, present or future director, officer, partner, principal, member, trustee or employee of the **Adviser**.

(D)    "**Professional Services**" means:

   (1)    financial, economic or investment advice given or investment management services performed for others for a fee or commission by the **Adviser** or on behalf of the **Adviser** by any person or entity;

   (2)    the provision of computer and Internet services, administrative services, and publications prepared or written by any **Insured**, provided such services are performed in connection with the **Adviser's** financial or investment operations; or

   (3)    the selection, oversight and direction by any **Insured** of any person or entity performing **Professional Services** on behalf of the **Adviser**.

(E)    "**Wrongful Act**" means:

   (1)    any actual or alleged act, error, omission, misstatement, misleading statement or breach of fiduciary duty or other duty committed by any **Insured** in the performance of, or failure to perform, **Professional Services**; and

   (2)    any actual or alleged libel, slander, or oral or written publication of defamatory or disparaging material committed by any **Insured** in the performance of **Professional Services**.

## III.    EXCLUSIONS

*Mercury 000130*

**FINANCIAL SERVICES LIABILITY POLICY**
**FD 71 01 09 00**

The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured**:

(A)      brought about or contributed to in fact by any:

      (1)     intentionally dishonest, fraudulent or criminal act or omission or any willful violation of any statute, rule or law; or

      (2)     profit or remuneration gained by any **Insured** to which such **Insured** is not legally entitled;

      as determined by a final adjudication in the underlying action or in a separate action or proceeding.  Each **Insured** agrees that, if the Insurer has no liability to an **Insured** for **Loss** as a result of a **Claim** by reason of this EXCLUSION (A), such **Insured** will repay the Insurer upon demand all **Loss** paid on behalf of such **Insured** in connection with such **Claim**;

(B)      based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **Wrongful Act** which, before the Inception Date of this Policy, was the subject of any notice given under any other policy of insurance;

(C)      for any actual or alleged bodily injury, sickness, mental anguish, emotional distress, libel, slander, invasion of privacy, malicious use or abuse of process, malicious prosecution, wrongful entry or eviction, false arrest, false imprisonment, assault, battery, oral or written publication of defamatory or disparaging material, disease or death of any person, or damage or destruction of any tangible property including loss of use thereof; however, this EXCLUSION (C) will not apply to any:

      (1)     alleged mental anguish or emotional distress to the extent that they arise from an **Insured's** performance of **Professional Services**;

      (2)     actual or alleged libel, slander, oral or written publication of defamatory or disparaging material committed by an **Insured** in the performance of **Professional Services**; or

      (3)     **Claim** arising from damage to, destruction of, or loss of use of, client records in an **Insured's** possession.

(D)      based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual, alleged or threatened discharge, dispersal, release, escape, seepage, transportation, emission, treatment, removal or disposal of pollutants, contaminants, or waste of any kind including but not limited to nuclear material or nuclear waste or any actual or alleged direction, request or voluntary decision to test for, abate, monitor, clean up, recycle, remove, recondition, reclaim, contain, treat, detoxify or neutralize pollutants, contaminants or waste of any kind including but not limited to nuclear material or nuclear waste;

(E)      based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **Wrongful Act** underlying or alleged in any prior and/or pending litigation or administrative or regulatory proceeding which incepted prior to the Pending And Prior Proceeding Date set forth in ITEM 6(b) of the Declarations;

(F)      brought by, or on behalf of, or at the direction of any **Insured**, except and to the extent such **Claim** is brought:

      (1)     in the form of a crossclaim, third party claim or other claim for contribution or indemnity by an **Insured Person** which is part of or results directly from a **Claim** which is not otherwise excluded by the terms of this Policy;

      (2)     by an **Insured Person**, solely in his or her capacity as a client or customer of the **Adviser**; or

      (3)     by an **Insured** with respect to which failure to make such **Claim** would result in liability to the **Insured** for failure to do so;

*Mercury 000131*